**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| MAXIM CRUDE OIL, LLC | § | |
|     Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | Civil Cause No. 2:21-cv-90 |
| NOIL CORP., INC. and | § | |
| MORRELL STEVE NEELY | § | |
| | § | |
|     Defendants | § | |

**<u>DEFENDANTS' NOTICE OF REMOVAL</u>**

**TO:   THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, CORPUS CHRISTI DIVISION**

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants Noil Corp., Inc. and Morrell Steve Neely ("Defendants") hereby give notice of removal of the action captioned *Maxim Crude Oil, LLC v. Noil Corp., Inc. and Morrell Steve Neely,* Cause No. 2021DCV-1521-A, now pending in the District Court of Nueces County, Texas, 28th Judicial District, to the United States District Court for the Southern District of Texas, Corpus Christi Division.  As grounds for removal, Defendants respectfully state the following in accordance with the requirement of 28 U.S.C. § 1446(a) for a "short and plain statement of the grounds for removal."

**Background and Procedural Requirements**

1.     On or about April 23, 2021, Plaintiff Maxim Crude Oil, LLC ("Plaintiff" or "Maxim") filed the Original Petition in this action.  Pursuant to 28 U.S.C. § 1446(a) and Local Rule 81, true and correct copies of the Original Petition and the documents required by Local Rule 81 are attached hereto as Exhibit A-Tabs 1-4.[1]

---

[1] Because there has been no executed service of process, no executed process has been attached.

2.      Pursuant to 28 U.S.C. § 1446, removal to the United States District Court for the Southern District of Texas, Corpus Christi Division is appropriate because the state court action is pending in the Nueces County District Court in Corpus Christi, Texas, thus making this Court "the district and division within which such action is pending." 28 U.S.C. § 1446(a).

3.      This Notice of Removal is filed within thirty (30) days of the filing of the Original Petition and Defendant's receipt of the Citation and the Petition. *See* 28 U.S.C. § 1446(b).

4.      This Notice of Removal is on behalf of all of the Defendants.  Therefore, no Defendant has indicated objection to this Removal.

5.      This Court has jurisdiction over this action under the diversity of citizenship provisions in 28 U.S.C § 1441 and 28 U.S.C. § 1332.  As an initial matter, no Defendant is a citizen of the State of Texas.  *See* 28 U.S.C. § 1441(b)(2).

**Complete Diversity of Citizenship Confers Federal Jurisdiction**

6.      Removal of the State Court Action is proper under 28 U.S.C. § 1332 and 1441 because the amount in controversy, exclusive of costs and interest, exceeds $75,000 and the action is between citizens of different states.  Plaintiff Maxim purports to be a citizen of the State of Texas while neither Neely nor Noil are citizens of the State of Texas.

7.      Defendant will promptly file with the Clerk for the District Court of Travis County, Texas, a "Notice of Filing of Notice of Removal," attached hereto as Exhibit A-Tab 5.

WHEREFORE, Defendant removes this action, previously commenced in the District Court of Nueces County, Texas, 28th Judicial District, to the United States District Court for the Southern District of Texas, Corpus Christi Division.

Dated this 3rd day of May, 2021.

OF COUNSEL:                          Respectfully submitted,


                                    /s/ Matthew R. Beatty
Marty J. Schwartz                   Matthew R. Beatty
IL State Bar                        State Bar No. 24001169
mschwartz@schainbanks.com           mbeatty@bnsfirm.com
Schain Banks                        Michael L. Navarre
Three First National Plaza          State Bar No.  00792711
70 W. Madison Street, Suite 5300    mnavarre@bnsfirm.com
Chicago, IL 60602                   Beatty Navarre Strama, PC
(312) 345-5700 Telephone            901 S. MoPac Expy.
(312) 345-5701 Facsimile            Building 1, Suite 200
                                    Austin, Texas 78746
                                    (512) 879-5050 Telephone
                                    (512) 879-5040 Facsimile

                                    **ATTORNEYS FOR DEFENDANTS
                                    NOIL CORP., INC. AND
                                    MORRELL STEVE NEELY**


## CERTIFICATE OF SERVICE

I certify that on this the 3rd day of May, 2021, I served a true and correct copy of the foregoing instrument on the counsel of record below by CM/ECF and by email as follows:

Antonio Ortiz – via aortiz@jhwclaw.com
Shelby A. Jordan – via sjordan@jhwclaw.com
**JORDAN, HOLZER & ORTIZ, P.C.**
500 N. Shoreline, Suite 900
Corpus Christi, Texas, 78401


                                     /s/ Matthew R. Beatty
                                    Matthew R. Beatty

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| MAXIM CRUDE OIL, LLC | § | |
|     Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | Civil Cause No. 2:21-cv-90 |
| NOIL CORP., INC. and | § | |
| MORRELL STEVE NEELY | § | |
| | § | |
|     Defendants | § | |

**INDEX FOR EXHIBIT A – DOCUMENTS FILED IN THE**
**28TH JUDICIAL DISTRICT COURT OF NUECES COUNTY, TEXAS**

| Tab No. | Description |
|---|---|
| 1 | Docket Sheet |
| 2 | Plaintiff's Original Petition and Application for Temporary Restraining Order and Application for Temporary Injunction |
| 3 | Proposed Temporary Restraining Order |
| 4 | Signed Temporary Restraining Order |
| 5 | Notice to State Court of Filing Notice of Removal |

# TAB 1

https://research.txcourts.gov/CourtRecordsSearch/ViewCasePrint/7633e76e517756359d5006916acca347

## Case Information

# Maxim Crude Oil, LLC vs. Noil Corp., Inc.,Morrell Steve Neely

2021DCV-1521-A

| Location | Case Category | Case Type | Case Filed Date | Judge |
|---|---|---|---|---|
| Nueces County - District Clerk | Civil - Contract | Debt/Contract - Other | 4/23/2021 | Hasette, Nanette |

## Parties ③

| Type | Name | Attorneys |
|---|---|---|
| Plaintiff | Maxim Crude Oil, LLC | Antonio Ortiz |
| Defendant | Noil Corp., Inc. | |
| Defendant | Morrell Steve Neely | |

## Events ⑤

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 4/23/2021 | Filing | Petition | Plaintiff s Original Petition And Application For Temporary Restraining Order And Application For Temporary Injunction | Exhibit A.pdf, Exhibit B.pdf, Exhibit C.pdf, POP, Application for TRO and App for Temp Inj.pdf |
| 4/23/2021 | Filing | Jury Fee Paid (OCA) | | No Documents ⓘ |
| 4/23/2021 | Filing | Proposed Order | Temporary Restraining Order | Proposed TRO.pdf |
| 4/23/2021 | Filing | Petition | | No Documents ⓘ |
| 4/26/2021 | Filing | Temporary Restraining Order | | Temporary Restraining Order.tif |

© 2021 Tyler Technologies, Inc. | All Rights Reserved
Version: 2021.3.0.3169

EMPOWERED BY
TYLER TECHNOLOGIES

# TAB 2

Filed
4/23/2021 1:24 PM
Anne Lorentzen
District Clerk
Nueces County, Texas

CAUSE NO. ___2021DCV-1521-A___

| | | |
|---|---|---|
| Maxim Crude Oil, LLC | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | ____ JUDICIAL DISTRICT |
| | § | |
| Noil Corp., Inc. and Morrell Steve Neely | § | |
| | § | |
| *Defendants.* | § | NUECES COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION
**and**
## APPLICATION FOR TEMPORARY RESTRAINING ORDER
**and**
## APPLICATION FOR TEMPORARY INJUNCTION

TO THE HONORABLE DISTRICT JUDGE:

COMES NOW Maxim Crude Oil, LLC (herein "Plaintiff" or "Maxim""), complaining of the following Defendants: Noil Corp., Inc. ("Noil") and Morrell Steve Neely ("Neely"), (collectively, "Defendants"), and would respectfully show the Court as follows:

## I.
## DISCOVERY LEVEL

1.      Pursuant to Texas Rule of Civil Procedure 190.4, Plaintiff intends to conduct discovery under Discovery Control Plan III.

2.      Plaintiff seeks damages in excess of $1 million, jointly, and severally from each named Defendant.

## II.
## PARTIES AND SERVICE

3.       Plaintiff, Maxim is a Texas limited liability company, with its principal place of business in Live Oak County, Texas and its principal assets consisting primarily of real and personal property located in Nueces County, Texas.

4.      Defendant, Noil Corp., Inc. is a foreign corporation organized and existing under the laws of the State of Illinois, whose home office is located at Chicago, Illinois and may be served with process by having the Texas Secretary of State serving the registered agent Ronald Gafford, Esq. at 70 W. Madison Street, Suite 1400, Chicago, Illinois 60602.  Defendant engages in business in Texas but does not maintain a regular place of business in this state and this suit arose out of Defendant's business in Texas.

5.      Defendant, Morrell Steve Neely ("Neely") is an individual and domiciled in the State of Illinois and conducting business within the State of Texas, and in Nueces County, Texas. Neely may be served at 9011 S. Paxton Avenue, Chicago, Illinois 60617. Neely has more than minimum contacts with the State of Texas.

6.      The Civil Conspiracy:  Each reference herein to any Defendant, or to Defendants, is a reference to the civil conspiracy to defraud Plaintiff through actions and omissions taken by one or more of its members within the State of Texas, and in which each Defendant was a member, and from time to time, by which each Defendant-member committed the fraud and fraudulent acts injuring Plaintiff.  Accordingly, Plaintiff alleges that each member of the civil conspiracy conducts business of the conspiracy in the State of Texas for the purpose and with the intent to defraud and accordingly, is jointly and severally liable for each and every act of the conspiracy committed at any time during, before or after, each of the Defendants' respective conduct on behalf of the civil conspiracy.

## III.
## JURISDICTION AND VENUE

7.       This action is in this Court's jurisdiction pursuant to Tex. Govt. C. § 24.007 and Tex. Civ. Prac. & Rem. C. 65.021;  Tex. Civ. Prac. & Rem. Code § 17.042.

8.    The court has jurisdiction over Defendants, nonresidents, pursuant to Tex. Civ. Prac. & Rem. Code §17.042(1) because they have purposefully availed themselves of the privileges and benefits of conducting business in Texas by engaging in business in Texas by contracting by e-mail with a Texas resident, which contract was to be performed in whole or in part by Defendants in Texas.

9.    Venue is proper in Nueces County, Texas pursuant to Tex. Civ. Prac. & Rem. 15.011 and 15.005. Venue is also proper in Nueces County, Texas pursuant to Tex. Civ. Prac. & Rem. Code §15.002(a)(1)-(3) because all or a substantial part of the events or omissions occurred in Nueces County, Texas.

**IV.**
**BACKGROUND FACTS**

10.    Plaintiff is in the business of purchasing and distributing for sale various types of petrochemicals, including various categories of refined crude oil, and other similar crude products. Plaintiff's business operations are based primarily in the South Texas and Nueces County area. Defendants purport to be in the business of supplying crude products for sale to wholesale fuel distributors and other resellers such as Plaintiff, as well as consumers and other end-users.

11.    In early March 2021, Plaintiff obtained purchasers wishing to acquire a fuel product called Naptha in the Nueces County area. Plaintiff then contacted Defendants to inquire about their ability to source this particular commodity. Importantly, Plaintiff informed Defendants that it was crucial that the product was acquired on a timely basis for resale to these particular purchasers that sought to purchase the product from Plaintiff. Defendants represented that it was a business enterprise with business connections in Corpus Christi, Nueces County, Texas and that Defendants could source the particular product Plaintiff's customers wished to purchase. Specifically, Defendants made extensive and repeated oral and written representations to Plaintiff that it could

procure Naptha through its numerous industry refinery contacts in the Nueces County area that had access to the product and that it could promptly provide Plaintiff the product.

12.     As a result of Defendants' representations and promises, the parties entered into a Crude Products Agreement dated March 15, 2021 (the "Agreement"). Attached hereto is a true and correct copy of the Crude Products Agreement entered into on March 15, 2021 marked Exhibit "A". The Agreement would require Plaintiff advance funds to Defendant Noil upon Noil informing Plaintiff it had procured the product. The funds were required to be held in an escrow account until the product was first "lifted" or picked up by Plaintiff. This was a crucial term of the business arrangement agreed to by the parties because of the need to safeguard the significant amount of funds that Defendants requested Plaintiff pay prior to Plaintiff obtaining the product. This term is acknowledged in an email dated March 11, 2021, shown below from Noil's Senior Vice President, Jennifer Watson, where it is expressly represented to Plaintiff that "[Noil] will hold payment in escrow as agreed for the first lift":

---------- Forwarded message ---------
From: **jennifer.watson** <jennifer.watson@noilcorp.com>
Date: Thu, Mar 11, 2021 at 8:11 PM
Subject: updated jobber agreement
To: david@maximcrude.com <david@maximcrude.com>, james@maximcrude.com <james@maximcrude.com>

Gentlemen,

Please find the updated jobber agreement attached. I apologize for the delay.  We will hold payment in escrow as agreed for the first lift. I look forward to working with you. Please let me know if you need anything.

I noticed that closing today was $1.50885 ($1.47885 after discount) in case you would like to adjust the payment or we can leave it according to the invoice.

Have a good evening.

Best,

Jenn

Jennifer Watson

Senior Vice President
**Noil Corp Inc.**
110 West Kinzie St.
Chicago, Illinois 60654
Email: jennifer.watson@noilcorp.com
Direct: 803-687-3286

This representation was made in an email dated March 11, 2021, along with a copy of the Agreement attached that was subsequently entered into by the parties on March 15, 2021. Likewise, the same representation was made by Ms. Watson in her text message correspondence to Plaintiff's representatives where she states that the "escrow" is listed on the invoice as a "trade account":



Finally, consistent with Ms. Watson's statement informing Plaintiff that the reference to Noil's "trade account" is actually referencing the "escrow account" agreed upon by the parties, the invoice says precisely that:



(Annotations made to emphasize the portion of the invoice that references the "trade account"). The invoice also states that the payment is to be held in the "trade account" (which is represented to mean an escrow account) "until the first lift has been confirmed."

13.    In accordance with the parties' agreement, after Defendants represented to Plaintiff that it had secured a source for the product Plaintiff proceeded to wire $2,000,000.00 through two separate wire transfers directly to Noil's bank account represented to be an "escrow account" by Defendants.

14.    Since the funds were wired to Defendants approximately one month ago, and well over a month after the Agreement was executed, Defendants have failed to provide the product it promised it would be providing in exchange for the payment and have instead repeatedly made excuses and delays for their nonperformance and have refused to refund the $2,000,000.00 of Plaintiff's funds wired to Defendants. Finally, on April 5, 2021, in accordance with the termination provision of the Agreement, Plaintiff gave Defendants notice it was terminating the Agreement and yet again requested they promptly refund the $2,000,000.00 wired to Defendants. On

numerous occasions, Defendants have promised the funds would be returned but have failed and/or refused to return Plaintiff its funds. Furthermore, not once within the 7-day termination period did Defendants object to the termination of the Agreement or claim that somehow it had earned any portion of the funds wired to Defendants. Defendants eventually stopped responding to Plaintiff and ignored all attempts from Plaintiff to reach Defendants requesting an update on the status of the return of the funds.

15.    It was not until April 15, 2021, that Plaintiff finally received a response from Defendants through their counsel acknowledging receipt of the April 5th letter from Plaintiff and for the first time claimed that if Plaintiff canceled the first month's order, Defendant "would deduct its lost profits for the first month ($570,000) and refund the balance of the initial payment made by Maxim to Noil Corp."  (See, Exhibit "B" attached hereto).

16.    Since that date, Plaintiff's counsel has demanded Plaintiff's funds be returned and Defendants have continued to make excuses and delayed refunding Plaintiff's money which Plaintiff has reason to believe was never placed in an escrow account and was used for other purposes by Defendants. In fact, Defendant Noil's representatives represented on numerous occasions that it would provide a bank statement showing the funds in an escrow account but have failed to ever provide any such statement.

17.    Finally, Defendants agreed that it would return only $1,400,000 of Plaintiff's money and withhold the remaining balance due to its damages suffered and lost profits, despite Defendants' non-performance under the agreement and Plaintiff properly terminating the contract in accordance with its terms.

18.    Defendants are essentially attempting to extort Plaintiff by withholding the return of Plaintiff's funds until Plaintiff agrees to let Defendants keep $570,000 for doing absolutely no work and for failing to perform under the agreement between the parties, which was rightfully terminated as a result of Defendant's non-performance. Moreover, Defendants are fully aware of the fact that without such funds Plaintiff's business has been severely damaged and it has restricted its ability to continue to do business due to its cashflow shortage resulting from Defendants' possession of $2,000,000 of Plaintiff's operating capital for nearly a month, and its current possession of $600,000 of Plaintiff's funds it is refusing to return.

19.    Defendants claimed that the funds Plaintiff was wiring were to be placed in an escrow account "until the first lift (of product) was confirmed." That representation was false. Additionally, Defendants represented that they had located the product Plaintiff was attempting to procure in order to induce Plaintiff into wiring $2,000,000 in funds to Defendants. That representation was false. Defendant Noil's Senior Vice President, Jennifer Watson, represented that the invoice for the funds to be wired by Plaintiff would contain a notation that it was for a trade account which was the description for Noil's escrow account and that the funds would not be released until they completed the first day of lift of the product. That representation was false. Defendants claimed that it could procure Naptha for Plaintiff through its numerous industry refinery contacts that had access to the product and that it could promptly provide Plaintiff the product. That representation was false.

20.    Upon information and belief, Defendants are a sham company created to perpetuate a fraud, through publication of false and misleading information, representing that they had access to all of Plaintiff's needs through their contacts in the industry.  That fiction is simply to allow Defendants to induce the execution of a crude products agreement that then induces people to wire

substantial sums of money to Defendants with no intention of performing its obligations under the agreements entered into.

21.     To accomplish the fraud, Defendants have customers pre-pay hundreds of thousands of dollars to the various Defendants, suggesting that this pre-payment is for broker's fees and other costs it is incurring to secure the products for its customer. In fact, unknown to Plaintiff, Defendants do not use the proceeds of these pre-payments to arrange and pay for the costs of procuring the product Plaintiff needs, and when Plaintiff demanded return of the money because Defendants did not provide the product pursuant to the Agreement, Defendants claimed it suffered $570,000 in damages, whether it be out of pocket costs or "lost profits" and that it would only refund Plaintiff's money if it agreed that Defendants could keep that egregious sum.

22.     But for the false and misleading information and statements, and as a result of the omission of the truth about Defendants, Plaintiff would not have entered into the Crude Products Agreement and would not have prepaid Defendants the $2,000,000.00 (herein the "Funds") for the products that were never actually procured by Defendants.   This intentional fraud allowed Defendants to receive and disburse Plaintiff's Funds among themselves.

23.     As a result of Defendants fraud and fraudulent civil conspiracy committing acts intended to defraud, Plaintiff has sent Defendants $2,000,000 of Plaintiff's own money, only to discover that Defendants are refusing to refund the money (at least $600,000 of which remains in Defendant's possession), and are refusing to even provide a bank statement showing the funds remain in an escrow account, or that they were ever placed in an escrow account to begin with. Instead, Defendants have determined that they are the judge, jury, and executioner and that they are able to unilaterally dictate what amount of Plaintiff's funds it should be able to keep for itself.

24.     Put simply, Defendants are illegally converting Plaintiff's funds for their own use. As if this were not enough, because the funds at issue were to be placed in an escrow account, Defendant is an escrow agent with a fiduciary duty to the parties for whom the escrow funds are maintained. An escrow agent owes a duty of loyalty, a duty to make full disclosure, and a duty to exercise a high degree of care to conserve the escrow fund and pay it only to those persons entitled to receive it. Contrary to that duty, Defendants have converted the escrow funds for their own use.

**V.**
**CAUSES OF ACTION**

**A.     Fraudulent Misrepresentations by Defendants**

25.     Plaintiff incorporates herein the allegations set out in ¶¶ 1 through 24 above in support of the recovery under this cause of action.

26.     Every reference to various Defendants includes its members, officers, employees, or agents inasmuch as various member, officers, employees at all times relevant hereto were acting in the scope of their employment with each Defendant-entity at each time that various members officers, employees, and agents, and therefore is alleged to have made the fraudulent statements, representations, omissions, misstatements, misleading statements, constituting actual fraud in furtherance of the civil conspiracy.

27.     Defendants committed fraud by omission.  Defendants made false representations of facts Defendants knew to be false, made with the purpose and intent that Plaintiff rely on those representations and commissions, and in fact Plaintiff did reasonably rely on those false representations and omissions, which acts, and reliance proximately resulted in the injury and damages suffered by Plaintiff.

28.    Plaintiff justifiably and reasonably relied on the silence of the Defendants at a time when the Defendants had a duty to speak.

29.    As a result of such reasonable reliance, Plaintiff was directly and proximately injured and suffered pecuniary loss, including loss of tangible personal property as well as consequential damages as set out below.

30.    Plaintiff is entitled to recover all actual damages together with exemplary damages for the fraud and malice of Defendants, jointly and severally from Defendants.

**B.    Fraud By Non-Disclosure and Omission By Defendants**

31.    Plaintiff incorporates herein the allegations set out in ¶¶ 1 through 24 above in support of the recovery under this cause of action.

32.    Every reference to various Defendants includes its members, officers, employees, or agents inasmuch as various member, officers, employees at all times relevant hereto were acting in the scope of their employment with each Defendant-entity at each time that various members officers, employees, and agents, and therefore is alleged to have made the fraudulent statements, representations, omissions, misstatements, misleading statements, constituting actual fraud in furtherance of the civil conspiracy.

33.    Defendants committed the fraudulent omissions, at a time that Defendants had a duty to speak.  Defendants fraudulent omissions were intended to mislead, and Defendants knew at the time that Plaintiff would not know or have a reasonable ability to discover, the omissions, and Defendants intended that Plaintiff act without the knowledge that would have caused Plaintiff to not act.

34.    Defendants made partial disclosures and conveyed false impressions and knew or should have known that Defendants had a duty to correct the prior false impression, but knowingly

and intentionally did not do so.  In fact, Defendants misrepresented their future intent to perform under the Crude Products Agreement.

35.    Defendants knowingly and intentionally concealed from or failed to disclose to Plaintiff those known facts that Defendant knew, or should have known, made his representations no longer true or made their prior false impression caused by the partial disclosure by Defendants to be materially and substantially false.

36.    Various officers, employees, and agents, and therefore Defendants had a duty to disclose all new facts to the Plaintiff to correct the earlier misrepresentations and false impressions.

37.    By failing to disclose the material facts Defendants knew or should have known that silence would be reasonably relied on by the Plaintiff to take actions or refrain from actions that would result in damages to Plaintiff.

38.    The Plaintiff was directly and proximately injured as a result of acting without the knowledge of the undisclosed facts.

39.    Plaintiff is entitled to recover all actual damages together with exemplary damages for the fraud and malice of Defendants, jointly and severally from Defendants.

**C.    Breach of Contract**

40.    Plaintiff incorporates herein the allegations set out in ¶¶ 1 through 24 above in support of the recovery under this cause of action.

41.    There is a valid enforceable contract, in addition Defendants had a legal duty independent of this contract, which legal duty the Defendants, through this civil conspiracy to defraud, breached.

42.    Defendants are the proper parties to sue for breach of the contract.  Plaintiff performed, or partially performed, tendered performance of, or was excused from performing its

contractual obligations. Furthermore, Plaintiff validly terminated the contract after Defendant's non-performance.

43.    Defendants breached the contract.

44.    Defendants breach caused Plaintiff's injury.

45.    Therefore, Defendants are jointly and severally liable to Plaintiff for breach of contract and partial performance.

**D.    Alternative Relief – Unjust Enrichment**

46.    Plaintiff incorporates herein the allegations set out in ¶¶ 1 through 24 above in support of the recovery under this cause of action.

47.    Defendants have obtained a benefit from Plaintiff, including the payments of Funds and the transfer of rights belonging to Plaintiff.

48.    The benefits obtained by Defendants were procured by the fraud, and/or duress and/or the taking of an undue advantage of Plaintiff.

49.    As a result of the unjust enrichment of Defendants, the Defendants are liable to Plaintiff for the value of the benefit taken by Defendants and converted to Defendants own use and is entitled to all actual, special, consequential and pecuniary damages and losses incurred.

**E.    Money Had and Received and For Turnover of Funds**

50.    Plaintiff incorporates herein the allegations set out in ¶¶ 1 through 24 above in support of the recovery under this cause of action.

51.    The Defendants hold money belonging to Plaintiff in equity and good conscience.

52.    Plaintiff was and is the owner of the Funds and money received by the Defendants. Plaintiff is entitled to a judgment, jointly and severally, for the Funds and money paid over to Defendants, as actual damages and an order of Turnover of those Fund in Defendants' or any one

of the Defendant's possession, by such Defendants to Plaintiff pursuant to pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 31.002 (West).

53.    Plaintiff is entitled to exemplary damages as a result of the fraud and malice of Defendants in furtherance of the civil conspiracy.

### F.    Breach of Fiduciary Duty and Intentional Conversion

54.    Plaintiff incorporates herein the allegations set out in ¶¶ 1 through 24 above in support of the recovery under this cause of action.

55.    Defendants agreed, as a fiduciary to Plaintiff, to deposit funds into a segregated escrow account to be administered by it and not removed "until the first lift has been confirmed as completed", and but for this representation by Defendants that the funds would be treated as escrow funds and placed into an escrow account, Plaintiff would not have wired the funds to Defendants.

56.    At all times relevant hereto, Defendant Neely was the control person of Defendant Noil and exercised his position to cause Noil to breach its fiduciary duty, and is liable and responsible for all damages for the aiding and abetting of this breach of fiduciary duty by Noil, and is jointly and severally liable for the breach of fiduciary duty damages.

57.    Plaintiff made written demand upon Defendants for the payment of these special escrow monies which had been deposited in the escrow account and administered by Noil as a fiduciary for the benefit of Plaintiffs.  However, Defendants caused the conversion of these monies in escrow by withdrawing the funds in the account to the exclusion of Plaintiff and using those funds for their own use and benefit in violation of the written agreement and the fiduciary duty to protect and properly disburse these funds to Plaintiff and for Plaintiff's benefit.

58.    Defendants conduct in breach of the escrow agreements was committed knowingly, intentionally, and with malice, and in, or by adding and abetting in, this breach of their fiduciary

duty owed to Plaintiff by Defendants. Therefore, Plaintiff seeks actual damages in the amount of the deposited funds converted, and exemplary damages for this defalcation while acting in as a fiduciary, both jointly and severally against both Defendant Noil and Defendant Neely.

**G.    Attorney's Fees**

59.    Plaintiff incorporates herein the allegations set out in ¶¶ 1 through 58 above in support of the recovery under this cause of action.

60.    Plaintiff is entitled to recover from Defendants, jointly and severally, its reasonable attorney's fees for the trial and prosecution of this suit, and for any successful defense of any judgment on appeal to all appellate courts.

## VI.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

61.    Plaintiff incorporates herein the allegations set out in ¶¶ 1 through 58 above in support of the recovery under this cause of action.

62.    Plaintiff delivered the sum of $2,000,000 to Defendants based on fraud and intentional and knowing conduct of the Defendants acting in furtherance of the civil conspiracy to defraud. Defendants have no basis by which they should be entitled to retain or not dissipate those Funds unless this Court enters the Temporary Restraining Order commanding Defendants and any person or entity in possession of those Funds, to retain possession of those Funds for the purpose of this litigation, and for an accounting.

63.    The injury to Plaintiff is imminent.

64.    Plaintiff will sustain irreparable injury unless Defendants are prevented by this Court from transferring, disposing, spending, or otherwise secreting their possession or interest in the Funds Plaintiff caused to be delivered to Defendants, on just and equitable terms.

65.    Plaintiff has no other adequate remedy at law.

66.    Plaintiff believes that Defendant Noil is insolvent.

67.    Plaintiff has shown a probable right to recover on its claims and causes of action, including Plaintiff's rights to the return of the fraudulently induced payment of those Funds.

68.    Injury to the Defendants is minimal.

69.    Plaintiff request for injunctive relief does not violate any public policy and in fact furthers the public policy of the State of Texas to prevent fraudulent conduct and fraudulent civil conspiracies to defraud.

70.    All requirement of V.T.C.A., Civil Practice & Remedies Code § 65.011 and all conditions precedent have been satisfied for the temporary relief sought herein, and for the reasons set forth above Plaintiff has no adequate remedy at law.

71.    Plaintiff requests that a cash bond in the amount of $1,000.00 be posted in support of this request for injunctive relief, and that a hearing on a preliminary injunction be timely set prior to the expiration of the temporary relief granted.

72.    Plaintiff incorporates herein the verification and Affidavit of James Jensen, managing member Plaintiff, attached hereto as Exhibit "C" as if fully set out herein verbatim.

## VII.
## CONDITIONS PRECEDENT

73.    All conditions precedent have been satisfied prior to this suit, or such conditions precedent have been waived by Defendants.

## VIII.
## DEMAND FOR JURY TRIAL

74.    Plaintiff demands a jury trial.

## IX.
## PRAYER

Wherefore, Plaintiff Maxim Crude Oil, LLC prays that upon hearing and trial, this Court:

      a.    GRANT a Temporary Restraining Order precluding and preventing the Defendants and all related third parties in possession of the Funds paid over to Defendants by Plaintiff under the terms of the Crude Products Agreement attached hereto as Exhibit "A" and induced by fraud from dissipation of the Funds described herein and; and

      b.    A day be appointed for a show cause hearing on the question and issuance of a temporary injunction pending trial and judgment in this matter; and

      c.    Defendants be cited to appear and answer on that day and at the conclusion of such hearing, a temporary injunction issued from this Court restraining Defendants, and its agents, servants, and employees from retaining possession of those Funds; and

      d.    Defendants be cited to appear, and that Plaintiff have judgment against Defendants for Turnover of all Funds, for all actual and punitive damages in an amount not less than the minimum jurisdictional limit of this Court; and

      e.    reasonable and necessary attorneys' fees; and

      f.    pre-judgment interest at the maximum rate of interest permitted by law; and

      g.    costs of suit; post-judgment interest, at the legal rate; and

      g.    any and all other relief to which Plaintiff may be entitled, both at law and in equity.

Dated:  April 23, 2021.

Respectfully Submitted,

/s/  *Antonio Ortiz*

Antonio Ortiz
State Bar # 24074839
Shelby A. Jordan
State Bar # 11016700
**JORDAN, HOLZER & ORTIZ, P.C.**
500 N. Shoreline, Suite 900
Corpus Christi, Texas, 78401
Telephone:   (361) 884-5678
Telecopier:   (361) 888-5555
Email:  aortiz@jhwclaw.com
          sjordan@jhwclaw.com
Copy to: cmadden@jhwclaw.com

**ATTORNEYS FOR PLAINTIFF**



# NOIL CORP INC.

x

## CRUDE PRODUCTS AGREEMENT

Dated: March 15, 2021

**NOIL CORP. INC.** ("Noil Corp. Inc.") and **MAXIM CRUDE OIL, LLC** ("Jobber") hereby agree as follows:

### 1. Area of Primary Responsibility.

Noil Corp. Inc. hereby appoints Jobber, upon the terms and conditions herein provided, its nonexclusive distributor ("Noil Corp. Inc. Jobber") of the Noil Corp. Inc. brand and other crude products of Noil Corp. Inc. specified in section 3 of this agreement, with responsibility to serve and develop trade for such crude products in the area specified in Exhibit A hereto ("Jobber's area of primary responsibility"). It is understood that Noil Corp. Inc. may also engage in the sale and distribution of the same crude products in Jobber's area of primary responsibility directly to consumers and by supply to other resellers.

### 2. Term.

The term of this agreement shall commence on March 15, 2021 and shall end on February 28, 2026.

### 3. Products and Quantities.

(a) Purchase and Sale Obligations. During the term of this agreement, Jobber shall purchase from Noil Corp. Inc. such quantities of each of certain crude products of Noil Corp. Inc. specified below as are necessary to serve customer demand for such crude products of Noil Corp. Inc. in Jobber's area of primary responsibility.

**Product(s)**
Naphtha of other
Crude products

Subject to the limitations set forth in this section 3, Noil Corp. Inc. shall sell to Jobber such quantities of such crude products as Jobber may order from Noil Corp. Inc.. Without limitation on the generality of the foregoing, Jobber agrees to purchase from Noil Corp. Inc. during each contract year not less than 50,000,000 gallons of Naphtha, crude or motor fuels.

(b) Monthly Percentages. Jobber has advised Noil Corp. Inc. that Jobber wishes that the maximum quantities to be delivered by Noil Corp. Inc. to Jobber hereunder be allocated on a percentage basis by calendar month as set forth in Exhibit B hereto. For any contract year after the first, Jobber may change the monthly percentages set forth in Exhibit B by giving Noil Corp. Inc. written notice of such changes prior to the end of the prior contract year.

(c) Monthly Limitation on Sale Obligation. Noil Corp. Inc. shall not be obligated to sell to Jobber in any calendar month quantities of any crude product in excess of the applicable monthly percentage specified in Exhibit B times the quantities of such crude product actually purchased by Jobber from Noil Corp. Inc. during the twelve (12) calendar months immediately preceding the calendar month before the month in question (e.g., the applicable 12-month period for the month of July would begin with the month of June during the prior calendar year and run through the month of May of the current calendar year), either under this agreement or under any similar prior agreement between Noil Corp. Inc. and Jobber.

| Product(s) | Maximum (Gals.) |
|---|---|

**Exhibit**

**A**



ULSD/Clear                                                                N/A
Motor Gasolines                                                           N/A

(d) <u>Other Limitations</u>. As used herein, "contract year" shall mean a 12-month period commencing with the first day of the term of this agreement or any anniversary thereof during the term of this agreement. Deliveries by Noil Corp. Inc. to Jobber for any fraction of a calendar month or contract year that this agreement may be in effect shall be in proportion to the quantities specified above. Although not required to do so, Noil Corp. Inc. may at its option and after request by Jobber elect to sell to Jobber quantities of crude products in excess of the maximum quantities specified herein. Deliveries by Noil Corp. Inc. to Jobber shall be spaced reasonably evenly over the month in accordance with such procedures as may be reasonably established from time to time by Noil Corp. Inc.. Jobber's purchases of each grade of a particular category of crude product shall be in such proportion as Noil Corp. Inc. in its sole discretion shall determine.

4. <u>Delivery</u>.

(a) <u>Delivery Points</u>. Subject to later change by Noil Corp. Inc. as set forth below, Noil Corp. Inc. shall deliver or arrange for the delivery of crude products to Jobber in the manner and at the delivery points set forth below. Specified for each product at each delivery point is the maximum percentage of Noil Corp. Inc.'s total maximum sales obligation for that product (as determined pursuant to section 3 of this agreement) which Noil Corp. Inc. shall be required to deliver to Jobber at that delivery point. Noil Corp. Inc. shall not be required, during any relevant time period, to deliver to Jobber at any particular delivery point quantities of any particular crude product in excess of the specified percentage of Noil Corp. Inc.'s maximum sales obligation for that product for that time period.

| Product(s) | Delivery Point | Type of Delivery | Maximum Percentage (%) |
|---|---|---|---|
| Naphtha | Corpis Christi Tx | Cust P-U | N/A |
| Motor Gasolines | Corpus Christi Tx | Cust P-U | |

Both Jobber and Noil Corp. Inc. shall have the right at any time in its absolute discretion to change any of the above delivery points and the maximum percentage of Noil Corp. Inc.'s maximum sales obligation for each product available to Jobber at each delivery point.

(b) <u>Legal Transfer</u>. Title and risk of loss shall pass to Jobber at the delivery point.

(c) Delivery into Jobber's Vehicles. If deliveries are to be made into vehicles supplied by Jobber, Noil Corp. Inc. shall not be required to make such deliveries into such vehicles unless they are clean and empty immediately prior to delivery and shall not be required to load or deliver quantities less than the full capacity of the vehicle, except as otherwise authorized by Noil Corp. Inc. from time to time. Jobber shall comply with such reasonable rules and regulations as Noil Corp. Inc. may from time to time establish regarding deliveries by Noil Corp. Inc. into Jobber's vehicles.

(d) <u>Delivery into Jobber's Storage Facilities</u>. If deliveries are to be made into Jobber's storage facilities, Jobber shall provide storage facilities sufficient to enable it to receive such deliveries and shall provide Noil Corp. Inc. with unimpeded and adequate ingress thereto and egress therefrom twenty-four hours per day. Jobber shall comply with such reasonable rules and regulations as Noil Corp. Inc. may from time to time establish regarding deliveries by Noil Corp. Inc. into Jobber's storage facilities.

(e) <u>Delivery by Barge</u>. If deliveries are to be made by barge, Jobber shall provide free wharfage at the delivery point where the barge may at all times lie safely afloat.

(f) <u>Demurrage</u>. Jobber shall reimburse Noil Corp. Inc. on demand for any demurrage or other charges incurred by Noil Corp. Inc. by reason of Jobber's failure to unload any delivery vehicle or release the same within the time allowed therefor without demurrage or other charge even though such failure may have arisen from causes beyond the control of Jobber.



(g) Orders for Delivery. Deliveries by Noil Corp. Inc. to Jobber shall be made after reasonable notice from Jobber. All orders for delivery of crude products covered by this agreement shall be placed by Jobber at Noil Corp. Inc.'s designated order point, unless Noil Corp. Inc. gives Jobber written notice of alternate arrangements.

5. Price.

The prices that Jobber shall pay Noil Corp. Inc. for crude products purchased hereunder shall be Noil Corp. Inc.'s prices to Jobber in effect at the time and place of each delivery for the particular product, grade, quantity and type of delivery involved, in accordance with the terms as defined in Exhibit D".

6. Payment Terms.

(a) Cash Terms. Jobber shall, except at Noil Corp. Inc.'s option, pay Noil Corp. Inc. cash before delivery or pickup for crude products purchased hereunder.

(b) Optional Credit Terms. Noil Corp. Inc. to make sales of crude products against the credit of Jobbers that Noil approves for such credit sales. If Jobber is so approved (and continues to be so approved) by Noil Corp. Inc. elects to make sales to Jobber under the credit arrangement, then any credit extended on such sales shall be extended by Noil Corp. Inc. and Jobber shall make payments to Noil Corp. Inc. for all crude products purchased hereunder on credit. Jobber acknowledges the importance of payment within the terms specified when credit is extended and agrees that past due amounts shall bear interest at the rate of 18% or the maximum rate permitted by the state of Jobber's residence as specified in section 20 of this agreement, whichever is less. If Jobber fails to make payment within the specified terms, such failure shall, at Noil Corp. Inc.'s option, be deemed a breach of this entire agreement and, in addition to such other remedies as it may have, Noil Corp. Inc. shall have thereafter the right to demand advance cash payment, to withhold deliveries until such advance payment (including payment of all amounts then outstanding for crude products delivered by Noil Corp. Inc. to Jobber hereunder) is received, or to terminate this agreement. The acceptance of any payment by Noil Corp. Inc. after the due date shall not waive any of Noil Corp. Inc.'s rights hereunder nor shall such withholding of deliveries or termination of this agreement affect any obligation of Jobber hereunder. If credit is extended to Jobber by Noil Corp. Inc., Jobber shall furnish Noil Corp. Inc. with such information regarding Jobber's financial condition as Noil Corp. Inc. may reasonably request from time to time.

(c) Change of Payment Terms. Noil Corp. Inc.'s terms of payment are subject to change based on agreement written with Jobber.

7. Change or Tax.

Any tax, duty, toll, fee, impost, charge or other exaction, or the amount equivalent thereto, and any increase thereof now or hereafter imposed, levied or assessed by any governmental authority upon, measured by, incident to or as a result of the transactions herein provided for (other than local, state and Federal net income taxes measured by the net income of Noil Corp. Inc. from all sources), or the transportation, importation, production, manufacture, use or ownership of the goods the subject of this agreement, shall, if collectible or payable by Noil Corp. Inc., be paid by Jobber on demand by Noil Corp. Inc.. Any such payments shall be in addition to the prices otherwise herein provided for. Jobber shall, at Noil Corp. Inc.'s request, execute and deliver to Noil Corp. Inc. such certificates or other documents as Noil Corp. Inc. may reasonably require in order to enable Noil Corp. Inc. to secure any tax exemption which may be available in connection with sales or deliveries hereunder.

8. Product Identity and Noil Corp. Inc.'s Insignia.

(a) Product Quality. The crude products covered by this agreement shall be Noil Corp. Inc.'s brands, grades and quality thereof, respectively, as established by Noil Corp. Inc. from time to time for its Noil Corp. Inc. Jobbers at the time and place of delivery. Jobber shall not permit the adulteration of any crude products purchased hereunder.

(b) Product Identity. Except as otherwise provided in paragraph (g) of this section 8, Jobber agrees that the crude products purchased hereunder shall be sold by Jobber as the products of Noil Corp. Inc. and only under the trademarks and trade names authorized for such products by Noil Corp. Inc.. At no time shall any product not authorized by Noil Corp. Inc. to be sold thereunder be offered for sale or sold under such trademarks and trade names. Jobber shall see that any likelihood of confusion between Noil Corp. Inc.'s products and those of others and



any likelihood of substitution or commingling of the products of others as or with those of Noil Corp. Inc. is eliminated and shall comply with such reasonable rules and regulations in this regard as Noil Corp. Inc. may from time to time establish, Noil Corp. Inc.'s representatives shall have the right at any time to enter upon the premises where the crude products purchased hereunder are stored by or for Jobber and to take samples of such crude products for testing purposes, compensating Jobber (at Jobber's cost, which for this purpose shall be based on Noil Corp. Inc.'s price to Jobber hereunder then in effect at the time such samples are taken, or, at Noil Corp. Inc.'s option, in kind) for any products so taken.

(e) Jobber's Indemnity Obligations. Jobber's indemnity obligation under section 17 of this agreement shall include, but not be limited to, any and all expense, liability and claims for damage to property (including property of Jobber), or for injury to or death of any person (including Jobber), directly or indirectly arising or alleged to arise from anything occurring from any cause on or about or in connection with the maintenance, upkeep, repair, replacement or operation of any retail outlet supplied by Jobber (other than retail outlets to which Jobber makes deliveries as Noil Corp. Inc.'s agent pursuant to section 22 of this agreement) or anything located thereon, and the insurance to be carried by Jobber pursuant to section 18 of this agreement shall include, but not be limited to, insurance in regard to each such retail outlet (other than retail outlets to which Jobber makes deliveries as Noil Corp. Inc.'s agent pursuant to section 22 of this agreement) of the types and in the amounts specified in section 18 of this agreement and, upon request by Noil Corp. Inc., Jobber shall furnish Noil Corp. Inc. with satisfactory evidence of the maintenance of such insurance.

10. Conduct of Jobber's Business.

(a) Independent Business. In the performance of this agreement Jobber is engaged in an independent business and nothing herein contained shall be construed as granting Noil Corp. Inc. any right to control or direct Jobber with respect to Jobber's conduct of such business. Noil Corp. Inc. has no right to exercise any control over any of Jobber's employees, all of whom are entirely under the control and direction of Jobber, who shall be responsible for their actions and omissions. Jobber accepts exclusive liability for all contributions and payroll taxes required under Federal Social Security laws and State Unemployment Compensation laws or other payments under any laws of similar character as to all persons employed by and working for Jobber.

(b) Legal Compliance. Jobber shall conduct all operations hereunder in strict compliance with all applicable laws, ordinances and regulations of all governmental authorities, including but not limited to all rules and regulations of the Department of Transportation, the Federal Petroleum Marketing Practices Act and all applicable franchise laws and regulations. Jobber shall supply Noil Corp. Inc. with all information which Noil Corp. Inc. shall reasonably request to enable Noil Corp. Inc. to comply with all applicable laws, ordinances and regulations of all governmental authorities. Jobber's indemnity obligation under section 17 of this agreement shall include, but not be limited to, any and all expense, liability, claims, fines, civil penalties or demands which may arise or be assessed as a result of any failure by Jobber to comply with any of the foregoing governmental requirements.

(c) Sale of Noil Corp. Inc.'s Products. Jobber shall diligently promote the sale in Jobber's area of primary responsibility of the crude products purchased under this agreement, and shall conduct the operation of Jobber's business in such a manner as to promote goodwill toward Noil Corp. Inc. and its products. Jobber agrees to assist in the administration of any promotional programs Noil Corp. Inc. may establish for its dealer or other customers. Jobber agrees to distribute to Jobber's customers such promotional materials supplied by Noil Corp. Inc. as Noil Corp. Inc. may from time to time reasonably request.

11. Oil Spills.

If a crude product spill occurs anywhere in connection with Jobber's performance of this agreement, Jobber shall promptly notify Noil Corp. Inc. and the appropriate governmental authorities and shall take immediate action to clean up the spill and prevent further damage. Upon receipt of such notification, Noil Corp. Inc. shall have the right, at its election, to provide, or cause to be provided, to Jobber such additional manpower, equipment and material as in Noil Corp. Inc.'s sole discretion are deemed reasonable to complete the clean-up in a satisfactory manner. Jobber shall pay and be responsible for, and Jobber's indemnity obligation under section 17 of this agreement shall include, but not be limited to, all costs and expenses incurred in connection with the clean-up operations, including reimbursement to Noil Corp. Inc. for all of its costs and expenses, and all fines, charges, fees or judgments imposed or levied by any Federal, state or local governmental agency as a result of such spill, except



in the event the spill resulted solely from any act or omission on the part of Noil Corp. Inc. or Noil Corp. Inc.'s employees.

12. Sale of Jobber's Business.

(a) Offer to Transfer Assets. Subject to any valid requirements of any applicable statute, if at any time during the term of this agreement, Jobber desires to sell, lease or otherwise transfer all or any part of the assets (including but not limited to real or personal property, contract rights, accounts receivable, customer lists and other intangible assets) then used by Jobber in the distribution and sale of crude products purchased under this agreement (other than as collateral for a loan from a financial institution or any other transfer in the ordinary course of Jobber's business), and Jobber receives a bona fide offer for the same which Jobber wishes to accept, Jobber shall immediately notify Noil Corp. Inc. in writing of the terms thereof and provide Noil Corp. Inc. with a complete copy of the executed written agreement or other documents embodying such offer which contain all of the terms and conditions between the parties, with no material terms yet to be negotiated, together with copies of all information regarding Jobber's business supplied to the offeror by Jobber, and all information and documentation required by section 16 of this agreement.

(b) Noil Corp. Inc.'s Right of First Refusal. Noil Corp. Inc. shall have the right to acquire such interest of Jobber at the price and on the terms of such offer if Noil Corp. Inc., within sixty (60) days after Noil Corp. Inc.'s receipt of such written notice from Jobber of any such offer (together with all documents and other information required by this section 12 and section 16), notifies Jobber in writing of Noil Corp. Inc.'s exercise of such option. If Noil Corp. Inc. exercises such right, the transaction shall be consummated within thirty (30) days after delivery to Jobber of Noil Corp. Inc.'s notice of exercise or at such later date as may be specified in the offer and Jobber shall, prior to such date and at Jobber's expense, do all things necessary or desirable in order to give Noil Corp. Inc. title to the interest being acquired free from the claims of Jobber's creditors. If Noil Corp. Inc. does not exercise such right, Jobber may, at any time within six months after the expiration of such 60-day period, but no later, sell, lease or otherwise transfer such interest, but only to the original offeror and only upon the terms of the offer submitted by Jobber to Noil Corp. Inc..

(c) General. Noil Corp. Inc.'s rights hereunder shall continue to apply until Jobber's entire interest is transferred in accordance herewith. An offer by a third party to exchange other property interests owned or to be acquired by it for any interest of Jobber shall be deemed to constitute an offer to purchase for a price equal to the fair market value of the property offered in exchange. Nothing herein shall be construed as a consent by Noil Corp. Inc. to any such sale, lease or transfer or a waiver of any of Noil Corp. Inc.'s rights under section 16 hereof or under any other agreement between Jobber and Noil Corp. Inc.. Noil Corp. Inc. shall have the right to assign its rights under this section 12 to a third party.

13. Prevention of Performance; Shortage of Supply.

(a) Force Majeure. There shall be no obligation to sell or deliver or to receive or use the crude products covered by this agreement when and while, and to the extent that, the receiving or using or manufacture or making deliveries in the customary manner is prevented or hindered by act of God, fire, riot, labor disturbances (whether involving employees of the party affected or of others and regardless of whether the disturbance could be settled by acceding to the demands of a labor group), accident, war or the acts of any government (whether foreign or domestic, Federal, state, county or municipal) or any causes beyond the reasonable control of the party affected, whether or not similar to any of the foregoing causes. In cases of partial or total interruption or loss or shortage of transportation facilities or supplies, or shortage of products deliverable hereunder, Noil Corp. Inc. may allocate deliveries of available products among Jobber, Noil Corp. Inc.'s other customers, contract or otherwise, including Noil Corp. Inc.'s affiliates, and Noil Corp. Inc. for its own use, on any basis which in Noil Corp. Inc.'s sole judgment is fair and reasonable, allowing for such priorities as Noil Corp. Inc. deems appropriate. No such reduction need be made up.

(b) Shortage of Supplies. Due to uncertainties in the supply/demand situation (which may include a decision by Noil Corp. Inc. that the costs of some crude oil and petroleum products which might be available are unreasonable), Noil Corp. Inc. may not have sufficient supplies of one or more of the crude products covered by this agreement to meet the full requirements of Jobber, of Noil Corp. Inc.'s other customers, contract or otherwise, including Noil Corp. Inc.'s affiliates, and of Noil Corp. Inc. for its own use. Whenever that situation exists and Noil Corp. Inc.'s performance hereunder is not otherwise excused, Noil Corp. Inc. may allocate deliveries of available



products on any basis which in Noil Corp. Inc.'s sole judgment is fair and reasonable, allowing for such priorities as Noil Corp. Inc. deems appropriate. No such reduction need be made up.

(c) Allocation. Allocation is fair and reasonable even if it is based on a shortage in the then contemplated sources of supply or a general shortage in Noil Corp. Inc.'s system or on historical or planned deliveries. "Noil Corp. Inc.'s system" means the supply system of Noil Corp. Inc.'s parent company, Noil Corp. Inc., and its wholly owned subsidiaries.

14. Termination.

(a) Jobber's Right to Terminate This Agreement. Jobber may terminate this agreement without cause at any time during the term hereof upon giving Noil Corp. Inc. written notice of such termination within 7 days.

(b) Noil Corp. Inc.'s Right to Terminate This Agreement (other than for market withdrawal). Noil Corp. Inc. may, in addition to its other remedies, including but not limited to the right to terminate this agreement as otherwise provided herein, terminate this agreement upon giving Jobber ninety (90) days' prior written notice of such termination or, if it would not be reasonable for Noil Corp. Inc. to give ninety (90) days' prior written notice, at Noil Corp. Inc.'s election upon giving Jobber prior notice for such lesser period as is reasonable in the circumstances, if any one of the following occurs:

(1) Curable Breach. Jobber by act or omission breaches or defaults on any covenant, condition or other provision of this agreement, which breach or default can be cured, and Jobber fails to cure such breach or default within ten (10) days after such written notice from Noil Corp. Inc. which shall specify such breach or default; or

(2) Noncurable Breach. Jobber by act or omission breaches or defaults on any covenant, condition or other provision of this agreement, which breach or default cannot be cured, or in the event of any breach or default by Jobber after notice of two previous breaches or defaults of any kind has been given hereunder, regardless of Jobber's curing of such previous breaches or defaults; or

(3) Failure to Exert Good Faith Efforts to Honor Agreement. Jobber fails to exert good faith efforts to carry out the provisions of this agreement following written notice to Jobber from Noil Corp. Inc. of such failure and a reasonable opportunity to exert good faith efforts to carry out such provisions; or

(4) Failure to Pay Noil Corp. Inc. in a Timely Manner. Jobber fails to pay to Noil Corp. Inc. in a timely manner when due all sums to which Noil Corp. Inc. is legally entitled (whether or not such sums are owed under this agreement); or

(5) Noncompliance with Applicable Laws. Jobber knowingly fails to comply with Federal, state or local laws and regulations relevant to Jobber's performance of this agreement; or

(6) Trademark Violation. Willful adulteration, commingling, mislabeling or misbranding of motor fuels or other violations by Jobber of trademarks utilized by Noil Corp. Inc.; or

(7) Unlawful or Deceptive Acts. Unlawful, fraudulent or deceptive acts or practices or criminal misconduct by Jobber relevant to Jobber's performance of this agreement; or

(8) Inducement of Breach of Third-Party Contract. Jobber knowingly induces the breach by a third party of a contract between Noil Corp. Inc. and the third party; or

(9) Felony Conviction. Conviction of Jobber of any felony involving moral turpitude; or

(10) Death. Jobber's death if Jobber is an individual (subject to any valid requirements of any applicable statute); or

(11) Other Events. Any other event which is relevant to the relationship between Noil Corp. Inc. and Jobber and as a result of which termination of this agreement is reasonable.

Without limitation on the foregoing, it is agreed that upon the occurrence of any of the events specified in clauses (6) through (10) of this paragraph (b) it would not be reasonable to require Noil Corp. Inc. to give ninety (90) days' prior written notice, that ten (10) days' notice would be reasonable in the circumstances, and that in any such circumstance Noil Corp. Inc. may elect to terminate this agreement upon giving Jobber ten (10) instead of ninety (90) days' prior written notice of such termination.



(c) <u>Market Withdrawal</u>. If during the term hereof Noil Corp. Inc. decides to withdraw from marketing motor fuel in Jobber's area of primary responsibility through retail outlets identified by Noil Corp. Inc.'s insignia, Noil Corp. Inc. may terminate this agreement by giving Jobber one hundred eighty (180) days' prior written notice of such termination and otherwise complying with any applicable requirements of law, including the Federal Crude Marketing Practices Act.

(d) <u>No Implied Waiver or Release</u>. Waiver by Noil Corp. Inc. of one or more breaches or defaults hereunder by Jobber shall not be deemed to be a waiver of any other or continuing breach or default hereunder. Termination of this agreement shall not relieve Jobber of responsibility for obligations incurred prior to termination.

(e) <u>Sale of Products After Expiration of Term</u>. If Noil Corp. Inc. continues to accept orders from Jobber for the crude products covered hereby following expiration of the term of this agreement, such sales shall be upon all of the terms and conditions hereof; provided that such sales shall not be construed to evidence a renewal of this agreement by operation of law or otherwise, but shall imply only an agreement from day to day, which Noil Corp. Inc. may (subject to any valid requirements of any applicable statute) terminate without cause at any time upon giving Jobber written notice of such termination.

15. <u>Exchange Terminals</u>.

(a) <u>Termination of Exchange Agreements</u>. Each of the following delivery points is an exchange terminal at which crude products are made available to Noil Corp. Inc. pursuant to a product exchange agreement between Noil Corp. Inc. and a third party:

Corpus Christi, TX

Each such exchange agreement is terminable at any time by either party thereto without cause upon short notice typically thirty (30) to sixty (60) days' notice. If any such exchange agreement is terminated by either party thereto (and Noil Corp. Inc. may do so in its absolute discretion), Noil Corp. Inc. may terminate its obligations under section 4 of this agreement to deliver crude products to Jobber at the applicable delivery point upon giving Jobber ninety (90) days' prior written notice of such termination or, if it would not be reasonable for Noil Corp. Inc. to give ninety (90) days' prior written notice, at Noil Corp. Inc.'s election upon giving Jobber prior notice of such lesser period as is reasonable in the circumstances. If Noil Corp. Inc.'s obligations to make deliveries at a particular delivery point are terminated pursuant hereto, Noil Corp. Inc.'s maximum sales obligation under section 3 of this agreement for each product previously delivered to Jobber at that delivery point shall be reduced by the maximum percentage of Noil Corp. Inc.'s maximum sales obligation for each such product available to Jobber at that delivery point as set forth in section 4 of this agreement.

(b) <u>Alternative Supply Arrangements</u>. If any such exchange agreement is terminated and Noil Corp. Inc. is able to make alternative arrangements, on terms and conditions which are (in its sole judgment) satisfactory to Noil Corp. Inc., for the supply of crude products to Jobber at the applicable delivery point, Noil Corp. Inc.'s obligations hereunder shall be subject to all of the terms and conditions of such alternative supply arrangements. If only limited quantities of crude products are available to Noil Corp. Inc. at such delivery point under such alternative supply arrangements, Noil Corp. Inc. may allocate deliveries of available products in the manner set forth for other circumstances in section 13 of this agreement. No such reduction need be made up. Upon termination of such alternative supply arrangements, Noil Corp. Inc. shall have the right, pursuant to paragraph (a) of this section 15, to terminate its obligations to make deliveries at the applicable delivery point and proportionately to reduce its maximum sales obligations to Jobber.

(c) <u>Termination of Supply at All Delivery Points</u>. If pursuant hereto Noil Corp. Inc.'s obligation to sell crude products to Jobber has been terminated with respect to all delivery points and Noil Corp. Inc. therefore no longer has any remaining obligation hereunder to sell crude products to Jobber, this agreement shall automatically terminate without further notice to Jobber.

(d) <u>Exchange Terminal Rules and Regulations</u>. Jobber shall comply with all applicable rules and regulations of any exchange terminal in effect at the time of delivery, including but not limited to any requirement that Jobber provide specified insurance coverage.

16. <u>Assignment</u>.



(a) <u>Assignment by Jobber</u>. This agreement is personal to Jobber and Jobber shall not, subject to any valid requirements of any applicable statute, assign any rights or delegate any duties that Jobber may have under this agreement, either voluntarily, involuntarily, by operation of law, merger or otherwise, without the prior written consent of Noil Corp, Inc. Jobber shall advise Noil Corp. Inc. in writing of any proposed assignment, and shall provide Noil Corp. Inc. such information and documentation relating to the proposed assignment and assignee as Noil Corp. Inc. may reasonably require, including but not limited to a fully completed Jobber Application in Noil Corp. Inc.'s then-current form, together with all financial statements and other attachments designated in such application, and all information and documentation required by section 12 of this agreement.

(b) <u>Change in Control of Corporation</u>. This paragraph (b) applies if Jobber is a corporation. Any sale, conveyance, alienation, transfer or other change of interest in or title to or beneficial ownership of any voting stock of Jobber (or securities convertible into voting stock of Jobber) which results in a change in the control of Jobber, whether voluntarily, involuntarily, by operation of law, merger or other corporate proceedings, or otherwise, shall be construed as an assignment of Jobber's rights under this agreement. A change in the control of Jobber shall be deemed to occur whenever a party gains the ability to influence the business and affairs of Jobber directly or indirectly. A party who owns twenty-five percent (25%) or more of the voting stock of Jobber (or securities convertible into such voting stock) shall be deemed to have such ability. Thus, for example, the following would constitute an assignment of Jobber's rights hereunder and require Noil Corp. Inc.'s prior written consent under paragraph (a) of this section 16: (i) the transfer of 25% or more of the voting stock of Jobber, (ii) the transfer of a lesser percentage of such stock to an existing stockholder who thereby would own 25% or more of Jobber's voting stock, or (iii) the transfer of a lesser percentage of such stock which as a practical matter results in a change in the control of Jobber.

(c) <u>Change in Control of Partnership</u>. This paragraph (c) applies if Jobber is a partnership. Any sale, conveyance, alienation, transfer or other change of interest in or title or beneficial ownership of any partnership interest in Jobber which results in a change in the control of Jobber, whether voluntarily, involuntarily, by operation of law, or otherwise, shall be construed as an assignment of Jobber's rights under this agreement. A change in the control of Jobber shall be deemed to occur whenever a party gains the ability to influence the business and affairs of Jobber directly or indirectly. A party who owns twenty-five percent (25%) or more of a partnership (whether a general or a limited partnership), or 25% of the general partnership interests in a limited partnership, shall be deemed to have such ability. Thus, for example, the following would constitute an assignment of Jobber's rights hereunder and require Noil Corp. Inc.'s prior written consent under paragraph (a) of this section 16: (i) the transfer of 25% or more of the beneficial interest in Jobber, (ii) the transfer of 25% or more of the general partnership interests in Jobber, (iii) the transfer of a lesser percentage of such interests in Jobber to an existing partner who would thereby own 25% or more of the total partnership or 25% or more of the general partnership interests in Jobber, or (iv) the transfer of a lesser percentage of such partnership interests which as a practical matter results in a change in the control of Jobber.

17. <u>Indemnity</u>.

Jobber shall indemnify, defend and hold harmless Noil Corp. Inc., Noil Corp. Inc., the subsidiary and affiliated companies of each of them (collectively "Noil Corp. Inc. and its affiliates"), and their respective directors, employees and agents, from and against any and all expenses (including attorneys' fees), liabilities and claims of whatsoever kind and nature, including but not limited to those for damage to property (including property of Jobber) or for injury to or death of any person (including Jobber), directly or indirectly arising or alleged to arise out of or in any way connected with the storage, handling, distribution, sale or use of any crude products purchased hereunder, or with the maintenance, upkeep, repair, replacement or operation of any premises used by Jobber in connection with this agreement or anything located thereon, including any act or omission of Jobber or Jobber's agents or employees in the performance of this agreement, or in the operation of any vehicle or vehicles in connection with Jobber's business.

18. <u>Insurance</u>.

(a) <u>Insurance to be Maintained by Jobber</u>. Without in any way limiting Jobber's indemnity obligation under section 17 of this agreement, Jobber shall maintain at Jobber's own expense during the term of this agreement the insurance specified below with respect to Jobber's operations in connection with this agreement:

(1) <u>Employees</u>. Workers' Compensation and Employer's Liability Insurance as prescribed by applicable law;



(2) General Liability. Comprehensive or Commercial General Liability (Bodily Injury and Property Damage) Insurance of not less than $1,000,000 combined single limit per occurrence, including the following supplementary coverage: (i) Contractual Liability Insurance to cover liability assumed under this agreement and (ii) Product and Completed Operations Liability Insurance;

(3) Vehicles. Automobile Liability (Bodily Injury and Property Damage) Insurance of not less than $1,000,000 combined single limit per occurrence, on all owned, non-owned and hired vehicles; and

(4) Other Legal Requirements. Any other insurance or surety bonding that may be required under the laws, ordinances and regulations of any governmental authority, including the Federal Motor Carrier Act of 1980 and all rules and regulations of the Department of Transportation.

(b) Other Insurance Requirements. The insurance specified in paragraph (a) of this section 18 shall be issued by insurance companies which meet Noil Corp. Inc.'s financial standards for insurers (as established by Noil Corp. Inc. from time to time) and shall require the insurer to provide Noil Corp. Inc. with ten (10) days' prior written notice of any cancellation or material change in the insurance. The insurance specified in clauses (2), (3) and (4) of paragraph (a) shall name Noil Corp. Inc. and its affiliates as additional insureds.

(c) Proof of Insurance. Jobber shall furnish Noil Corp. Inc. with certificates or other documentary evidence satisfactory to Noil Corp. Inc. of the insurance required to be maintained by Jobber under this section 18. If Jobber fails to do so as to any of the required insurance, then Noil Corp. Inc., in addition to such other remedies as it may have, shall have the right to purchase such insurance at Jobber's expense. Jobber shall, upon demand promptly reimburse Noil Corp. Inc. for the cost of any insurance purchased by Noil Corp. Inc. for Jobber's account under this paragraph (c).

19. Motor Fuel Regulations.

(a) Compliance Requirements. The crude products covered by this agreement include products that are subject to Federal air pollution laws and regulations controlling fuels and fuel additives for use in motor vehicles and motor vehicle engines. Those laws and regulations require motor fuels to meet product specifications designed to minimize harmful emissions, and impose directly on Jobber, any distributor, reseller, retailer or wholesale purchaser-consumer (as defined in such regulations) receiving regulated motor fuels from Jobber ("Jobber's motor fuel customers") and Noil Corp. Inc. specific legal obligations in selling and distributing regulated motor fuels. Noil Corp. Inc. has established certain programs and procedures for handling regulated motor fuels to achieve compliance with these governmental requirements and reduce liability exposure for noncompliance. Jobber recognizes the importance to Noil Corp., Inc., Jobber and the public of Jobber and Jobber's motor fuel customers meeting fully all governmental motor fuel requirements. Accordingly, Jobber shall comply with, and shall cause Jobber's motor fuel customers to comply with, Noil Corp. Inc.'s current and future programs and procedures for handling regulated motor fuels, as set forth in Noil Corp. Inc.'s Motor Fuel Quality Compliance Manual or other written communications that Noil Corp. Inc. has distributed or may in the future distribute to Jobber. Jobber shall require Jobber's motor fuel customers to follow Noil Corp. Inc.'s programs and procedures for handling regulated motor fuels by written agreement in a form approved by Noil Corp. Inc.. Noil Corp. Inc. does not represent or warrant that following its programs and procedures for handling regulated motor fuels will ensure compliance with all governmental motor fuel requirements. Jobber is independently responsible for complying fully with all applicable Federal, state and local laws and regulations pertaining to motor fuels, and for causing Jobber's motor fuel customers to so comply.

(b) Product Testing. Jobber shall promptly advise Noil Corp. Inc. if Jobber has any indication that contamination of motor fuel may have occurred in order that Noil Corp. Inc. may, at its option, conduct a test of such product. Noil Corp. Inc.'s representatives shall have the right at any time to enter upon the premises where motor fuels purchased hereunder are stored by or for Jobber and to take such quantities of such products as they deem necessary to check the quality of the product, compensating Jobber (at Jobber's cost, which for this purpose shall be based on Noil Corp. Inc.'s price to Jobber hereunder in effect at the time such product is taken, or, at Noil Corp. Inc.'s option, in kind) for any product so taken.

(c) Indemnity. Jobber's indemnity obligation under section 17 of this agreement shall include, but not be limited to, any and all expense, liability, claims, fines, civil penalties or demands which may arise or be assessed as a result of any act or omission of Jobber, Jobber's agents, employees or carriers or of Jobber's motor fuel customers



in handling motor fuel purchased hereunder, or as a result of failure by any of them to follow Noil Corp. Inc.'s programs and procedures for handling motor fuel.

(d) Noncompliance. If Jobber fails to comply with the requirements of this section 19 with regard to any particular motor fuel product, then Noil Corp. Inc., in addition to such other remedies as it may have, shall have the right to terminate delivery to Jobber of the motor fuel product in question or to suspend such delivery until Noil Corp. Inc. is satisfied that Jobber is again in compliance herewith.

20. Notices; Confidential Information.

(a) Notices. Any and all written notices to be given hereunder shall be posted by certified mail or personally delivered to the other party at the address set forth below, or at such other address as either party may designate by written notice to the other. Any such notice shall be deemed received when deposited in the United States mail with postage fully prepaid thereon or when personally delivered.

| Noil Corp. Inc. | Maxim Crude Oil, LLC LLC |
|---|---|
| 100 East Walton St. #700 | 1058 FM 3024 |
| Chicago, Illinois 60611 | West George, Texas 78022 |

(b) Confidential Information. Jobber agrees that all materials, technology and information made available to Jobber and not to the general public by or at the direction of Noil Corp. Inc. at any time before or during the term of this agreement through any means of communication (collectively "Confidential Information") shall be considered proprietary trade secrets of Noil Corp. Inc.. Without limitation on the generality of the foregoing, Confidential Information includes information about or derived from a Noil Corp. Inc. web site or a web site maintained by a third party designated by Noil Corp. Inc., which is accessible by Jobber but not the general public. Jobber shall keep confidential all Confidential Information and use it only in connection with Jobber's operations as an authorized reseller of Noil Corp. Inc. products. Jobber shall not disclose Confidential Information to anyone other than Jobber's employees, agents or contractors who have a need to know Confidential Information to assist such operations, and Jobber shall cause any such person to whom Jobber discloses Confidential Information to keep it confidential and not to disclose it to anyone else. Upon Noil Corp. Inc.'s request, Jobber shall promptly return or destroy all Confidential Information disseminated in written, electronic or machine-readable form, and all notes, documents and computer files containing Confidential Information, and all copies of the foregoing. Jobber shall notify Noil Corp. Inc. promptly in the event Jobber is required by legal process to disclose any Confidential Information, and make reasonable efforts to obtain an appropriate protective order for any such required disclosure of Confidential Information.

21. Prior Agreements.

This agreement shall not become effective if, prior to the commencement of the term hereof, Noil Corp. Inc. notifies Jobber of Noil Corp. Inc.'s election to exercise any right Noil Corp. Inc. may have to terminate any prior agreement with Jobber covering the sale by Noil Corp. Inc. of crude products to Jobber. In such event this agreement shall be null and void. Subject to the foregoing, effective as of the commencement of the term hereof, this agreement terminates and supersedes any prior agreements between Jobber and Noil Corp. Inc. and its affiliates relating to the subject matter hereof, provided that any outstanding breach by Jobber of any such prior agreement shall be deemed to be a breach of this agreement. No modification of this agreement, and no waiver of any provision hereof, shall be binding on Noil Corp. Inc. unless in writing and signed by Noil Corp. Inc..

22. Deliveries to Contract Accounts.

(a) Noil Corp. Inc.'s Contract Customers. Jobber shall, at Noil Corp. Inc.'s request and as Noil Corp. Inc.'s agent, make deliveries of crude products for Noil Corp. Inc.'s account to those customers under contract with Noil Corp. Inc. ("contract customers") specified in Exhibit C hereto and to such other contract customers as Noil Corp. Inc. may from time to time specify during the term hereof. Contract customers may include, without limitation, local, state and Federal governments, retail dealers, certain consumers and other resellers. Jobber shall be credited by Noil Corp. Inc. at Jobber's cost for the particular crude product involved, based on Noil Corp. Inc.'s price to Jobber hereunder in effect at the time that Jobber makes such delivery. Each such delivery by Jobber shall constitute a return to Noil Corp. Inc.'s inventory of the crude product so delivered and not a resale of the crude product by Jobber to Noil Corp. Inc., and the quantities of crude products so delivered shall not constitute a part of the maximum quantities specified in section 3 of this agreement.



(b) Mode of Delivery. In addition to deliveries from Jobber's trucks into the storage facilities of contract customers, Jobber shall, at Noil Corp. Inc.'s request, make deliveries into contract customers' trucks at Jobber's storage facilities, and Jobber shall provide unimpeded and adequate access to Jobber's storage facilities during normal business hours to enable contract customers to receive deliveries of crude products.

(c) Credit Deliveries. In making deliveries for Noil Corp. Inc.'s account to contract customers, Jobber shall confine all credit deliveries, both as to time and money limits, within the authority given to Jobber by Noil Corp. Inc. in writing. If Jobber makes any credit deliveries in excess of written authorization either as to time or money limits, Jobber shall pay Noil Corp. Inc. upon demand the amount of such sale price which on the date of such demand remains unpaid to Noil Corp. Inc., and Noil Corp. Inc. may set off such unpaid price against any sums then or thereafter due to Jobber from Noil Corp. Inc..

(d) Compensation. As Jobber's sole compensation for making deliveries to contract customers, on or before the twentieth (20th) day of each month during the term hereof Noil Corp. Inc. shall pay Jobber the service charges specified in Exhibit C hereto on all deliveries of crude products made by Jobber during the preceding calendar month to the contract customers specified in Exhibit C and shall pay Jobber such service charges as may be later agreed upon by Noil Corp. Inc. and Jobber on all deliveries of crude products made by Jobber during the preceding month to such other contract customers as Noil Corp. Inc. may specify during the term hereof.

23. Jobber Application; Conflicts of Interest.

(a) Jobber Application. Jobber represents and warrants that all information set forth in Jobber's written application to become a Noil Corp. Inc. Jobber and all other written information, including but not limited to financial statements, submitted by Jobber in connection with such application was at the time of submission true, accurate and complete, and did not omit any material fact necessary to make the information submitted, in light of the circumstances under which it was submitted, not misleading.

(b) Residency. Jobber represents and warrants that Jobber is a citizen or lawful permanent resident of the United States. Jobber shall upon request furnish Noil Corp. Inc. with proof of Jobber's citizenship or immigration status.

(c) Sales or Earnings Projections Disclaimer. Due to the various factors which may affect the performance of an individual jobber's business, Noil Corp. Inc. does not supply statements of estimated or projected sales or earnings to prospective Jobbers, nor does Noil Corp. Inc. represent that Jobbers will earn or are likely to earn a profit. And no employee of Noil Corp. Inc. has been or is authorized to make such statements.

(d) Conflicts of Interest. Except as otherwise expressly provided herein, neither Jobber nor any director, employee or agent of Jobber shall give to or receive from any director, employee or agent of Noil Corp. Inc. and its affiliates any gift, entertainment or other favor of significant value, or any commission, fee or rebate, in connection with this agreement. Neither Jobber nor any director, employee or agent of Jobber shall, without Noil Corp. Inc.'s prior written consent, enter into or maintain any business arrangement with any director, employee or agent of Noil Corp. Inc. and its affiliates unless such person is acting as a representative of and on behalf of Noil Corp. Inc. and its affiliates.

(e) Violation. In the event of any violation of this section 23, including any breach of the warranties set forth in this section 23 or any other violation occurring prior to the commencement of the term hereof which resulted directly or indirectly in Noil Corp. Inc. entering into this agreement, Noil Corp. Inc. shall have the right to terminate this agreement. Jobber shall immediately notify Noil Corp. Inc. upon acquiring knowledge of any violation of this section 23.

### *Signature Page Next Page*

MAXIM CRUDE OIL, LLC.                          NOIL CORP. INC. CORP

By: James Jenson                                      By: Steve Neely
As: CEO                                                    As: CEO



Signature: _____    Signature: _____

**EXHIBIT A**

**CRUDE JOBBER PRODUCTS AGREEMENT**

Jobber's area of primary responsibility, referred to in Section I of this agreement, consists of the following:

| County | State |
|--------|-------|
| Harris | Texas |

## EXHIBIT B

### CRUDE JOBBER PRODUCTS AGREEMENT

#### GALLONS PER MONTH

| Month | Naphtha |
|---|---|
| March | 6,300,000 |
| April | 6,300,000 |
| May | 6,300,000 |
| June | 6,300,000 |
| July | 6,300,000 |
| August | 6,300,000 |
| September | 6,300,000 |
| October | 6,300,000 |
| November | 6,300,000 |
| December | 6,300,000 |
| January | 6,300,000 |
| February | 6,300,000 |
| | |
| TOTAL | 75,600,000 |

* amounts are subject to increase



**EXHIBIT C**

## CRUDE JOBBER PRODUCTS AGREEMENT

Pursuant to section 22 of this agreement, for requested deliveries by Jobber for Noil Corp. Inc.'s account to the contract customers specified below, Noil Corp. Inc. shall pay Jobber the following service charges:

**THIS EXHIBIT IS NOT APPLICABLE.**



**EXHIBIT D**

**CRUDE JOBBER PRODUCTS AGREEMENT -- PRICING BENCHMARK**

Noil agrees to provide the following Opis Benchmark Pricing: *Based on current month daily Closing Price*

*CBOE*

Mont Belviue, Texas

Based of 3-day average

Minus (-)$0.03 cent per gallon

**END EXHIBIT**

INVOICE                                    1800310791

15 March 2021
NOIL CORP INC
Chicago, IL 60611                 844-427-7877

PAYMENT DUE BY:        March 16, 2021

| Sold To: | | ROL n/a |
| --- | --- | --- |
| Attn: James Jenson | | |
| MAXIM CRUDE OIL LLC | | |
| 1026 FM 3036 | | |
| George West, Texas 78022 | | |

| QUANTITY (Gal) | DETAILS | UNIT PRICE | LINE TOTAL |
| --- | --- | --- | --- |
| 1,425,000 | LY75 million gallons Naphtha FK 300 | 1.6393 | 2,329,992.50 |
| 20% overage | | 465,979.50 | |

**Payment is to be held by Noil Corp Inc. trade account until the first lift has been confirmed as completed**

**All payments are due by Friday at 11 AM CT for the following week.**

| | | | |
| --- | --- | --- | --- |
| SUBTOTAL | $2,795,972.00 | | |
| | | TOTAL DUE | $2,795,972.00 |

| Payment Beneficiary: | Noil Corp Inc. | |
| --- | --- | --- |
| Name of Bank: | First Midwest Bank | |
| Address of Bank: | 749 Lee St, Des Plaines, IL 60016 | |
| Account Number: | 9105725555 | http://noilcorp.com |
| Routing Number: | 021408101 | info@noilcorp.com |
| Payment Reference: | 1800310791 | |

PAYMENT SHOULD BE MADE BY BANK TRANSFER.  MADE PAYABLE TO NOIL CORP INC.

Agreed to by Maxim Crude Oil. LLC: _____

Agreed to by Noil Corp Inc.: _____

2021DCV-1521-A



Marty J. Schwartz
70 W. Madison Street
Suite 2300
Chicago, IL 60602
Main (312) 345-5700
Fax (312) 345-5701
mschwartz@schainbanks.com
www.schainbanks.com

**Via certified mail 7019 0140 0000 5961 7130
and email James@MaximCrude.com**
April 15, 2021

Maxim Crude Oil, LLC
Att: James Jensen
1058 FM
West George, TX  78022

**RE:   Noil Corp Inc. v Maxim Crude Oil, LLC
        March 15, 2021 Crude Products Agreement**

Dear Mr. Jensen:

The undersigned is counsel for Noil Corp Inc.

My client acknowledges receipt of your letter of April 5, 2021.

Noil Corp. is in the process of procuring the first month's supply of
Naphtha, which is 6,300,000 gallons. You are aware of these efforts and you
are aware of the reasons that none of the Naphtha has been delivered yet.

At this point, my client is offering you two options. One, you can wait for
my client to procure the Naphtha, which my client anticipates will be



Exhibit

B

shortly. Two, you can cancel the first month's order, which would be considered a breach of the contract. In the event of a breach, my client will deduct its lost profits for the first month ($570,000) and refund the balance of the initial payment made by Maxim to Noil Corp.

Please advise as soon as possible as to your preference. My client will cease its efforts to procure the product based on your April 5, 2021 letter until you advise of your choice.

Please feel free to contact me or have your counsel contact me if you have any questions.

My client looks forward to resolving this issue in an amicable manner.

Very truly yours,

Marty J. Schwartz
MJS/kr

2021DCV-1521-A

# EXHIBIT "C"
## AFFIDAVIT OF JAMES JENSEN, AUTHORIZED AGENT FOR MAXIM CRUDE OIL, LLC.

**STATE OF WYOMING**

}

**COUNTY OF TETON**

BEFORE ME, the undersigned authority personally appeared James Jensen, known to me, and stated upon his oath the following:

1.  My name is James Jensen, and I am above the age of 18 years, and competent to make this affidavit.

2.  I am the managing member of Maxim Crude Oil, LLC and I have personal knowledge of the facts and matters set out in the attached Plaintiff's Original Petition regarding the Crude Products Agreement marked Exhibit "A" and attached to the Original Petition, the allegations of fraud and fraudulent representations and omissions, and the damages that will occur to Plaintiff if the Funds are not restrained from dissipation by Defendants.

3.  I am authorized to make this affidavit as the authorized officer of Maxim Crude Oil, LLC and I am the custodian of records and the person that may authenticate the Crude Products Agreement marked Exhibit "A" to the Original Petition as a business record of Plaintiff.

4.  As the managing member, I am competent to affirm that the $2,000,000 in funds ("Funds") were in fact delivered to Defendant Noil Corp., Inc. yet not placed in an escrow account as Defendants promised they would be, and that Defendants have failed and refused to refund the $2,000,000 for over one month, and then returned $1,400,000, but has refused to return the $600,000 balance of Plaintiff's funds after the agreement was terminated, refused to give locations of their funds, and refused to return the balance of the funds.

5.  The loss or dissipation of the balance of funds prior to a trial of this matter will substantially and materially harm Maxim Crude Oil, LLC inasmuch as Defendants do not appear to have any assets, any other funds, or any manner in which it could repay those funds unless those funds are enjoined from dissipation by Defendants.

6.  The irreparable harm is imminent. The enjoining of Defendants from dissipating the funds will not deprive Defendants of those funds until trial and will have little or no injury to the Defendants.

7.  Maxim Crude Oil, LLC has no other remedy at law to protect its interest, equity and value and its rights in the funds unless Defendants, and each of the individual defendants, along with all members, agents, representatives, depository account banks or brokerage firms, or other third parties in possession of those funds, are enjoined from dissipating those funds.

8.   Because Plaintiff seeks only an injunction enjoining and preventing dissipation of those funds that rightfully belong to Plaintiff, Plaintiff believes a bond of not more than $1,000.00 will adequately protect the interest of the Defendants in those funds.

Further Affiant Sayeth Not.

_____
James Jensen

SWORN AND SUBSCRIBED to witness my hand and seal of office this 23 day of April 2021.

_____
Notary Public for the State of ~~Texas~~ Wyoming

Commission Expires: 01 - 28 , 2025.

PAIGE FOGARTY - NOTARY PUBLIC
COUNTY OF LINCOLN        STATE OF WYOMING
MY COMMISSION EXPIRES JANUARY 28, 2025

Plaintiff's Original Petition

Page 21 of 19 pages
(including Verification)

TAB 3

Filed
4/23/2021 1:24 PM
Anne Lorentzen
District Clerk
Nueces County, Texas



CAUSE NO. 2021DCV-1521-A

| Maxim Crude Oil, LLC | § | IN THE DISTRICT COURT |
| *Plaintiff*, | § | |
| | § | |
| v. | § | ____ JUDICIAL DISTRICT |
| | § | |
| Noil Corp., Inc. and Morrell Steve Neely | § | |
| | § | |
| *Defendants*. | § | NUECES COUNTY, TEXAS |

## TEMPORARY RESTRAINING ORDER

On _____, the Plaintiff's Original Petition and Application of Plaintiff, Maxim Crude Oil, LLC, for this *ex parte* temporary restraining order regarding the Funds described and defined therein was heard by the court on Plaintiff's verified Petition, without notice to Defendant, and it clearly appears from the specific facts set forth in that verified Petition and the Affidavit attached thereto that immediate and irreparable injury, loss, and harm will result to Plaintiff before notice can be served on Noil Corp., Inc. and Morrell Steve Nelly (collectively the "Defendants") and a hearing had, unless Defendants are immediately restrained and enjoined as requested in Plaintiff's Petition and Application regarding the Funds described therein, in that Plaintiff will lose their property rights described in Plaintiff's Original Petition by dissipation of the Funds made the basis of Plaintiff's suit and claims, without a fair opportunity to protect its property and property rights, and that the harm to the Defendants will be minimal for the temporary restraining order period; and the court is therefore of the opinion that Plaintiff is entitled to a temporary restraining order without notice; accordingly it is therefore

ORDERED that the clerk of this court immediately issue a temporary restraining order, to continue in effect until the conclusion of the hearing on temporary injunction, or until further order

of this court, restraining and enjoining the following named Defendants, jointly and severally, Noil Corp., Inc. and Morrell Steve Nelly (collectively "Defendants") and each and every Defendant's heirs, assigns, representatives, agents or each entity-Defendants' members, officers, directors, partners, commissioners, agents, employees, and all Defendants' deposit account counter-parties, brokerage account counter-parties and any and all third parties in possession of the Funds paid to Defendants by Plaintiff, and each Defendant's attorneys or other professionals in possession of any part or portion of the Funds, from:

    a. Proceeding in any manner to transfer, spend, encumber, hide, secret, or otherwise dispose of any of the Funds in the possession Defendants; and from

    b. Destroying, altering, hiding or secreting any and all documents evidencing the Funds, including all documents regarding the deposit, expenditures, transfers, or other disposition of those Funds; and

    c. Each Defendant is mandatorily enjoined to safeguard and retain all such Funds in their possession or under their control, pending further order of this Court; and

    d. That Defendants, its agents, servants and employees from retaining possession of those Funds.

and it is further

ORDERED that any acts or conduct, including the entry by Defendants into any contract to accomplish any act in violation of this temporary restraining order shall be void and of no force and effect; and

ORDERED that Maxim Crude Oil, LLC shall, prior to the issuance of the temporary restraining order by the clerk, file with the clerk of this Court a bond in the amount of $_____, delivered or executed by Plaintiff in cash or a corporate surety admitted to

do business in the State of Texas, payable to Defendant and conditioned as the law requires; and it is further

ORDERED that Plaintiff's application for temporary injunction shall be set for hearing and heard in this court on _____, 2021 , at _____ o'clock __M. subject to further orders of this Court and further *ex parte* extension for not more than an additional fourteen (20) days.

ENTERED on December _____, 2021 at _____ o'clock __.M.


_____
DISTRICT JUDGE PRESIDING

TAB 4

CERTIFIED COPY

Filed
4/23/2021 1:24 PM
Anne Lorentzen
District Clerk
Nueces County, Texas

CAUSE NO. 2021DCV-1521-A

| | | |
|---|---|---|
| Maxim Crude Oil, LLC | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 28th JUDICIAL DISTRICT |
| | § | |
| Noil Corp., Inc. and Morrell Steve Neely | § | |
| | § | |
| *Defendants.* | § | NUECES COUNTY, TEXAS |

## TEMPORARY RESTRAINING ORDER

On APRIL 26, 2021, the Plaintiff's Original Petition and Application of Plaintiff,

Maxim Crude Oil, LLC, for this *ex parte* temporary restraining order regarding the Funds

described and defined therein was heard by the court on Plaintiff's verified Petition, without notice

to Defendant, and it clearly appears from the specific facts set forth in that verified Petition and

the Affidavit attached thereto that immediate and irreparable injury, loss, and harm will result to

Plaintiff before notice can be served on Noil Corp., Inc. and Morrell Steve Nelly (collectively the

"Defendants") and a hearing had, unless Defendants are immediately restrained and enjoined as

requested in Plaintiff's Petition and Application regarding the Funds described therein, in that

Plaintiff will lose their property rights described in Plaintiff's Original Petition by dissipation of

the Funds made the basis of Plaintiff's suit and claims, without a fair opportunity to protect its

property and property rights, and that the harm to the Defendants will be minimal for the temporary

restraining order period; and the court is therefore of the opinion that Plaintiff is entitled to a

temporary restraining order without notice;  accordingly it is therefore

ORDERED that the clerk of this court immediately issue a temporary restraining order, to

continue in effect until the conclusion of the hearing on temporary injunction, or until further order

Page 1

of this court, restraining and enjoining the following named Defendants, jointly and severally, Noil

Corp., Inc. and Morrell Steve Nelly (collectively "Defendants") and each and every Defendant's

heirs, assigns, representatives, agents or each entity-Defendants' members, officers, directors,

partners, commissioners, agents, employees, and all Defendants' deposit account counter-parties,

brokerage account counter-parties and any and all third parties in possession of the Funds paid to

Defendants by Plaintiff, and each Defendant's attorneys or other professionals in possession of

any part or portion of the Funds, from:

    a.  Proceeding in any manner to transfer, spend, encumber, hide, secret, or otherwise

        dispose of any of the Funds in the possession Defendants; and from

    b.  Destroying, altering, hiding or secreting any and all documents evidencing the Funds,

        including all documents regarding the deposit, expenditures, transfers, or other

        disposition of those Funds; and

    c.  Each Defendant is mandatorily enjoined to safeguard and retain all such Funds in their

        possession or under their control, pending further order of this Court; and

    d.  That Defendants, its agents, servants and employees from retaining possession of those

        Funds.

and it is further

    ORDERED that any acts or conduct, including the entry by Defendants into any contract

to accomplish any act in violation of this temporary restraining order shall be void and of no force

and effect; and

    ORDERED that Maxim Crude Oil, LLC shall, prior to the issuance of the temporary

restraining order by the clerk, file with the clerk of this Court a bond in the amount of

$ 1000. 00    , delivered or executed by Plaintiff in cash or a corporate surety admitted to

do business in the State of Texas, payable to Defendant and conditioned as the law requires; and it is further

ORDERED that Plaintiff's application for temporary injunction shall be set for hearing and heard in this court on May 5, 2021, at 1:30 o'clock P.M. remotely by Zoom Meeting ID: 914 5224 823 subject to further orders of this Court and further *ex parte* extension for not more than an additional fourteen (20) days.

ENTERED on December APRIL 26, 2021 at 11:11 o'clock A.M.

_____
DISTRICT JUDGE PRESIDING



STATE OF TEXAS
COUNTY OF NUECES

The above and foregoing is a true and
correct copy as the same appears on
file and or recorded in the appropriate
records of Nueces County, Texas.

Thereby certified on 



ANNE LORENTZEN
NUECES COUNTY DISTRICT CLERK
CLERK OF THE DISTRICT AND COUNTY COURTS AT LAW

TAB 5

CAUSE NO. 2021DCV-1521-A

| | | |
|---|---|---|
| MAXIM CRUDE OIL, LLC | § | IN THE DISTRICT COURT |
|     Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | 28TH JUDICIAL DISTRICT OF |
| NOIL CORP., INC. and | § | |
| MORRELL STEVE NEELY | § | |
| | § | |
|     Defendants | § | NUECES COUNTY, TEXAS |

## <u>NOTICE TO STATE COURT OF FILING NOTICE OF REMOVAL</u>

COME NOW Defendants, Noil Corp., Inc. and Morrell Steve Neely ("Defendants") and

respectfully notify the Clerk of the 28th Judicial District Court of Nueces County, Texas, that

Defendants have filed a NOTICE OF REMOVAL, a true and correct copy of which (without

exhibits already included in the State Court record) is attached hereto as Exhibit "A," removing

this action from the 28th Judicial District of Nueces County, Texas, to the United States District

Court for the Southern District of Texas, Corpus Christi, Division.


OF COUNSEL:                                    Respectfully submitted,


                                               */s/ Matthew R. Beatty*

Marty J. Schwartz                              Matthew R. Beatty
IL State Bar No. _____               State Bar No. 24001169
mschwartz@schainbanks.com                      mbeatty@bnsfirm.com
Schain Banks                                   Michael L. Navarre
Three First National Plaza                     State Bar No.  00792711
70 W. Madison Street, Suite 5300               mnavarre@bnsfirm.com
Chicago, IL 60602                              Beatty Navarre Strama, PC
(312) 345-5700 Telephone                       901 S. MoPac Expy., Bldg. 1, Suite 200
(312) 345-5701 Facsimile                       Austin, Texas 78746
                                               (512) 879-5050 Telephone
                                               (512) 879-5040 Facsimile

                                               **ATTORNEYS FOR DEFENDANTS**
                                               **NOIL CORP., INC. AND**
                                               **MORRELL STEVE NEELY**

## CERTIFICATE OF SERVICE

I certify that on this the 3ʳᵈ day of May, 2021, I served a true and correct copy of the foregoing instrument on the counsel of record below by email and via efile.txcourts.gov.

Antonio Ortiz – via aortiz@jhwclaw.com
Shelby A. Jordan – via sjordan@jhwclaw.com
**JORDAN, HOLZER & ORTIZ, P.C.**
500 N. Shoreline, Suite 900
Corpus Christi, Texas, 78401

   */s/ Matthew R. Beatty*
Matthew R. Beatty

2