**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| Maxim Crude Oil, LLC | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Cause 2:21-cv-00090 |
| | § | |
| Noil Corp., Inc. and Morrell Steve Neely | § | |
| | § | |
| *Defendants.* | § | |

**AFFIDAVIT OF JAMES JENSEN**

**STATE OF TEXAS**

**}**

**COUNTY OF HIDALGO**

BEFORE ME, the undersigned authority, personally appeared JAMES JENSEN, known to me and upon his oath stated as follows:

1.      My name is JAMES JENSEN and I am above the age of 18 and I have personal knowledge of the facts set out in this Affidavit, and I have personal knowledge of the Plaintiff's Motion for Preliminary Injunction and Brief in Support filed in this Court on behalf of the Plaintiff.

**A.      Exhibits Attached to and Authenticated in This Affidavit**

2.      Attached to this Affidavit are true and correct copies of the original of the following documents I reference and authenticate in this Affidavit:

Exhibit "1" – Crude Products Agreement with Noil Corp. (Exhibit A to Petition).

Exhibit "2" - Schwartz letter dated April 15, 2021 (Exhibit B to Petition).

Exhibit "3" - Invoices from Noil Corp. for Wire Payments to be Sent.

Exhibit "4" – Demand letter from Maxim to Noil dated April 5, 2021.

Exhibit "5" – Follow up demand and termination letter dated April 6, 2021.

Exhibit "6" – Text Message Correspondence between James Jensen and Jennifer Watson beginning March 10, 2021.

Exhibit "7" Text Message Correspondence between James Jensen and Jennifer Watson whereby Watson confirms contract "includes the escrow structure."

Exhibit "8" – Text Message Correspondence between James Jensen, David Hillman, Steve Nelson, and Jennifer Watson.

Exhibit "9" – Text Message Screen Shot from Watson stating "Trade Account" is their "Escrow Account."

Exhibit "10" – Confirmation of wires being sent.

Exhibit "11" – March 11, 2021 Email from Watson to Jensen with updated jobber agreement stating "[w]e will hold payment in escrow as agreed for the first lift."

3.      I have personal knowledge of the Exhibits as authenticated by this Affidavit as set out herein.

4.      I have personal knowledge of the documents referenced in my Affidavit as either: (i)  business records over which I am the custodian or the agent or employee custodian;  (ii) the business records of the Plaintiff at the time these documents were maintained as part of the business records of that entity; or (iii) the public information published by or about Defendants.

**B.      Personal Background**

5.      I am the President and Owner of Maxim Crude Oil, LLC ("Plaintiff"), and have been active in the operations of the Plaintiff as set out in the Plaintiff's Original Petition filed by the Plaintiff against Defendants Noil Corp., Inc. ("Noil") and Morrell Steve Neely ("Neely") (collectively, "Defendants").

6.      I am personally familiar with the agreements, correspondence, and the transactions made the basis of this lawsuit for which a preliminary injunction is sought, and the conduct committed by Defendants both before and after Plaintiff entered into any agreements with Defendants.

**C.      Background Facts**

7.      This Affidavit is filed in connection with Plaintiff's Supplemental Brief in Support of its Motion for Preliminary Injunction.  This Affidavit discusses, but in far less detail, the facts and allegations set out in the Plaintiff's Original Petition filed in Nueces County District Court seeking a temporary restraining order, Plaintiff's Emergency Opposed Motion for Preliminary Injunction, Plaintiff's Brief in Support filed with this Affidavit, and the various contracts attached as exhibits to my affidavit, and which are incorporated in this affidavit for all purposes including the defined terms therein.

8.      I was personally involved in dealing with Defendants and in entering into the agreements which created the fiduciary relationship of Defendants and Plaintiff as a result of Defendant's agreement to act as an escrow agent with respect to Plaintiff's funds wired to what Defendant described as an "escrow trade account."

9.     The Agreement established by express terms the relationship between Plaintiff and Defendant Noil and, specifically, Defendant's relationship as the escrow agent owing a duty to Plaintiff with regard to the funds wired to Defendant's account. This is established by Defendants' repeated representations that the funds Plaintiff paid for the product would be placed in an escrow account until the product was first "lifted" or picked up by Plaintiff, and only at that time would the funds be released from the account. In fact, Defendants represented that the "Trade Account" Plaintiff wired the funds to was the name of its "escrow account." Defendant specifically represented that such account was an escrow account and would be treated as such, and made these both prior to and after: (1) Plaintiff entered into the Agreement with Defendant Noil; (2) Plaintiff wired $1,500,000.00 to Defendants; and (3) Plaintiff wired an additional $500,000.00 to Defendants.

*[Signature on following page]*

FURTHER AFFIANT SAYETH NOT

James Jensen

**STATE OF TEXAS**

}

**COUNTY OF HIDALGO**

BEFORE ME, the undersigned authority, personally appeared James Jensen, and upon his oath stated that the foregoing factual allegations are within his personal knowledge true and correct.

SUBSCRIBED before me to witness my hand and seal of office this 12 day of May, 2021.

Notary Public in and for the State of Texas

Commission Expires: 05-20 , 2022.



# NOIL CORP INC.

x

## CRUDE PRODUCTS AGREEMENT

Dated: March 15, 2021

**NOIL CORP. INC.** ("Noil Corp. Inc.") and **MAXIM CRUDE OIL, LLC** ("Jobber") hereby agree as follows:

### 1. Area of Primary Responsibility.

Noil Corp. Inc. hereby appoints Jobber, upon the terms and conditions herein provided, its nonexclusive distributor ("Noil Corp. Inc. Jobber") of the Noil Corp. Inc. brand and other crude products of Noil Corp. Inc. specified in section 3 of this agreement, with responsibility to serve and develop trade for such crude products in the area specified in Exhibit A hereto ("Jobber's area of primary responsibility"). It is understood that Noil Corp. Inc. may also engage in the sale and distribution of the same crude products in Jobber's area of primary responsibility directly to consumers and by supply to other resellers.

### 2. Term.

The term of this agreement shall commence on March 15, 2021 and shall end on February 28, 2026.

### 3. Products and Quantities.

(a) Purchase and Sale Obligations. During the term of this agreement, Jobber shall purchase from Noil Corp. Inc. such quantities of each of certain crude products of Noil Corp. Inc. specified below as are necessary to serve customer demand for such crude products of Noil Corp. Inc. in Jobber's area of primary responsibility.

> **Products)**
> Naphtha of other
> Crude products

Subject to the limitations set forth in this section 3, Noil Corp. Inc. shall sell to Jobber such quantities of such crude products as Jobber may order from Noil Corp. Inc.. Without limitation on the generality of the foregoing, Jobber agrees to purchase from Noil Corp. Inc. during each contract year not less than 50,000,000 gallons of Naphtha, crude or motor fuels.

(b) Monthly Percentages. Jobber has advised Noil Corp. Inc. that Jobber wishes that the maximum quantities to be delivered by Noil Corp. Inc. to Jobber hereunder be allocated on a percentage basis by calendar month as set forth in Exhibit B hereto. For any contract year after the first, Jobber may change the monthly percentages set forth in Exhibit B by giving Noil Corp. Inc. written notice of such changes prior to the end of the prior contract year.

(c) Monthly Limitation on Sale Obligation. Noil Corp. Inc. shall not be obligated to sell to Jobber in any calendar month quantities of any crude product in excess of the applicable monthly percentage specified in Exhibit B times the quantities of such crude product actually purchased by Jobber from Noil Corp. Inc. during the twelve (12) calendar months immediately preceding the calendar month before the month in question (e.g., the applicable 12-month period for the month of July would begin with the month of June during the prior calendar year and run through the month of May of the current calendar year), either under this agreement or under any similar prior agreement between Noil Corp. Inc. and Jobber.

| Product(s) | Maximum (Gals.) |
| --- | --- |
|  |  |

**Plaintiff's Exhibit**

**1**

exhibitsticker.com



| | |
|---|---|
| ULSD/Clear | N/A |
| Motor Gasolines | N/A |

(d) Other Limitations. As used herein, "contract year" shall mean a 12-month period commencing with the first day of the term of this agreement or any anniversary thereof during the term of this agreement. Deliveries by Noil Corp. Inc. to Jobber for any fraction of a calendar month or contract year that this agreement may be in effect shall be in proportion to the quantities specified above. Although not required to do so, Noil Corp. Inc. may at its option and after request by Jobber elect to sell to Jobber quantities of crude products in excess of the maximum quantities specified herein. Deliveries by Noil Corp. Inc. to Jobber shall be spaced reasonably evenly over the month in accordance with such procedures as may be reasonably established from time to time by Noil Corp. Inc.. Jobber's purchases of each grade of a particular category of crude product shall be in such proportion as Noil Corp. Inc. in its sole discretion shall determine.

4. Delivery.

(a) Delivery Points. Subject to later change by Noil Corp. Inc. as set forth below, Noil Corp. Inc. shall deliver or arrange for the delivery of crude products to Jobber in the manner and at the delivery points set forth below. Specified for each product at each delivery point is the maximum percentage of Noil Corp. Inc.'s total maximum sales obligation for that product (as determined pursuant to section 3 of this agreement) which Noil Corp. Inc. shall be required to deliver to Jobber at that delivery point. Noil Corp. Inc. shall not be required, during any relevant time period, to deliver to Jobber at any particular delivery point quantities of any particular crude product in excess of the specified percentage of Noil Corp. Inc.'s maximum sales obligation for that product for that time period.

| Product(s) | Delivery Point | Type of Delivery | Maximum Percentage (%) |
|---|---|---|---|
| Naphtha | Corpis Christi Tx | Cust P-U | N/A |
| Motor Gasolines | Corpus Christi Tx | Cust P-U | |

Both Jobber and Noil Corp. Inc. shall have the right at any time in its absolute discretion to change any of the above delivery points and the maximum percentage of Noil Corp. Inc.'s maximum sales obligation for each product available to Jobber at each delivery point.

(b) Legal Transfer. Title and risk of loss shall pass to Jobber at the delivery point.

(c) Delivery into Jobber's Vehicles. If deliveries are to be made into vehicles supplied by Jobber, Noil Corp. Inc. shall not be required to make such deliveries into such vehicles unless they are clean and empty immediately prior to delivery and shall not be required to load or deliver quantities less than the full capacity of the vehicle, except as otherwise authorized by Noil Corp. Inc. from time to time. Jobber shall comply with such reasonable rules and regulations as Noil Corp. Inc. may from time to time establish regarding deliveries by Noil Corp. Inc. into Jobber's vehicles.

(d) Delivery into Jobber's Storage Facilities. If deliveries are to be made into Jobber's storage facilities, Jobber shall provide storage facilities sufficient to enable it to receive such deliveries and shall provide Noil Corp. Inc. with unimpeded and adequate ingress thereto and egress therefrom twenty-four hours per day. Jobber shall comply with such reasonable rules and regulations as Noil Corp. Inc. may from time to time establish regarding deliveries by Noil Corp. Inc. into Jobber's storage facilities.

(e) Delivery by Barge. If deliveries are to be made by barge, Jobber shall provide free wharfage at the delivery point where the barge may at all times lie safely afloat.

(f) Demurrage. Jobber shall reimburse Noil Corp. Inc. on demand for any demurrage or other charges incurred by Noil Corp. Inc. by reason of Jobber's failure to unload any delivery vehicle or release the same within the time allowed therefor without demurrage or other charge even though such failure may have arisen from causes beyond the control of Jobber.



(g) Orders for Delivery. Deliveries by Noil Corp. Inc. to Jobber shall be made after reasonable notice from Jobber. All orders for delivery of crude products covered by this agreement shall be placed by Jobber at Noil Corp. Inc.'s designated order point, unless Noil Corp. Inc. gives Jobber written notice of alternate arrangements.

5. Price.

The prices that Jobber shall pay Noil Corp. Inc. for crude products purchased hereunder shall be Noil Corp. Inc.'s prices to Jobber in effect at the time and place of each delivery for the particular product, grade, quantity and type of delivery involved, in accordance with the terms as defined in Exhibit D".

6. Payment Terms.

(a) Cash Terms. Jobber shall, except at Noil Corp. Inc.'s option, pay Noil Corp. Inc. cash before delivery or pickup for crude products purchased hereunder.

(b) Optional Credit Terms. Noil Corp. Inc. to make sales of crude products against the credit of Jobbers that Noil approves for such credit sales. If Jobber is so approved (and continues to be so approved) by Noil Corp. Inc. elects to make sales to Jobber under the credit arrangement, then any credit extended on such sales shall be extended by Noil Corp. Inc. and Jobber shall make payments to Noil Corp. Inc. for all crude products purchased hereunder on credit. Jobber acknowledges the importance of payment within the terms specified when credit is extended and agrees that past due amounts shall bear interest at the rate of 18% or the maximum rate permitted by the state of Jobber's residence as specified in section 20 of this agreement, whichever is less. If Jobber fails to make payment within the specified terms, such failure shall, at Noil Corp. Inc.'s option, be deemed a breach of this entire agreement and, in addition to such other remedies as it may have, Noil Corp. Inc. shall have thereafter the right to demand advance cash payment, to withhold deliveries until such advance payment (including payment of all amounts then outstanding for crude products delivered by Noil Corp. Inc. to Jobber hereunder) is received, or to terminate this agreement. The acceptance of any payment by Noil Corp. Inc. after the due date shall not waive any of Noil Corp. Inc.'s rights hereunder nor shall such withholding of deliveries or termination of this agreement affect any obligation of Jobber hereunder. If credit is extended to Jobber by Noil Corp. Inc., Jobber shall furnish Noil Corp. Inc. with such information regarding Jobber's financial condition as Noil Corp. Inc. may reasonably request from time to time.

(c) Change of Payment Terms. Noil Corp. Inc.'s terms of payment are subject to change based on agreement written with Jobber.

7. Change or Tax.

Any tax, duty, toll, fee, impost, charge or other exaction, or the amount equivalent thereto, and any increase thereof now or hereafter imposed, levied or assessed by any governmental authority upon, measured by, incident to or as a result of the transactions herein provided for (other than local, state and Federal net income taxes measured by the net income of Noil Corp. Inc. from all sources), or the transportation, importation, production, manufacture, use or ownership of the goods the subject of this agreement, shall, if collectible or payable by Noil Corp. Inc., be paid by Jobber on demand by Noil Corp. Inc.. Any such payments shall be in addition to the prices otherwise herein provided for. Jobber shall, at Noil Corp. Inc.'s request, execute and deliver to Noil Corp. Inc. such certificates or other documents as Noil Corp. Inc. may reasonably require in order to enable Noil Corp. Inc. to secure any tax exemption which may be available in connection with sales or deliveries hereunder.

8. Product Identity and Noil Corp. Inc.'s Insignia.

(a) Product Quality. The crude products covered by this agreement shall be Noil Corp. Inc.'s brands, grades and quality thereof, respectively, as established by Noil Corp. Inc. from time to time for its Noil Corp. Inc. Jobbers at the time and place of delivery. Jobber shall not permit the adulteration of any crude products purchased hereunder.

(b) Product Identity. Except as otherwise provided in paragraph (g) of this section 8, Jobber agrees that the crude products purchased hereunder shall be sold by Jobber as the products of Noil Corp. Inc. and only under the trademarks and trade names authorized for such products by Noil Corp. Inc.. At no time shall any product not authorized by Noil Corp. Inc. to be sold thereunder be offered for sale or sold under such trademarks and trade names. Jobber shall see that any likelihood of confusion between Noil Corp. Inc.'s products and those of others and



any likelihood of substitution or commingling of the products of others as or with those of Noil Corp. Inc. is eliminated and shall comply with such reasonable rules and regulations in this regard as Noil Corp. Inc. may from time to time establish, Noil Corp. Inc.'s representatives shall have the right at any time to enter upon the premises where the crude products purchased hereunder are stored by or for Jobber and to take samples of such crude products for testing purposes, compensating Jobber (at Jobber's cost, which for this purpose shall be based on Noil Corp. Inc.'s price to Jobber hereunder then in effect at the time such samples are taken, or, at Noil Corp. Inc.'s option, in kind) for any products so taken.

(c) Jobber's Indemnity Obligations. Jobber's indemnity obligation under section 17 of this agreement shall include, but not be limited to, any and all expense, liability and claims for damage to property (including property of Jobber), or for injury to or death of any person (including Jobber), directly or indirectly arising or alleged to arise from anything occurring from any cause on or about or in connection with the maintenance, upkeep, repair, replacement or operation of any retail outlet supplied by Jobber (other than retail outlets to which Jobber makes deliveries as Noil Corp. Inc.'s agent pursuant to section 22 of this agreement) or anything located thereon, and the insurance to be carried by Jobber pursuant to section 18 of this agreement shall include, but not be limited to, insurance in regard to each such retail outlet (other than retail outlets to which Jobber makes deliveries as Noil Corp. Inc.'s agent pursuant to section 22 of this agreement) of the types and in the amounts specified in section 18 of this agreement and, upon request by Noil Corp. Inc., Jobber shall furnish Noil Corp. Inc. with satisfactory evidence of the maintenance of such insurance.

10. Conduct of Jobber's Business.

(a) Independent Business. In the performance of this agreement Jobber is engaged in an independent business and nothing herein contained shall be construed as granting Noil Corp. Inc. any right to control or direct Jobber with respect to Jobber's such business. Noil Corp. Inc. has no right to exercise any control over any of Jobber's employees, all of whom are entirely under the control and direction of Jobber, who shall be responsible for their actions and omissions. Jobber accepts exclusive liability for all contributions and payroll taxes required under Federal Social Security laws and State Unemployment Compensation laws or other payments under any laws of similar character as to all persons employed by and working for Jobber.

(b) Legal Compliance. Jobber shall conduct all operations hereunder in strict compliance with all applicable laws, ordinances and regulations of all governmental authorities, including but not limited to all rules and regulations of the Department of Transportation, the Federal Petroleum Marketing Practices Act and all applicable franchise laws and regulations. Jobber shall supply Noil Corp. Inc. with all information which Noil Corp. Inc. shall reasonably request to enable Noil Corp. Inc. to comply with all applicable laws, ordinances and regulations of all governmental authorities. Jobber's indemnity obligation under section 17 of this agreement shall include, but not be limited to, any and all expense, liability, claims, fines, civil penalties or demands which may arise or be assessed as a result of any failure by Jobber to comply with any of the foregoing governmental requirements.

(c) Sale of Noil Corp. Inc.'s Products. Jobber shall diligently promote the sale in Jobber's area of primary responsibility of the crude products purchased under this agreement, and shall conduct the operation of Jobber's business in such a manner as to promote goodwill toward Noil Corp. Inc. and its products. Jobber agrees to assist in the administration of any promotional programs Noil Corp. Inc. may establish for its dealer or other customers. Jobber agrees to distribute to Jobber's customers such promotional materials supplied by Noil Corp. Inc. as Noil Corp. Inc. may from time to time reasonably request.

11. Oil Spills.

If a crude product spill occurs anywhere in connection with Jobber's performance of this agreement, Jobber shall promptly notify Noil Corp. Inc. and the appropriate governmental authorities and shall take immediate action to clean up the spill and prevent further damage. Upon receipt of such notification, Noil Corp. Inc. shall have the right, at its election, to provide, or cause to be provided, to Jobber such additional manpower, equipment and material as in Noil Corp. Inc.'s sole discretion are deemed reasonable to complete the clean-up in a satisfactory manner. Jobber shall pay and be responsible for, and Jobber's indemnity obligation under section 17 of this agreement shall include, but not be limited to, all costs and expenses incurred in connection with the clean-up operations, including reimbursement to Noil Corp. Inc. for all of its costs and expenses, and all fines, charges, fees or judgments imposed or levied by any Federal, state or local governmental agency as a result of such spill, except



in the event the spill resulted solely from any act or omission on the part of Noil Corp. Inc. or Noil Corp. Inc.'s employees.

12. Sale of Jobber's Business.

(a) Offer to Transfer Assets. Subject to any valid requirements of any applicable statute, if at any time during the term of this agreement, Jobber desires to sell, lease or otherwise transfer all or any part of the assets (including but not limited to real or personal property, contract rights, accounts receivable, customer lists and other intangible assets) then used by Jobber in the distribution and sale of crude products purchased under this agreement (other than as collateral for a loan from a financial institution or any other transfer in the ordinary course of Jobber's business), and Jobber receives a bona fide offer for the same which Jobber wishes to accept, Jobber shall immediately notify Noil Corp. Inc. in writing of the terms thereof and provide Noil Corp. Inc. with a complete copy of the executed written agreement or other documents embodying such offer which contain all of the terms and conditions between the parties, with no material terms yet to be negotiated, together with copies of all information regarding Jobber's business supplied to the offeror by Jobber, and all information and documentation required by section 16 of this agreement.

(b) Noil Corp. Inc.'s Right of First Refusal. Noil Corp. Inc. shall have the right to acquire such interest of Jobber at the price and on the terms of such offer if Noil Corp. Inc., within sixty (60) days after Noil Corp. Inc.'s receipt of such written notice from Jobber of any such offer (together with all documents and other information required by this section 12 and section 16), notifies Jobber in writing of Noil Corp. Inc.'s exercise of such option. If Noil Corp. Inc. exercises such right, the transaction shall be consummated within thirty (30) days after delivery to Jobber of Noil Corp. Inc.'s notice of exercise or at such later date as may be specified in the offer and Jobber shall, prior to such date and at Jobber's expense, do all things necessary or desirable in order to give Noil Corp. Inc. title to the interest being acquired free from the claims of Jobber's creditors. If Noil Corp. Inc. does not exercise such right, Jobber may, at any time within six months after the expiration of such 60-day period, but no later, sell, lease or otherwise transfer such interest, but only to the original offeror and only upon the terms of the offer submitted by Jobber to Noil Corp. Inc..

(c) General. Noil Corp. Inc.'s rights hereunder shall continue to apply until Jobber's entire interest is transferred in accordance herewith. An offer by a third party to exchange other property interests owned or to be acquired by it for any interest of Jobber shall be deemed to constitute an offer to purchase for a price equal to the fair market value of the property offered in exchange. Nothing herein shall be construed as a consent by Noil Corp. Inc. to any such sale, lease or transfer or a waiver of any of Noil Corp. Inc.'s rights under section 16 hereof or under any other agreement between Jobber and Noil Corp. Inc.. Noil Corp. Inc. shall have the right to assign its rights under this section 12 to a third party.

13. Prevention of Performance; Shortage of Supply.

(a) Force Majeure. There shall be no obligation to sell or deliver or to receive or use the crude products covered by this agreement when and while, and to the extent that, the receiving or using or manufacture or making deliveries in the customary manner is prevented or hindered by act of God, fire, riot, labor disturbances (whether involving employees of the party affected or of others and regardless of whether the disturbance could be settled by acceding to the demands of a labor group), accident, war or the acts of any government (whether foreign or domestic, Federal, state, county or municipal) or any causes beyond the reasonable control of the party affected, whether or not similar to any of the foregoing causes. In cases of partial or total interruption or loss or shortage of transportation facilities or supplies, or shortage of products deliverable hereunder, Noil Corp. Inc. may allocate deliveries of available products among Jobber, Noil Corp. Inc.'s other customers, contract or otherwise, including Noil Corp. Inc.'s affiliates, and Noil Corp. Inc. for its own use, on any basis which in Noil Corp. Inc.'s sole judgment is fair and reasonable, allowing for such priorities as Noil Corp. Inc. deems appropriate. No such reduction need be made up.

(b) Shortage of Supplies. Due to uncertainties in the supply/demand situation (which may include a decision by Noil Corp. Inc. that the costs of some crude oil and petroleum products which might be available are unreasonable), Noil Corp. Inc. may not have sufficient supplies of one or more of the crude products covered by this agreement to meet the full requirements of Jobber, of Noil Corp. Inc.'s other customers, contract or otherwise, including Noil Corp. Inc.'s affiliates, and of Noil Corp. Inc. for its own use. Whenever that situation exists and Noil Corp. Inc.'s performance hereunder is not otherwise excused, Noil Corp. Inc. may allocate deliveries of available



products on any basis which in Noil Corp. Inc.'s sole judgment is fair and reasonable, allowing for such priorities as Noil Corp. Inc. deems appropriate. No such reduction need be made up.

(c) Allocation. Allocation is fair and reasonable even if it is based on a shortage in the then contemplated sources of supply or a general shortage in Noil Corp. Inc.'s system or on historical or planned deliveries. "Noil Corp. Inc.'s system" means the supply system of Noil Corp. Inc.'s parent company, Noil Corp. Inc., and its wholly owned subsidiaries.

14. Termination.

(a) Jobber's Right to Terminate This Agreement. Jobber may terminate this agreement without cause at any time during the term hereof upon giving Noil Corp. Inc. written notice of such termination within 7 days.

(b) Noil Corp. Inc.'s Right to Terminate This Agreement (other than for market withdrawal). Noil Corp. Inc. may, in addition to its other remedies, including but not limited to the right to terminate this agreement as otherwise provided herein, terminate this agreement upon giving Jobber ninety (90) days' prior written notice of such termination or, if it would not be reasonable for Noil Corp. Inc. to give ninety (90) days' prior written notice, at Noil Corp. Inc.'s election upon giving Jobber prior notice for such lesser period as is reasonable in the circumstances, if any one of the following occurs:

(1) Curable Breach. Jobber by act or omission breaches or defaults on any covenant, condition or other provision of this agreement, which breach or default can be cured, and Jobber fails to cure such breach or default within ten (10) days after such written notice from Noil Corp. Inc. which shall specify such breach or default; or

(2) Noncurable Breach. Jobber by act or omission breaches or defaults on any covenant, condition or other provision of this agreement, which breach or default cannot be cured, or in the event of any breach or default by Jobber after notice of two previous breaches or defaults of any kind has been given hereunder, regardless of Jobber's curing of such previous breaches or defaults; or

(3) Failure to Exert Good Faith Efforts to Honor Agreement. Jobber fails to exert good faith efforts to carry out the provisions of this agreement following written notice to Jobber from Noil Corp. Inc. of such failure and a reasonable opportunity to exert good faith efforts to carry out such provisions; or

(4) Failure to Pay Noil Corp. Inc. in a Timely Manner. Jobber fails to pay to Noil Corp. Inc. in a timely manner when due all sums to which Noil Corp. Inc. is legally entitled (whether or not such sums are owed under this agreement); or

(5) Noncompliance with Applicable Laws. Jobber knowingly fails to comply with Federal, state or local laws and regulations relevant to Jobber's performance of this agreement; or

(6) Trademark Violation. Willful adulteration, commingling, mislabeling or misbranding of motor fuels or other violations by Jobber of trademarks utilized by Noil Corp. Inc.; or

(7) Unlawful or Deceptive Acts. Unlawful, fraudulent or deceptive acts or practices or criminal misconduct by Jobber relevant to Jobber's performance of this agreement; or

(8) Inducement of Breach of Third-Party Contract. Jobber knowingly induces the breach by a third party of a contract between Noil Corp. Inc. and the third party; or

(9) Felony Conviction. Conviction of Jobber of any felony involving moral turpitude; or

(10) Death. Jobber's death if Jobber is an individual (subject to any valid requirements of any applicable statute); or

(11) Other Events. Any other event which is relevant to the relationship between Noil Corp. Inc. and Jobber and as a result of which termination of this agreement is reasonable.

Without limitation on the foregoing, it is agreed that upon the occurrence of any of the events specified in clauses (6) through (10) of this paragraph (b) it would not be reasonable to require Noil Corp. Inc. to give ninety (90) days' prior written notice, that ten (10) days' notice would be reasonable in the circumstances, and that in any such circumstance Noil Corp. Inc. may elect to terminate this agreement upon giving Jobber ten (10) instead of ninety (90) days' prior written notice of such termination.



(c) <u>Market Withdrawal</u>. If during the term hereof Noil Corp, Inc. decides to withdraw from marketing motor fuel in Jobber's area of primary responsibility through retail outlets identified by Noil Corp. Inc.'s insignia, Noil Corp. Inc. may terminate this agreement by giving Jobber one hundred eighty (180) days' prior written notice of such termination and otherwise complying with any applicable requirements of law, including the Federal Crude Marketing Practices Act.

(d) <u>No Implied Waiver or Release</u>. Waiver by Noil Corp. Inc. of one or more breaches or defaults hereunder by Jobber shall not be deemed to be a waiver of any other or continuing breach or default hereunder. Termination of this agreement shall not relieve Jobber of responsibility for obligations incurred prior to termination.

(e) <u>Sale of Products After Expiration of Term</u>. If Noil Corp. Inc. continues to accept orders from Jobber for the crude products covered hereby following expiration of the term of this agreement, such sales shall be upon all of the terms and conditions hereof; provided that such sales shall not be construed to evidence a renewal of this agreement by operation of law or otherwise, but shall imply only an agreement from day to day, which Noil Corp. Inc. may (subject to any valid requirements of any applicable statute) terminate without cause at any time upon giving Jobber written notice of such termination.

15. <u>Exchange Terminals</u>.

(a) <u>Termination of Exchange Agreements</u>. Each of the following delivery points is an exchange terminal at which crude products are made available to Noil Corp. Inc. pursuant to a product exchange agreement between Noil Corp. Inc. and a third party:

Corpus Christi, TX

Each such exchange agreement is terminable at any time by either party thereto without cause upon short notice typically thirty (30) to sixty (60) days' notice. If any such exchange agreement is terminated by either party thereto (and Noil Corp. Inc. may do so in its absolute discretion), Noil Corp. Inc. may terminate its obligations under section 4 of this agreement to deliver crude products to Jobber at the applicable delivery point upon giving Jobber ninety (90) days' prior written notice of such termination or, if it would not be reasonable for Noil Corp. Inc. to give ninety (90) days' prior written notice, at Noil Corp. Inc.'s election upon giving Jobber prior notice of such lesser period as is reasonable in the circumstances. If Noil Corp. Inc.'s obligations to make deliveries at a particular delivery point are terminated pursuant hereto, Noil Corp. Inc.'s maximum sales obligation under section 3 of this agreement for each product previously delivered to Jobber at that delivery point shall be reduced by the maximum percentage of Noil Corp. Inc.'s maximum sales obligation for each such product available to Jobber at that delivery point as set forth in section 4 of this agreement.

(b) <u>Alternative Supply Arrangements</u>. If any such exchange agreement is terminated and Noil Corp. Inc. is able to make alternative arrangements, on terms and conditions which are (in its sole judgment) satisfactory to Noil Corp. Inc., for the supply of crude products to Jobber at the applicable delivery point, Noil Corp. Inc.'s obligations hereunder shall be subject to all of the terms and conditions of such alternative supply arrangements. If only limited quantities of crude products are available to Noil Corp. Inc. at such delivery point under such alternative supply arrangements, Noil Corp. Inc. may allocate deliveries of available products in the manner set forth for other circumstances in section 13 of this agreement. No such reduction need be made up. Upon termination of such alternative supply arrangements, Noil Corp. Inc. shall have the right, pursuant to paragraph (a) of this section 15, to terminate its obligations to make deliveries at the applicable delivery point and proportionately to reduce its maximum sales obligations to Jobber.

(c) <u>Termination of Supply at All Delivery Points</u>. If pursuant hereto Noil Corp. Inc.'s obligation to sell crude products to Jobber has been terminated with respect to all delivery points and Noil Corp. Inc. therefore no longer has any remaining obligation hereunder to sell crude products to Jobber, this agreement shall automatically terminate without further notice to Jobber.

(d) <u>Exchange Terminal Rules and Regulations</u>. Jobber shall comply with all applicable rules and regulations of any exchange terminal in effect at the time of delivery, including but not limited to any requirement that Jobber provide specified insurance coverage.

16. <u>Assignment</u>.



(a) Assignment by Jobber. This agreement is personal to Jobber and Jobber shall not, subject to any valid requirements of any applicable statute, assign any rights or delegate any duties that Jobber may have under this agreement, either voluntarily, involuntarily, by operation of law, or otherwise, without the prior written consent of Noil Corp. Inc.. Jobber shall advise Noil Corp. Inc. in writing of any proposed assignment, and shall provide Noil Corp. Inc. such information and documentation relating to the proposed assignment and assignee as Noil Corp. Inc. may reasonably require, including but not limited to a fully completed Jobber Application in Noil Corp. Inc.'s then-current form, together with all financial statements and other attachments designated in such application, and all information and documentation required by section 12 of this agreement.

(b) Change in Control of Corporation. This paragraph (b) applies if Jobber is a corporation. Any sale, conveyance, alienation, transfer or other change of interest in or title to or beneficial ownership of any voting stock of Jobber (or securities convertible into voting stock of Jobber) which results in a change in the control of Jobber, whether voluntarily, involuntarily, by operation of law, merger or other corporate proceedings, or otherwise, shall be construed as an assignment of Jobber's rights under this agreement. A change in the control of Jobber shall be deemed to occur whenever a party gains the ability to influence the business and affairs of Jobber directly or indirectly. A party who owns twenty-five percent (25%) or more of the voting stock of Jobber (or securities convertible into such voting stock) shall be deemed to have such ability. Thus, for example, the following would constitute an assignment of Jobber's rights hereunder and require Noil Corp. Inc.'s prior written consent under paragraph (a) of this section 16: (i) the transfer of 25% or more of the voting stock of Jobber, (ii) the transfer of a lesser percentage of such stock to an existing stockholder who thereby would own 25% or more of Jobber's voting stock, or (iii) the transfer of a lesser percentage of such stock which as a practical matter results in a change in the control of Jobber.

(c) Change in Control of Partnership. This paragraph (c) applies if Jobber is a partnership. Any sale, conveyance, alienation, transfer or other change of interest in or title or beneficial ownership of any partnership interest in Jobber which results in a change in the control of Jobber, whether voluntarily, involuntarily, by operation of law, or otherwise, shall be construed as an assignment of Jobber's rights under this agreement. A change in the control of Jobber shall be deemed to occur whenever a party gains the ability to influence the business and affairs of Jobber directly or indirectly. A party who owns twenty-five percent (25%) or more of a partnership (whether a general or a limited partnership), or 25% of the general partnership interests in a limited partnership, shall be deemed to have such ability. Thus, for example, the following would constitute an assignment of Jobber's rights hereunder and require Noil Corp. Inc.'s prior written consent under paragraph (a) of this section 16: (i) the transfer of 25% or more of the beneficial interest in Jobber, (ii) the transfer of 25% or more of the general partnership interests in Jobber, (iii) the transfer of a lesser percentage of such interests in Jobber to an existing partner who would thereby own 25% or more of the total partnership or 25% or more of the general partnership interests in Jobber, or (iv) the transfer of a lesser percentage of such partnership interests which as a practical matter results in a change in the control of Jobber.

17. Indemnity.

Jobber shall indemnify, defend and hold harmless Noil Corp. Inc., Noil Corp. Inc., the subsidiary and affiliated companies of each of them (collectively "Noil Corp. Inc. and its affiliates"), and their respective directors, employees and agents, from and against any and all expenses (including attorneys' fees), liabilities and claims of whatsoever kind and nature, including but not limited to those for damage to property (including property of Jobber) or for injury to or death of any person (including Jobber), directly or indirectly arising or alleged to arise out of or in any way connected with the storage, handling, distribution, sale or use of any crude products purchased hereunder, or with the maintenance, upkeep, repair, replacement or operation of any premises used by Jobber in connection with this agreement or anything located thereon, including any act or omission of Jobber or Jobber's agents or employees in the performance of this agreement, or in the operation of any vehicle or vehicles in connection with Jobber's business.

18. Insurance.

(a) Insurance to be Maintained by Jobber. Without in any way limiting Jobber's indemnity obligation under section 17 of this agreement, Jobber shall maintain at Jobber's own expense during the term of this agreement the insurance specified below with respect to Jobber's operations in connection with this agreement:

(1) Employees. Workers' Compensation and Employer's Liability Insurance as prescribed by applicable law;



(2) General Liability. Comprehensive or Commercial General Liability (Bodily Injury and Property Damage) Insurance of not less than $1,000,000 combined single limit per occurrence, including the following supplementary coverage: (i) Contractual Liability Insurance to cover liability assumed under this agreement and (ii) Product and Completed Operations Liability Insurance;

(3) Vehicles. Automobile Liability (Bodily Injury and Property Damage) Insurance of not less than $1,000,000 combined single limit per occurrence, on all owned, non-owned and hired vehicles; and

(4) Other Legal Requirements. Any other insurance or surety bonding that may be required under the laws, ordinances and regulations of any governmental authority, including the Federal Motor Carrier Act of 1980 and all rules and regulations of the Department of Transportation.

(b) Other Insurance Requirements. The insurance specified in paragraph (a) of this section 18 shall be issued by insurance companies which meet Noil Corp. Inc.'s financial standards for insurers (as established by Noil Corp. Inc. from time to time) and shall require the insurer to provide Noil Corp. Inc. with ten (10) days' prior written notice of any cancellation or material change in the insurance. The insurance specified in clauses (2), (3) and (4) of paragraph (a) shall name Noil Corp. Inc. and its affiliates as additional insureds.

(c) Proof of Insurance. Jobber shall furnish Noil Corp. Inc. with certificates or other documentary evidence satisfactory to Noil Corp. Inc. of the insurance required to be maintained by Jobber under this section 18. If Jobber fails to do so as to any of the required insurance, then Noil Corp. Inc., in addition to such other remedies as it may have, shall have the right to purchase such insurance at Jobber's expense. Jobber shall, upon demand promptly reimburse Noil Corp. Inc. for the cost of any insurance purchased by Noil Corp. Inc. for Jobber's account under this paragraph (c).

19. Motor Fuel Regulations.

(a) Compliance Requirements. The crude products covered by this agreement include products that are subject to Federal air pollution laws and regulations controlling fuels and fuel additives for use in motor vehicles and motor vehicle engines. Those laws and regulations require motor fuels to meet product specifications designed to minimize harmful emissions, and impose directly on Jobber, any distributor, reseller, retailer or wholesale purchaser-consumer (as defined in such regulations) receiving regulated motor fuels from ("Jobber's motor fuel customers") and Noil Corp. Inc. specific legal obligations in selling and distributing regulated motor fuels. Noil Corp. Inc. has established certain programs and procedures for handling regulated motor fuels to achieve compliance with these governmental requirements and reduce liability exposure for noncompliance. Jobber recognizes the importance to Noil Corp., Inc., Jobber and the public of Jobber and Jobber's motor fuel customers meeting fully all governmental motor fuel requirements. Accordingly, Jobber shall comply with, and shall cause Jobber's motor fuel customers to comply with, Noil Corp. Inc.'s current and future programs and procedures for handling regulated motor fuels, as set forth in Noil Corp. Inc.'s Motor Fuel Quality Compliance Manual or other written communications that Noil Corp. Inc. has distributed or may in the future distribute to Jobber. Jobber shall require Jobber's motor fuel customers to follow Noil Corp. Inc.'s programs and procedures for handling regulated motor fuels by written agreement in a form approved by Noil Corp. Inc.. Noil Corp. Inc. does not represent or warrant that following its programs and procedures for handling regulated motor fuels will ensure compliance with all governmental motor fuel requirements. Jobber is independently responsible for complying fully with all applicable Federal, state and local laws and regulations pertaining to motor fuels, and for causing Jobber's motor fuel customers to so comply.

(b) Product Testing. Jobber shall promptly advise Noil Corp. Inc. if Jobber has any indication that contamination of motor fuel may have occurred in order that Noil Corp. Inc. may, at its option, conduct a test of such product. Noil Corp. Inc.'s representatives shall have the right at any time to enter upon the premises where motor fuels purchased hereunder are stored by or for Jobber and to take such quantities of such products as they deem necessary to check the quality of the product, compensating Jobber (at Jobber's cost, which for this purpose shall be based on Noil Corp. Inc.'s price to Jobber hereunder in effect at the time such product is taken, or, at Noil Corp. Inc.'s option, in kind) for any product so taken.

(c) Indemnity. Jobber's indemnity obligation under section 17 of this agreement shall include, but not be limited to, any and all expense, liability, claims, fines, civil penalties or demands which may arise or be assessed as a result of any act or omission of Jobber, Jobber's agents, employees or carriers or of Jobber's motor fuel customers



in handling motor fuel purchased hereunder, or as a result of failure by any of them to follow Noil Corp. Inc.'s programs and procedures for handling motor fuel.

(d) Noncompliance. If Jobber fails to comply with the requirements of this section 19 with regard to any particular motor fuel product, then Noil Corp. Inc., in addition to such other remedies as it may have, shall have the right to terminate delivery to Jobber of the motor fuel product in question or to suspend such delivery until Noil Corp. Inc. is satisfied that Jobber is again in compliance herewith.

20. Notices; Confidential Information.

(a) Notices. Any and all written notices to be given hereunder shall be posted by certified mail or personally delivered to the other party at the address set forth below, or at such other address as either party may designate by written notice to the other. Any such notice shall be deemed received when deposited in the United States mail with postage fully prepaid thereon or when personally delivered.

| Noil Corp. Inc. | Maxim Crude Oil, LLC LLC |
|---|---|
| 100 East Walton St. #700 | 1058 FM 3024 |
| Chicago, Illinois 60611 | West George, Texas 78022 |

(b) Confidential Information. Jobber agrees that all materials, technology and information made available to Jobber and not to the general public by or at the direction of Noil Corp. Inc. at any time before or during the term of this agreement through any means of communication (collectively "Confidential Information") shall be considered proprietary trade secrets of Noil Corp. Inc.. Without limitation on the generality of the foregoing, Confidential Information includes information about or derived from a Noil Corp. Inc. web site or a web site maintained by a third party designated by Noil Corp. Inc., which is accessible by Jobber but not the general public. Jobber shall keep confidential all Confidential Information and use it only in connection with Jobber's operations as an authorized reseller of Noil Corp. Inc. products. Jobber shall not disclose Confidential Information to anyone other than Jobber's employees, agents or contractors who have a need to know Confidential Information to assist such operations, and Jobber shall cause any such person to whom Jobber discloses Confidential Information to keep it confidential and not to disclose it to anyone else. Upon Noil Corp. Inc.'s request, Jobber shall promptly return or destroy all Confidential Information disseminated in written, electronic or machine-readable form, and all notes, documents and computer files containing Confidential Information, and all copies of the foregoing. Jobber shall notify Noil Corp. Inc. promptly in the event Jobber is required by legal process to disclose any Confidential Information, and make reasonable efforts to obtain an appropriate protective order for any such required disclosure of Confidential Information.

21. Prior Agreements.

This agreement shall not become effective if, prior to the commencement of the term hereof, Noil Corp. Inc. notifies Jobber of Noil Corp. Inc.'s election to exercise any right Noil Corp. Inc. may have to terminate any prior agreement with Jobber covering the sale by Noil Corp. Inc. of crude products to Jobber. In such event this agreement shall be null and void. Subject to the foregoing, effective as of the commencement of the term hereof, this agreement terminates and supersedes any prior agreements between Jobber and Noil Corp. Inc. and its affiliates relating to the subject matter hereof, provided that any outstanding breach by Jobber of any such prior agreement shall be deemed to be a breach of this agreement. No modification of this agreement, and no waiver of any provision hereof, shall be binding on Noil Corp. Inc. unless in writing and signed by Noil Corp. Inc..

22. Deliveries to Contract Accounts.

(a) Noil Corp. Inc.'s Contract Customers. Jobber shall, at Noil Corp. Inc.'s request and as Noil Corp. Inc.'s agent, make deliveries of crude products for Noil Corp. Inc.'s account to those customers under contract with Noil Corp. Inc. ("contract customers") specified in Exhibit C hereto and to such other contract customers as Noil Corp. Inc. may from time to time specify during the term hereof. Contract customers may include, without limitation, local, state and Federal governments, retail dealers, certain consumers and other resellers. Jobber shall be credited by Noil Corp. Inc. at Jobber's cost for the particular crude product involved, based on Noil Corp. Inc.'s price to Jobber hereunder in effect at the time that Jobber makes such delivery. Each such delivery by Jobber shall constitute a return to Noil Corp. Inc.'s inventory of the crude product so delivered and not a resale of the crude product by Jobber to Noil Corp. Inc., and the quantities of crude products so delivered shall not constitute a part of the maximum quantities specified in section 3 of this agreement.



(b) Mode of Delivery. In addition to deliveries from Jobber's trucks into the storage facilities of contract customers, Jobber shall, at Noil Corp. Inc.'s request, make deliveries into contract customers' trucks at Jobber's storage facilities, and Jobber shall provide unimpeded and adequate access to Jobber's storage facilities during normal business hours to enable contract customers to receive deliveries of crude products.

(c) Credit Deliveries. In making deliveries for Noil Corp. Inc.'s account to contract customers, Jobber shall confine all credit deliveries, both as to time and money limits, within the authority given to Jobber by Noil Corp. Inc. in writing. If Jobber makes any credit deliveries in excess of written authorization either as to time or money limits, Jobber shall pay Noil Corp. Inc. upon demand the amount of such sale price which on the date of such demand remains unpaid to Noil Corp. Inc., and Noil Corp. Inc. may set off such unpaid price against any sums then or thereafter due to Jobber from Noil Corp. Inc..

(d) Compensation. As Jobber's sole compensation for making deliveries to contract customers, on or before the twentieth (20th) day of each month during the term hereof Noil Corp. Inc. shall pay Jobber the service charges specified in Exhibit C hereto on all deliveries of crude products made by Jobber during the preceding calendar month to the contract customers specified in Exhibit C and shall pay Jobber such service charges as may be later agreed upon by Noil Corp. Inc. and Jobber on all deliveries of crude products made by Jobber during the preceding month to such other contract customers as Noil Corp. Inc. may specify during the term hereof.

23. Jobber Application; Conflicts of Interest.

(a) Jobber Application. Jobber represents and warrants that all information set forth in Jobber's written application to become a Noil Corp. Inc. Jobber and all other written information, including but not limited to financial statements, submitted by Jobber in connection with such application was at the time of submission true, accurate and complete, and did not omit any material fact necessary to make the information submitted, in light of the circumstances under which it was submitted, not misleading.

(b) Residency. Jobber represents and warrants that Jobber is a citizen or lawful permanent resident of the United States. Jobber shall upon request furnish Noil Corp. Inc. with proof of Jobber's citizenship or immigration status.

(c) Sales or Earnings Projections Disclaimer. Due to the various factors which may affect the performance of an individual jobber's business. Noil Corp. Inc. does not supply statements of estimated or projected sales or earnings to prospective Jobbers, nor does Noil Corp. Inc. represent that Jobbers will earn or are likely to earn a profit. And no employee of Noil Corp. Inc. has been or is authorized to make such statements.

(d) Conflicts of Interest. Except as otherwise expressly provided herein, neither Jobber nor any director, employee or agent of Jobber shall give to or receive from any director, employee or agent of Noil Corp. Inc. and its affiliates any gift, entertainment or other favor of significant value, or any commission, fee or rebate, in connection with this agreement. Neither Jobber nor any director, employee or agent of Jobber shall, without Noil Corp. Inc.'s prior written consent, enter into or maintain any business arrangement with any director, employee or agent of Noil Corp. Inc. and its affiliates unless such person is acting as a representative of and on behalf of Noil Corp. Inc. and its affiliates.

(e) Violation. In the event of any violation of this section 23, including any breach of the warranties set forth in this section 23 or any other violation occurring prior to the commencement of the term hereof which resulted directly or indirectly in Noil Corp. Inc. entering into this agreement, Noil Corp. Inc. shall have the right to terminate this agreement. Jobber shall immediately notify Noil Corp. Inc. upon acquiring knowledge of any violation of this section 23.

*Signature Page Next Page*

MAXIM CRUDE OIL, LLC                         NOIL CORP. INC. CORP

By: James Jenson                             By: Steve Neely
As: CEO                                      As: CEO

Signature: _____          Signature: _____

**EXHIBIT A**

## CRUDE JOBBER PRODUCTS AGREEMENT

Jobber's area of primary responsibility, referred to in Section I of this agreement, consists of the following:

| County | State |
|--------|-------|
| Harris | Texas |

## EXHIBIT B

### CRUDE JOBBER PRODUCTS AGREEMENT

#### GALLONS PER MONTH

| Month | Naphtha |
|---|---|
| March | 6,300,000 |
| April | 6,300,000 |
| May | 6,300,000 |
| June | 6,300,000 |
| July | 6,300,000 |
| August | 6,300,000 |
| September | 6,300,000 |
| October | 6,300,000 |
| November | 6,300,000 |
| December | 6,300,000 |
| January | 6,300,000 |
| February | 6,300,000 |
| | |
| TOTAL | 75,600,000 |

*amounts are subject to increase



**EXHIBIT C**

**CRUDE JOBBER PRODUCTS AGREEMENT**

Pursuant to section 22 of this agreement, for requested deliveries by Jobber for Noil Corp. Inc.'s account to the contract customers specified below, Noil Corp. Inc. shall pay Jobber the following service charges:

**THIS EXHIBIT IS NOT APPLICABLE.**



**EXHIBIT D**

**CRUDE JOBBER PRODUCTS AGREEMENT -- PRICING BENCHMARK**

Noil agrees to provide the following Opis Benchmark Pricing: *Based on current month daily Closing Price*

*CBOE*

Mont Belviue, Texas

Based of 3-day average

Minus (-)$0.03 cent per gallon

**END EXHIBIT**

INVOICE                          1800310791

15 March 2021
NOIL CORP INC

Chicago, IL 60611              844-427-7877

PAYMENT DUE BY:        March 16, 2021

| Sold To: | | BOL n/a |
| --- | --- | --- |
| Attn: James Jenson | | |
| MAXIM CRUDE OIL LLC | | |
| 1026 FM 3024 | | |
| George West, Texas 78022 | | |

| QUANTITY (Gal) | DETAILS | UNIT PRICE LINE TOTAL | |
| --- | --- | --- | --- |
| 1,425,000 | 1,425 million gallons Naphtha EK 390 | 1.6393 | 2,329,897.50 |
| 20% overage | | 465,979.50 | |

**Payment is to be held by Noil Corp Inc. trade account until the first lift has been confirmed as completed **

** All payments are due by Friday at 11 AM CT for the following week. **

| | |
| --- | --- |
| Bank Beneficiary: | Noil Corp Inc |
| Name of Bank: | First Midwest Bank |
| Address of Bank: | 749 Lee St, Des Plaines, IL 60016 |
| Account Number: | 9155725555 |
| Routing Number: | 021901208 |
| Payment Reference: | 1800310791 |

http://noilcorp.com
info@noilcorp.com

**PAYMENT SHOULD BE MADE BY BANK TRANSFER. MADE PAYABLE TO NOIL CORP INC.**

Agreed to by Maxim Crude Oil, LLC:

Agreed to by Noil Corp Inc.:

2021DCV-1521-A



SCHAIN BANKS KENNY & SCHWARTZ LTD

Marty J. Schwartz

70 W. Madison Street

Suite 2300

Chicago, IL 60602

Main (312) 345-5700

Fax (312) 345-5701

mschwartz@schainbanks.com

www.schainbanks.com

**Via certified mail 7019 0140 0000 5961 7130
and email James@MaximCrude.com**
April 15, 2021

Maxim Crude Oil, LLC
Att: James Jensen
1058 FM
West George, TX  78022

**RE:    Noil Corp Inc. v Maxim Crude Oil, LLC
         March 15, 2021 Crude Products Agreement**

Dear Mr. Jensen:

The undersigned is counsel for Noil Corp Inc.

My client acknowledges receipt of your letter of April 5, 2021.

Noil Corp. is in the process of procuring the first month's supply of
Naphtha, which is 6,300,000 gallons. You are aware of these efforts and you
are aware of the reasons that none of the Naphtha has been delivered yet.

At this point, my client is offering you two options. One, you can wait for
my client to procure the Naphtha, which my client anticipates will be

Plaintiff's Exhibit

**2**

shortly. Two, you can cancel the first month's order, which would be considered a breach of the contract. In the event of a breach, my client will deduct its lost profits for the first month ($570,000) and refund the balance of the initial payment made by Maxim to Noil Corp.

Please advise as soon as possible as to your preference. My client will cease its efforts to procure the product based on your April 5, 2021 letter until you advise of your choice.

Please feel free to contact me or have your counsel contact me if you have any questions.

My client looks forward to resolving this issue in an amicable manner.

Very truly yours,

Marty J. Schwartz
MJS/kr

# INVOICE    1800310791

15 March 2021
**NOIL CORP INC**
Chicago, IL 60611                    844-427-7877

**PAYMENT DUE BY:**          March 16, **2021**

**Sold To:**                                                                BOL n/a
**Attn: James Jenson**
**MAXIM CRUDE OIL LLC**
1058 FM 3024
George West, Texas 78022

| QUANTITY (Gal) | DETAILS | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| 2,200,000 | 2.2 million gallons Naphtha TK-300 | 1.4793 | 3,254,394.00 |

**Payment is to be held by Noil Corp Inc. trade account until the first lift has been confirmed as completed.**

**All payments are due by Friday at 11 AM CT for the following week.**

Net Total    $3,598,100.00

|  | USD TOTAL | $3,254,394.00 |
|---|---|---|

**PAYMENT DETAILS**                                                    OTHER INFORMATION
Name of Beneficiary:          Noil Corp Inc

Name of Bank:                First Midwest Bank

Address of Bank:              749 Lee St. Des Plaines, IL 60016

Account Number:              8100728099                    http://noilcorp.com

Routing Number               071901604                    info@noilcorp.com

Payment Reference:            1800310785

**PAYMENT SHOULD BE MADE BY BANK TRANSFER.  MADE PAYABLE TO NOIL CORP INC.**

Agreed to by Maxim Crude Oil, LLC:_____-

Agreed to by Noil Corp Inc.:_____

Plaintiff's Exhibit

**3**

# INVOICE        1800310791

15 March 2021
**NOIL CORP INC**
Chicago, IL 60611        844-427-7877

**PAYMENT DUE BY:**      **March 16, 2021**

**Sold To:**        BOL n/a
**Attn: James Jenson**
**MAXIM CRUDE OIL LLC**
1058 FM 3024
George West, Texas 78022

| QUANTITY (Gal) | DETAILS | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| 1,575,000 | 1.575 million gallons Naphtha TK-300 | 1.4793 | 2,329,897.50 |
| 20% overage | | | 465,979.50 |

**\*\*Payment is to be held by Noil Corp Inc. trade account until the first lift has been confirmed as completed.\*\***

**\*\*All payments are due by Friday at 11 AM CT for the following week.\*\***

| Net Total | | | |
|---|---|---|---|
| | $2,795,877.00 | | |
| | | USD TOTAL | $2,795,877.00 |

**PAYMENT DETAILS**        OTHER INFORMATION

| | |
|---|---|
| Name of Beneficiary: | Noil Corp Inc |
| Name of Bank: | First Midwest Bank |
| Address of Bank: | 749 Lee St. Des Plaines, IL 60016 |
| Account Number: | 8100728099 |
| Routing Number | 071901604 |
| Payment Reference: | 1800310785 |

http://noilcorp.com

info@noilcorp.com

**PAYMENT SHOULD BE MADE BY BANK TRANSFER.  MADE PAYABLE TO NOIL CORP INC.**

Agreed to by Maxim Crude Oil, LLC:_____-

Agreed to by Noil Corp Inc.:_____



NOIL CORP, INC
100 East Walton St #700
Chicago, Illinois 60611
Mr. Steve Neeley, CEO                                                    April 5, 2021

Mr. Neeley,

On March 16, 2021 Maxum entered into a contract to purchase the refined petroleum product call NAFTA. At that time NOIL represented that it had numerous industry refinery contacts to access the product and would perform promptly to provide the product. On March 23, 2021 Maxim through a wire transfer deposited the sum of $1,500,000 million dollars into a NOIL account which by contract was agreed to be placed in their trade Escrow account "until the first lift (of product) was confirmed".    An Additional $500,000 was wired into this same escrowed account on March 22, 2021 bringing the full total delivered to NOIL to $2,000,000 million dollars.

As of today, April 5th, 2021 NOIL Corp has failed to perform pursuant to the contract of March 16th, 2021.

Maxim in discussions even prior to the signing of the contact, represented that it had several very time sensitive third-party Naphtha contracts which it needed to fulfill, and NOIL represented from the onset, that it had multiple Refinery contacts to access this Naphtha product.

After several weeks of potentially waiting for NOIL to perform pursuant to the contract, Maxim began on March 27th, 2021, to put NOIL on notice that it either perform as agreed or return the escrowed funds to Maxim until such time as it was in a position to perform pursuant to the contract.

Today, as of April 5th, 2021 NOIL has patently refused to honor this request to return the funds, continuing to make multiple false promises of when it was going to perform, and/or continuing its practice of stating, "just wait a few more days." Due to NOIL's faulty representation, Maxim has been forced to terminate logistical transportation contracts, has experienced significant damages to its corporate reputation and faces potential action from its customers who in good faith relied upon Maxim to fulfil its obligations to deliver the Naphtha product.

Maxim by this letter in formal written form, herby demands that NOIL immediately return the $2,000,000 million dollars contractually held in escrow or face legal consequences of its actions now appearing as conversion of funds, or conspiracy to commit fraud. If such funds are not immediately returned with 24 hours, Maxim will take full and appropriate legal action.

James Jensen
Maxim Crude Oil, LLC

**Plaintiff's Exhibit**

**4**
_____



NOIL CORP, INC
100 East Walton St #700
Chicago, Illinois 60611
Mr. Steve Neeley, CEO

April 6, 2021

Mr. Neely,

It is deeply disappointing and reckless that NOIL has chosen to ignore Maxim's demand to return the funds it holds in escrow which Maxim, in good faith, deposited with NOIL to acquire petroleum product.

The contract between NOIL and Maxim dated March 15, 2021 has obviously been terminated by NOIL's failure to perform in every respect. Furthermore, Maxim has suffered dramatic economic loss due to Maxim's reliance on the faulty and disingenuous representations and texts proffered by NOIL.

NOIL has left Maxim with no alternative but to seek legal redress and possible criminal action against the principals of NOIL who propagate this illegal subterfuge.

Maxim will seek the return of all funds tendered to NOIL pursuant to this scheme along with various other claims including, but not limited to, legal and additional administrative costs, contract cancellation fees, borrowing costs, equipment standby fees and lost business opportunity cost.

It is indeed unconscionable that NOIL has chosen to take this path.

James Jensen
Maxim Crude Oil, LLC

Plaintiff's Exhibit

5

James@MaximCrude.com          307-203-7100        1058 FM 3024 George West, TX 78022

iMessage
Wed, Mar 10, 11:59 AM

Hi James,

OPIS finally got back to Steve.  They are going to follow up, but it looks like we are at $1.55 cpg, but she is confirming that to also be for Mt. Bellevue. Then we subtract the .03 and we should all be on the same page. She compared it to the Singapore pricing, so that is what she is confirming so we can all be set and good to go. I'll get everything over to you shortly. I apologize for the delays.

Jenn
Noil Corp

Thanks—Appreciate all the effort getting everything correct.
James

You're welcome

We just received the OPIS report. It's reported on low rack Feed stock. Current price today is $1.66 cpg for Mt. Bellevue then we deduct your discount of the $.03 to make it $1.63 cpg today. I'll forward the OPIS report to you for benchmark.

Current OPIS report

Wed, Mar 10, 6:22 PM

Hi James. Sorry to text so late. Thank you for the spreadsheet, do you have anything from last week?

*[Handwritten note:]* These are all Texts Back & Forth from Jennifer SR VP NOIL, Corp.

Plaintiff's Exhibit

**6**

Thank you James. I am sure we have it figured out on a different formula to get it all to match. I appreciate it. I'll be in touch in the morning. Have a good night.

Thu, Mar 11, 7:19 AM

Hi James,

Good morning. We want to get things finalized, can you forward me two or three of your invoices that you've paid? Thank you

Jenn

Good morning,
Since we had just got really going with Valero when the bad weather hit in Texas so we only had the one start-up initial payment.
I'm thinking the problem we're having in pricing is in the difficulty of converting from price per tons to price per gallons.
That general conversion formula of 373.8 gals per ton is based on a standard weight of Naphtha which I'm questioning is consistent with what the market consistently uses.
If we can stay in gallons I think would be aligned in price.

What I sent you last night, I converted it for us. The conversion isn't the problem Since we sale in gallons on rack sales. The general issue is that rack is sold off of standard OPIS and not futures, so we are finding a structure to match the price. We'll get it done.

Can you please send the one invoice that you do have?

We technically didn't really have an invoice.
We negotiated the initial price structure, based on the OPIS CBOE daily trading daily closing price and wired Valero the trailing three day average of that closing price based on an initial 210,000 gallon take down.
(See spread sheet as to date of wire and volume)
After the storm, Valero's inability's to deliver sent us looking for alternative suppliers which we initially thought Noil was getting us working with Citgo.
We have no problem of going back to Valero directly

We have no budget to use using OPIS to pricing.
We are on the verge of now losing our markets so we need to finalize quickly.

We can get discounts that most are not offered or can get and that is a key advantage.

We can certainly get it done and find a solution so we can move quickly.

But the issue is, using futures and not direct OPIS pricing. So, we are finding a solution to convert the correct pricing structure to what you are using. We want to match what you need so we can close. ☺

James, can you send the payment receipt for your one payment to Valero?

We can get preferred pricing, we just need that last piece.

That way we also see the tax breakdown.

> We certainly appreciate the advantages NOIL brings to the structure.
> I'm having our back office check for everything we received from Valero.
> Otherwise, All I can send you is the wire confirmation from our bank JPMorgan to Valero.
>
> I know we submitted forms requested by Valero that Maxim was a "Re-seller" of the product and as such exempt from sales tax of Texas.

That is perfect. We are good then. Let me get this wrapped up. I also explained it to David. Thank you

Thu, Mar 11, 10:15 AM

The tax exempt number is

Thank you

I'm working to get everything finalized now. Thank you

Thu, Mar 11, 11:36 AM

Hi James, making sure this is what you are seeing for current futures? I'm finishing the invoice so we can finalize. Thank you

Jenn

Yes, exactly——but just keeps moving up!

It does. I'm speaking current for the invoice. Will get it to you shortly. Thanks

Great—can't wait to get underway

Indeed. Us as well. Thank you

Hi James.  Please let me know if the invoice is correct or if I need to ha e changes made. Pricing was the current market as we discussed minus the .03 discount.

And if the starting 1 week volume is correct

The price is correct which we've now successfully cleared the biggest hurdle!
The volume for the month per the contract is 6,300,000 gallons so  divided by four for a weeks total, I figured is 1,575,000 gallons—so would a weeks invoice be $1.4535 X 1,575,000 = $2,289,262.

Actually I was hoping we could invoice in 3 day

increments , 210,000 gallons per day X 3 days @ $1.4535 = $915,705
And keep on lock step with price movements.

But can live with the full week if preferred
James

Let me check on the 3 day. I think we made sure for the first week there was a straight lift with any potential overage as well. I'll clarify.

With the volume, we are at a 7 day term.

Mon, Mar 15, 8:12 AM

Jennifer, It's my understanding that the Agreement Maxim received last Friday is ready for signatures with the sole exception of the inclusion of some sort of escrow arrangement for the monies to be wired.
Maxim's only concern with respect to this issue is not with Noil but rather with Valero's ability to organize and timely allow Maxim's trucks access Valero's loading rack.
This concern is born out of Maxim's experience last month when Valero's plant personnel were inviting our trucks in, while Valero corporate was telling us to hold back based on inconsistent information.
We just want to be sure that once we tender payment, Noil has a firm  commitment to timely move ahead with the Three Rivers Valero Refinery.  Thanks

James,

Yes, we are waiting on the updated contract, which I've been guaranteed to have today. It includes the escrow structure.

As for Valero,since we can pull from any of the refineries and racks, Valero isn't the only option for us. With that being said, we've also been able to get full clearance that Valero is pulling our allocation and that there will be no issues with providing product. If in case there were any issues to come up, we would pull from another refinery for your lifts.

Best,

Jenn

Thanks for the explanation Great to know,
Anxious to get started!

You're welcome.

Looking forward to working with you!

Mon, Mar 15, 2:13 PM

Hi James, this was what I used to update the invoice today
to go along with the contract date as well.

Yes, that is exactly what I had as the most recent closing
price.  Thanks

You're welcome. That was how I can up with the current
price today so that the price matched the contract date.

Only question is the amount of gallons for the prepay
based on that price.
One week would be 1,575,000 gallons @$1.4793 or
$2,329,897.50

Tue, Mar 16, 8:48 AM

Hi James,

I was checking to see if there is anything you need or if we
are good? Please let me know when you email the docs, I
am out at a meeting today. Thank you.

Jenn

I will get the documents signed and returned to you today.
Moving a little money around to do the wire so that maybe
tomorrow.
Thanks

Sounds good. Thank you.

Let me know if I can help with anything.

Tue, Mar 16, 2:06 PM

Hi James,

I received the contract. Thanks

Wed, Mar 17, 7:21 AM

Good Morning. The executed documents are in your email.
I had to send from my personal email
( ) because our network
is currently down.

Jenn

Wed, Mar 17, 11:26 AM

Hi James,

I wanted to make sure you received what you needed this
morning.

My Corp email is back up. Please let me know if you need
anything else. Thank you

Jenn

Wed, Mar 17, 3:01 PM

Hi James,

Please let me know when the funds for the escrow trade
account should be issued when you can. We have to make
sure we are in line with the terminal as well. Thank you.

Jenn

Fri, Mar 19, 11:18 AM

Jenn,
We want to get the wire out to you today. Right now I've
freed up from Maxim's investment accounts a little over

$2 million which I like to forward realizing the balance of the $2,329897.5 invoice is mostly the 20% Overage amount which I will forward the balance to NOIL next week just as soon as when the Maxim investment securities settle out.

Also, the price of Naphtha has been doing its usual jumping around settling yesterday at $1.4285 a gallon. The pricing on the invoice is based on the closing last week at $1.4793. Based on delays I'm not sure when your pricing for the material begins but we'll work around whatever is the case.

Let me know if so should get the $ 2 million on it's way to you and if that can get the arrangements moving ahead with the refinery.

Thanks,
James

Sorry, understand the full invoice is $2,795,877.00.

James,

That is fine. We understand. Please go ahead. And we will get moving forward.

As for pricing, it will be the three day at time of lift, so any adjustments can continue into the following week as needed. Or we can figure out what works and get it done. We believe in working as a team.

Thank you. Let me know if you need anything from me.

Jenn

We sure look forward to working with quality people and a top notch company like NOIL!

Thank you.

We feel the same. We look forward to working with you and the whole team at Maxim! It is so refreshing to work with great people and we appreciate the opportunity!

Fri, Mar 19, 1:21 PM

Jenn,
I know you've sent it before but I can't find it and back office is asking - can you send wire instructions again

Yes. It's on the invoice as well. Let me resend

I also just emailed it

It's there, and has always been there, sorry for the dumb request

No worries. No question is dumb. We all have a lot we do every day. 😊

Fri, Mar 19, 2:40 PM

Hi James. I just wanted to check back with you. Was everything able to be done today?

Fri, Mar 19, 3:58 PM

I know the wire was initiated however I did not get the confirmation back that I usually receive. It was right at the closing so Chase has held up our larger wires a few times wanting a confirming verbal 2nd approval. I should be able to confirm in a few minutes that the funds left the account.

Understand. Sounds good. Thank you

Fri, Mar 19, 7:55 PM

Spoke to our Bank rep at Chase who explained the wire

was held up Friday until 2:30 on Wednesday Because the late timing did not allow enough time to complete . They have now assured me it will go out first thing Monday morning.

Thank you for the update. Hope you enjoy your weekend.

Mon, Mar 22, 12:12 PM

Hi James,

I hope you had a good weekend. I wanted to follow up with you this afternoon and make sure the payment was able to be sent out this morning. Thank you

Jenn

Mon, Mar 22, 1:17 PM

Jenn,
I don't know I've been more frustrated with a bank. I've fielded no less that 4 calls throughout the day from the banks fraud protection group asking the exact same questions about our wire.
At this point I can confirm that $1 500,000 left our account to NOIL .The additional $500k is still in transfer between accounts but will get that on its way quickly.
The full balance  on the invoice after this initial $2,000,000 payment we should have freed up by next week.

James,

I understand. These banks this day and time seem to have forgotten customer service and are more about just guidelines. No worries. If you have a wire confirmation, I can send that to Michael Chin at first Midwest and have him keep an eye on it.

Thank you again for the update. We will get it all done and moving forward.

Jenn

Wed, Mar 24, 1:24 PM

Jenn, I realize I haven't received back a fully executed contract.
Can you provide, Thanks

I will definitely get that to you today. I apologize.

Jenn

No problem

Wed, Mar 24, 4:24 PM

Hi James,

I wanted to check back with you on the $500k portion of the payment. Is that still on track or is there a timeline?

We are working to make adjustments so you can go ahead and lift now, but we are not wanting to change the volume which would affect everything else. We have already set the terminal for the 1,575,000 weekly. I'll speak with Steve this evening to see what alternatives we hope to have. We are ready to go other than that.

I'll also get the executed Jobber agreement to you this evening.

Thank you.

Jenn

Wed, Mar 24, 5:25 PM

Jenn, I'm still waiting on settlement of Securities to be able to complete the wire of the $500k. I'm optimistic that by the time I get it into Maxim's main account and initiate the wire, we can have it to you by the end of the week.
We certainly agree that we don't want any aspect of volume in our existing contract to be altered.
Also, please understand that once we start moving product, all of our customers are also on a pre-pay basis so liquidity will really free up once we can start delivering. I will check again in the morning to confirm timing of the $500k.

Thank you James. I'm working with Steve to find a work around and get it done for now.

Great!

Have a good night.

Fri, Mar 26, 8:47 AM

Jenn, The funds are finally showing up in Maxim's operating account this morning and I have initiated the wire for the $500k. Now at the mercy of the wire department but will check with them every half hour .

Good Morning James. Great, thank you for the update. As soon as we receive the funds, we will get with the terminal. Thank you

Fri, Mar 26, 11:19 AM

Hi James. Steve is also checking the bank every hour to see when the funds come in. With it being Friday, he's trying to get things done before people go home. Just wanted to keep you updated as well.

Thank you for the email.

Fri, Mar 26, 12:53 PM

Hi James, did you receive a confirmation yet?

We show the wire amount debited out of our accounts 3-4 hours ago so I was assuming it was in your account by now.

It hasn't showed yet. We've been checking.

Wire just showed in NOIL account. Thank you

Fri, Mar 26, 3:12 PM

Should I assume we're at a standstill till Monday?

I'm sorry. I'm about to set up a group text box for us with David. Steve is pushing to get codes and at the latest, Monday you are set. But he was trying to get them pushed today.

Wed, Apr 7, 10:14 AM

waiting on the return on Maxim's 2 million dollars

this morning—once returned will agree to provide a $2 million LC in favor of NOIL from Maxim's bank J.P. Morgan.

Wed, Apr 7, 11:27 AM

David had convinced me that we should wait another day based on his conversations with Valero.

That sounds good. Thank you

Thu, Apr 8, 4:27 PM

Now it's absolutely clear that Valero has no ability now or in the future to supply Naphtha from its Three Rivers site, Maxim expects its money promptly returned first thing in the morning.
Anything short of that now will confirm the fraud allegations  contained in my letter of April 7th.
James

Friday 11:16 AM

Jenn, It's my understanding that NOIL's in-house council has preparing a short mutual release letter that Maxim needs to execute. This letter to be provided within the hour, with the wire transfer to follow——all well before the wire system closes.

I spoke to Steve, that is what he told me.

On another note, As I also just told David, I have 3 million gallons a week being brought in to meet spec through a contact and I'll have that offer for confirmation this afternoon. We will work this out to make that work as well.

Happy to consider.
Where would the point of delivery be?

I'm working on that. Most likely Corpus is what we are working on.

I'm speaking to David about this. Because no need for me to pull it if you aren't taking it. 🫱

That could work



Saturday 10:35 AM

Hi James.

I will have our new naphtha commitment some time today on the large deliveries that my personal friend is helping me bring into the terminals for you all.  I'll get that to David so we can all arrange the process.

As for the Valero issue, please see the note below from Steve. Thank you.

Note:

The Attorney needs Maxim to put on letterhead, what happened at Valero and how it interrupted Maxim from receiving product.  Thanks.

That is absolutely an absurd request.
NOIL held themselves out in the highest regard as experts in the refined petroleum fuels market and by extension experts in dealing with Valero Refinery corporation in particular.
To now state that it is something Maxim needs to explain what went wrong with Valero is ludicrous.
If NOIL's council wants to talk to me I happy to take this call. But I assume this request maybe  just one more of NOiL's schemes to delay or withhold Maxim's funds from the wire of its $2 Million dollar as promised first thing Monday morning .
Maxim has no interest in discussing any further business with NOIL until the funds are returned.

Please call Steve to discuss. Thanks

Please forward my last text to Steve.

I did.

Thanks

You're welcome

I'll get with David about the delivery of the naphtha being brought in.

Monday 7:41 AM

Waiting this morning on immediately wire.
If an executed mutual release document is desired by NOil, then it needs to be sent now.

James,

Good Morning.

Steve had asked for just a short note stating all the issues that Valero has caused not performing and how it has affected you guys. We are also doing the same.

I'll forward your message. I'll ask Steve to send you a release as well.

I will speak to David this morning about the 6 million gallons I have arranged to come into Texas specifically for Maxim. David and I will have to work on the logistics. There will need to be some sort of contract security by LC or deposit for the product as you know how all of that works.

I'll forward your message to Steve and have him send what you need.

Have a good day.

Jenn

David and I spoke over the weekend and we both of the mindset and committed to the principle that we will not discuss any further business with NOIL until the $2 Million dollars is returned.
Even it that means wiring it back a few days later if product was secured.

Ok

Jennifer, just to follow-up on our conversation today, I know you keep saying your only involved in sales and marketing, but if my beliefs turn out to be true that Steve is orchestrating some fraudulent acts to misappropriate Maxim's funds, then all your conversations and texts with David and myself all appear to be part of a concerted effort on your part to mislead and delay Maxim from taking action when it could have otherwise more timely attempted to retrieved its funds.
If I were you, I'd make sure you truly really know Steve's actions and intentions for your own liability.

James. Talk to David, thanks.

I did speak with David and he sees your exposure in this as VP of NOIL no different than I do.
You need to talk, no plead with Steve, to do the right thing and defuse this situation before it criminally spins out of everyone's control.

Yesterday 2:20 PM

Another day is coming to a close end of course no Document to sign or money returned.
So If you truly don 't want to be included as part of this conspiracy then (as you told David you possess), evidence that Maxim's money is still in escrow, which information and knowledge you continue to consistently represent to both David and myself,
then you should forward that evidence.

The attorney will have your release to you tomorrow morning I'm told with proof of the funds. Please sign release. Thanks

The Canadian deal offer will be received this evening and that is a whole other deal. Up to 6 million gallons a week available.

I hope for your sake that's true.

Yep

Jennifer, Maxim has received a letter from Noil's council and I know David has communicated to you the ridiculous assertion that in any way Maxim owes NOIL any compensation must less the absolutely unsupportable number stated in the letter.

On the contrary NOIL is and continues to harm Maxim financially and begin May 1st, if Maxim is financially unable to enter into a new Naphtha contract from a new supplier because of Noil

refuses to release it funds, the damages will soar.

Additionally the Bank Statement you represented and promised would accompany the letter, demonstrating that NOIL had abided by the terms of the contact by placing Maxim's $2 Million Dollars into a separate escrow account, did not accompany the letter.

If this was an oversight please now forward or Maxim will deem that refusal to provide as an admission of NOIL breach of Contact.

Read 11:57 AM

I'll forward your messages as I do with all messages and emails.

Mon, Mar 15, 8:12 AM

Jennifer, It's my understanding that the Agreement Maxim received last Friday is ready for signatures with the sole exception of the inclusion of some sort of escrow arrangement for the monies to be wired.
Maxim's only concern with respect to this issue is not with Noil but rather with Valero's ability to organize and timely allow Maxim's trucks access Valero's loading rack.
This concern is born out of Maxim's experience last month when Valero's plant personnel were inviting our trucks in, while Valero corporate was telling us to hold back based on inconsistent information.
We just want to be sure that once we tender payment, Noil has a firm  commitment to timely move ahead with the Three Rivers Valero Refinery.  Thanks

James,

Yes, we are waiting on the updated contract, which I've been guaranteed to have today. It includes the escrow structure.

As for Valero, since we can pull from any of the refineries and racks, Valero isn't the only option for us. With that being said, we've also been able to get full clearance that Valero is pulling our allocation and that there will be no issues with providing product. If in case there were any issues to come up, we would pull from another refinery for your lifts.

Best,

Jenn

Plaintiff's Exhibit

7

iMessage
Fri, Mar 26, 4:24 PM

+1 (803) 687-3286

Hello Gentlemen.

Thank you for working with us this week as we work through this first trade.

Steve did reach our trader and he said he would get with Steve first thing Monday morning to get you set to lift.

I will contact you Monday morning so you'll be good to go. Then we will have everything pretty automated and ready to roll at that point. Even for adding new locations/terminals.

I'm here if you need anything at any time. Thank you again for your patience and the opportunity to work with you. We look forward to working with you.

Have a great weekend.

 Jenn

+1 (337) 303-4940

 Thanks Jenn

Thanks, we'll plan on first thing Monday morning to get moving!

+1 (803) 687-3286

You're welcome

Sounds good.

 Take care and enjoy your weekend.

Mon, Mar 29, 11:48 AM

Jenn, still waiting on a copy of a fully executed contract. Thanks

+1 (803) 687-3286

Oh gosh, I forgot. Let me get that from Steve and to you now.

This is a GROUP Text Involving Jennifer Watson of Steve Medley CEO of NOIL James Jensen Plaintiff David Hillman Plaintiff

Plaintiff's Exhibit

8



No problem just completing my file.

+1 (803) 687-3286



Resent it, but I did send it the other day with the invoice. I went back and verified.

Got it—Sorry I missed it the first time.

+1 (803) 687-3286



It's ok. Glad you have it.

Valero is now saying it will be tomorrow before we can start lifting —do you guys have any insight on these delays?

+1 (803) 687-3286

Steve is on the phone with Valero now. I'm on hold with Him. I'll come back with what he tells me and any backup if needed to get you going. He's working diligently to get it done.

Thanks for checking

+1 (803) 687-3286



You're welcome

Promise, this is top priority for us

Tue, Mar 30, 8:35 AM

+1 (803) 687-3286

Good Morning.

Steve has been on the phone with the terminal getting Valero and their mess under check. He is also working on two backup terminals so that this situation, as discussed will not occur and delays for lifting will be solved. With the extra support sites, the lifts will be set to roll to either location if we are told the main site will have delays as they have and did this week. This will solve the issues as we discussed. Unfortunately, the first lift and setting up takes time and at times it can have a speed bump to get started. Steve has been told for this first lift, he will have scheduling and all today and pushing so you can lift tomorrow. Then, additional sites will be set up so that these delays will not


occur and continual lifts from either site will be available to solve this issue. These refineries are ridiculous at times, so this will support the need with a solid solution.

> Thanks for that explanation, As you know, I've had my concerns about Valero from the beginning.
> We are starting to feel some erosion in creditability from our new customers that we promised delivery by no later than Monday.
> I feel if we are not delivering by tomorrow they will walk from our contracts.
> James

+1 (803) 687-3286

You're welcome.

I'm positive that being able to state that there are now backup terminals that will prevent additional delays from occurring will be the solution. Steve will make it happen at Valero and then the other backup terminals will support us so that Valero's shortfalls will not affect lifting again. This will also fall into play for any additional locations that may be needed for additional products at any time.

+1 (337) 303-4940

Thanks for the explanation I hope to have these worked out by tomorrow and future endeavors will have solid backup plans

+1 (803) 687-3286

You're welcome. And they definitely will be.

> Wed, Mar 31, 12:24 PM

> Jenn, I assume if we are still dead in the water at this point nothing will be happening till Next week so therefore I have sent Maxim's wire instructions for the return of Maxim's $2 Million.
> We will continue to hope that NOIL will ultimately be successful in acquiring allocations and lift codes and once at that point, Maxim will stand ready to re-wire the funds.
> James

+1 (803) 687-3286

Hi James. No, Steve is still working with terminals. He is

going to call you guys or do will set up a call so to discuss the lifts from the refineries.

+1 (337) 303-4940

we will be expecting the refund of Maxim's 2M/USD before the close of business today we hope that in the future NOIL will be able to secure successful lift codes from there partners and we look forward to other endeavors on those fronts.
Thanks David.

+1 (803) 687-3286

Need to know what the "cracker" is called at the terminal?

On with the terminal

+1 (337) 303-4940

Hydracracker

+1 (803) 687-3286

Thanks

+1 (337) 303-4940

That's in the process through

+1 (803) 687-3286

Yes

Fri, Apr 2, 6:50 AM

+1 (337) 303-4940

Good morning Jennifer
I was wanting to see what has Noil came up with over night to solve our current situation?

+1 (803) 687-3286

Good Morning. I'll have an update from Steve this morning. It's still early. I'm in a Doctor appointment now, but will call him when I'm out. I know yesterday evening the backups and Valero we're expecting to all have good news this morning. I will call you as soon as I speak with him this morning.

Jennifer,
It now morning and unless we have codes and access immediately to begin lifting, then Maxim demands that

funds ( $1 Million dollars ) that is presently in our contract
was to be held in escrow ,
be immediately returned to Maxim.
We do not view this as a termination of our relationship,
only the reasonable action given NOIL'S inability to perform
in a timely manor pursuant to our contract.
I await your prompt response to this action.
James

Fri, Apr 2, 8:07 AM

+1 (803) 687-3286

Good Morning and good news!! We have received your
confirmation this morning on your product. We are just
waiting on one more notice. We also have received
confirmation on some of the backups. And I am setting up
multiple sites through my personal connection so that it will
be moved and placed for your needs as needed. This is
currently in process of being worked through. I will  call you
both once Steve calls me with everything. He's just waiting
on one more bit of information.

Noil has been able to  perform by setting up a solution so
that you will not have breaks in lifts and have multiple
capabilities and capacity for multiple sites, the non
performance has come from the refinery itself. It generally
takes 3 to 5 business days to get a buyer set up in the
system after payment to escrow. We are excited to get
going now that we have received notice and that things are
set to go. I'm excited to be able to solve the breaks in lifts
for you as well and provide continuous support.



I'll call you both bad soon as I'm out of my appointment
and hear back from Steve. Thanks

I sincerely couldn't be happier to hear that Maxim may
finally be cleared to start lifting product pursuant to our
contract.
However, we are not in a position to wait till
late afternoon today to see if the "one more notice" comes
through.
Well before the fed wire system closes down today we
need to have resolution one way or another. Thanks
James

+1 (803) 687-3286

Ok, I do understand. But there isn't a maybe, it's a yes. I
will call you once Steve has the rest of what is needed.



With an allotment pulled, contract in place, and now confirmation and notice and all within this week (since full escrow) you will have what you need. That is for certain. We do understand the position with your client. I will also let Steve know your message.

Fri, Apr 2, 10:48 AM

Jenn, Literally back on a March 23rd text, the general message presented was that everything was fully approved and we were set to start lifting.
So, while we always remain optimistic, the hard reality TODAY and what I want to make abundantly clear is that; An unqualified YES all issues resolved means that Maxim trucks are in the Refinery lifting products today otherwise Maxim demands a wire transfer of $2 Million dollars be on its way back to Maxim.
If next week NOIL truly has product secured ready to move, then Maxim will continue to perform as per the contract.

+1 (803) 687-3286

James,

I relayed the message to a Steve. We need to also keep In mind that Since the final portion of your agreed escrow amount was not received until late last Friday, that is when the scheduling was to be released, but the refinery is the one who has not performed and caused issues but as of today, Steve will send you what you need to lift. He's is waiting on a final call from the scheduling desk now.

Jenn

My timing starts with the day NOIL received $1.5 million dollars. The intent of the parties was clearly established at that point and if NOIL didn't then aggressively move ahead to secure the product on behalf of Maxim then that inaction is inexcusable.

+1 (803) 687-3286

We started before we had any funds. We have worked on this since the start. But like any sales, commitments also have to be met and we have all met our commitments and you will have what you need today.

Fri, Apr 2, 1:07 PM

Sounds great, will
Look forward to it.

But we are now in the last hour of wire transfers.
Anticipating having what Maxim needs will come before
that point

+1 (803) 687-3286

We have full commitment to receive everything for you
today.

Great, we will start sending out trucks over to Valero
immediately.

+1 (803) 687-3286

Yes, as soon as we have received what is committed to us
to receive today from the refinery, you are good.

That seems like a bit of a backslide—either we have "full
commitment" to haul or we don't?

+1 (803) 687-3286

Not at all James.

We have full commitment and like I said, you'll have it.

Great, then we send trucks over

+1 (803) 687-3286

Rack sales is a completely different world. Like I said, we
have full commitment to receive everything today and you
will have it. Then you can start lifting. Thanks

Our position was that either we were hauling by end of the
Fed wire deadline today or NOIL needed to Initiate a wire.
If we can't lift product now then NOIL needs to wire.

Mon, Apr 5, 11:47 AM

Steve has asked for a letter detailing Maxim's position, but
do not have his email. Can it be provided?

Read

+1 (803) 687-3286

Yes, we discussed your call. You can email me and Steve.

Steve's email is ............................... Thank you

FYI- my contact has naphtha supply through her 9
refineries and I'm working to pull that together today or
tomorrow.

Tuesday 12:23 PM

+1 (803) 687-3286

Gentlemen?

I'm at a lunch meeting. I'm waiting on the docs to come
from Canadian desk any time now.



# CHASE CONNECT

Printed from Chase Connect

---

## Maxim Crude Oil, L.L.C.

---

Accounts

Maxim (...3751)     Maxim Refined
                    Fuels (...3127)

---

Showing 2 of 2 transactions

Filtered by:

Outgoing wire transfer     Last 2 months     $500,000.00 To $2,000,000.00

## NOIL WIRES

---

| Date | Description | Account | Transaction type | Amount |
|------|-------------|---------|------------------|--------|
| Mar 26, 2021 | ONLINE DOMESTIC WIRE TRANSFER VIA: FIRST MIDWEST BANK/071901604 A/C: NOIL CORP INC CHICAGO IL 60654 US REF: 1800310785 IMAD: 0326B1QGC05C010281 TRN: 3364261085ES 03/26 | Maxim (...3751) | Outgoing wire transfer | −$500,000.00 |
| Mar 22, 2021 | ONLINE DOMESTIC WIRE TRANSFER VIA: FIRST MIDWEST BANK/071901604 A/C: NOIL CORP INC CHICAGO IL 60654 US REF: 1800310785 IMAD: | Maxim (...3751) | Outgoing wire transfer | −$1,500,000.00 |

Plaintiff's Exhibit

**10**

0322B1QGC04C009877
TRN: 3382571081ES
03/22

You've reached the end of your activity.

JPMorgan Chase Bank, N.A. Member FDIC          ©2021 JPMorgan Chase & Co.          Equal Opportunity Lender ⌂



secure05b.chase.com/web/auth/dashboard#/dashboard/overviewAccounts/overview/accountSummaryDetail;accountDetailType=CHK;accountId=711816404;accountType=DDA



CHASE CONNECT

Sign out

ounts    Pay & transfer    Collect & deposit    Account management    Security

rview    Reports



| | | | |
|---|---|---|---|
| 22, 2021 | ONLINE DOMESTIC WIRE TRANSFER VIA: FIRST MIDWEST BANK/071901604 A/C: NOIL CORP INC CHICAGO IL 60654 US REF: 1800310785 IMAD: 0322B1QGC04C009877 TRN: 3382571081ES 03/22 | Outgoing wire transfer | −$1,500,000.00 | $67,036.9 |



secure05b.chase.com/web/auth/dashboard#/dashboard/overviewAccounts/overview/accountSummary/DetailaccountDetailType=CHK&accountId=713916404;accountType=DDA



transfer



ONLINE DOMESTIC WIRE TRANSFER VIA: FIRST MIDWEST BANK/071901604 A/C: NOIL CORP INC CHICAGO IL 60654 US REF: 1800310785 IMAD: 0326B1QGC05C010281 TRN: 3364261085ES 03/26

Outgoing wire transfer

-$500,000.00

$762,445.8

See more activity

     

---------- Forwarded message ---------
From: **jennifer.watson** <jennifer.watson@noilcorp.com>
Date: Thu, Mar 11, 2021 at 8:11 PM
Subject: updated jobber agreement
To: david@maximcrude.com <david@maximcrude.com>, james@maximcrude.com <james@maximcrude.com>

Gentlemen,

Please find the updated jobber agreement attached. I apologize for the delay.  We will hold payment in escrow as agreed for the first lift. I look forward to working with you. Please let me know if you need anything.

I noticed that closing today was $1.50885 ($1.47885 after discount) in case you would like to adjust the payment or we can leave it according to the invoice.

Have a good evening.


Best,

Jenn

Jennifer Watson

Senior Vice President
**Noil Corp Inc.**
110 West Kinzie St.
Chicago, Illinois 60654
Email: jennifer.watson@noilcorp.com
Direct: 803-687-3286

Plaintiff's Exhibit

**11**

**Plaintiff's Exhibit**

**12**



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# '$40 Billion Man' Accused Of Running Fuel Supply Ponzi

By **Michelle Casady**

Law360 (October 11, 2019, 5:54 PM EDT) -- A Houston-based company that buys and sells fuel has filed a lawsuit against a former business partner whose CEO styles himself as "the $40 Billion Man," alleging the partner company is actually operating a Ponzi scheme.

L. Energy International LLC filed a lawsuit in Harris County District Court on Thursday, seeking up to $1 million in damages from Noil Petroleum Corporation and its CEO and president, Morrell Steve Neely. L. Energy alleges that Noil agreed to sell L. Energy's fuel to a third party but then failed to pay L. Energy for that product. Neely has denied the allegations.

L. Energy alleges that Neely uses Noil to operate his Ponzi scheme, touting contracts with the U.S. Department of Defense, Southwest Airlines, United Airlines, Shell, Chevron, ExxonMobil and others, and uses that clout to lure in other fuel producers.

"These representations are not true," the lawsuit alleges. "In reality Noil appears to be nothing more than a website with its logo photoshopped onto a fuel truck and an abandoned office address."

Jason E. Williams of Bissinger Oshman & Williams LLP, who represents L. Energy, told Law360 on Friday that the case is simple.

"Noil had a client that took delivery of the fuel and Noil didn't pay for it," he said. "Noil claims that it has these massive volume buying contracts so it can furnish fuel cheaper than other people … so Noil was essentially selling fuel to its customers at below cost, so sooner or later it was going to run out of money or product. And that's what happened here."

But Neely told Law360 on Friday that the entire lawsuit is "a lie" and "frivolous." Neely alleges that it was L. Energy that breached the agreement by allowing a third-party client to take the fuel. He said he was working with an attorney before this lawsuit was filed to bring claims against L. Energy for allegedly stealing a client and has since instructed that attorney to proceed with pursuing the claims.

"They breached the contract and started selling directly to the client," he said in an interview. "And when the client didn't pay, they tried to get us to pay."

According to the lawsuit, L. Energy was solicited by Neely in 2018, who wanted to purchase its fuel to sell to other customers in Texas. Based on those representations, L. Energy agreed to start supplying Noil fuel, which Noil would resell to customers. After doing $500,000 in business together, Noil refused to pay for $199,000 worth of diesel fuel that was picked up by a customer.

L. Energy alleges that as proof of the scheme, it has a spreadsheet that was inadvertently emailed to it by Neely that shows Noil owes L. Energy for the diesel pickup.

Case No. 3:16-cv-2694

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO WESTERN DIVISION

# Marathon Petroleum Co. v. Noil Petroleum Corp.

Decided Jan 28, 2020

Case No. 3:16-cv-2694

01-28-2020

Marathon Petroleum Company, LP, Plaintiff v. Noil Petroleum Corporation, Defendant

Jeffrey J. Helmick United States District Judge

MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff and Counter-Defendant Marathon Petroleum Company, LP moves for summary judgment on both its claims and those asserted against it by Defendant and Counter-Claimant Noil Petroleum Corporation. (Doc. No. 48). Third-Party Defendant MPC Investment LLC also moves for summary judgment on Noil's claims asserted against it. (Doc. No. 49). Noil filed a memorandum in opposition to both these motions, (Doc. No. 53), and Marathon and MPC each filed a reply. (Doc. Nos. 55 & 56).

## II. BACKGROUND

On August 23, 2016, Marathon and Noil executed[i] a Sales Agreement (the "Marathon Contract") under which Marathon agreed to sell Noil 40,000 barrels of slurry oil at a price of the "[a]verage of Platt's U.S. Gulf Coast 3% Sulfur No. 6 Fuel Oil mean posting effective on August 23, 24, and 25, 2016, plus $0.42 per barrel." (Doc. No. 4-1 at 2). Pursuant to the Marathon Contract, *2 Marathon would deliver the slurry by barge from its refinery in Garyville, Louisiana to Magellan Marrero, Louisiana between August 23 and 25, 2016. (*Id.*).

> [i] Adam P. Lauth signed the Marathon Contract on behalf of Marathon. (Doc. No. 4-1 at 2). On the Marathon Contract, he
> is identified as a "trader" for MPC, Marathon's general partner. (*Id.*).

On August 25, 2016, two barges of Marathon slurry arrived at the Magellan Terminal, but no storage tank was available. Because the slurry could not be unloaded into a storage tank, the slurry sat in the Marathon-chartered barges in the Mississippi River while Noil attempted to find a solution to the problem. Eventually, on August 31, 2016, Noil arranged for a transfer of Marathon's charter to the barges with Genesis Marine. At this time, possession and title to the slurry transferred from Marathon to Noil.

This complication caused a ripple effect since Noil had already agreed to resell the Marathon slurry to Althea Petroleum. The agreement between Noil and Althea was memorialized in a contract (the "Althea Contract") executed one day prior to the Marathon Contract. In the Althea Contract, Noil agreed to sell "1,890,000 GALLONS TWICE WEEKLY ... PER 52 WEEKS" to Althea for a spot price of $0.95 per gallon, which was "[s]ubject to change based on CME GULF COAST NO. 6 FUEL OIL 3.0 % PLATTS FUTURES." (Doc. No. 4-2 at 2). The slurry was to be shipped by chartered barge from a storage facility in Garyville, Louisiana to

casetext

**Plaintiff's Exhibit**

**13**

2

1

Marathon Petroleum Co. v. Noil Petroleum Corp.    Case No. 3:16-cv-2694 (N.D. Ohio Jan. 28, 2020)

Houston. (*Id.* at 2-3). This did not contemplate the fact that, under the subsequently-executed Marathon Contract, the slurry would be delivered to Noil in Magellan Marrero, Louisiana rather than shipping directly from the Marathon facility in Garyville, Louisiana.

In any case, because of the delay in transferring the slurry from Marathon to Noil, Noil was not able to timely deliver the first load of slurry to Althea. As a result, Althea terminated the Althea Contract. Subsequently, Noil sold the slurry to Davison Petroleum Supply, LLC on September 2, 2016, for $1.3 million dollars - less than Noil would have received from Althea. *3

3

Meanwhile, on September 1, 2016, Marathon invoiced Noil $1,482,346.54 for the slurry, which Noil failed to pay. Therefore, on November 3, 2016, Marathon filed suit alleging a claim of breach of contract or, alternatively, unjust enrichment. (Doc. No. 1-1).

In response, Noil asserted counterclaims of breach of contract, fraudulent misrepresentation, negligent misrepresentation, and tortious interference with a business expectancy. (Doc. No. 4). Noil's counterclaims are based upon its allegations that Marathon agreed to secure storage for the slurry at the destination.

## III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

## IV. DISCUSSION

The parties agree that Ohio law governs the tort and contract claims asserted in this action.

## A. BREACH OF CONTRACT CLAIM AND COUNTERCLAIM

Marathon and Noil each allege the other breached the Marathon Contract. In Ohio, "[a] cause of action for breach of contract requires the claimant to establish the existence of a contract, *4 the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018) (citations omitted).

4

### 1. Marathon's Claim

Marathon contends it is entitled to summary judgment on its breach of contract claim because Noil accepted and resold the slurry and, thus, breached the Marathon Contract by failing to pay for it. I agree. There is no evidence to suggest Noil made any attempt to reject the slurry or terminate the Marathon Contract. As such, by taking possession of the slurry and reselling it rather than rejecting it, Noil "accepted" the slurry under Ohio law. O.R.C. § 1302.64(A). By failing to pay Marathon for the accepted slurry, Noil breached the Marathon Contract. O.R.C. § 1302.83(A)(1). Therefore, Marathon is granted summary judgment on its breach of contract claim and is entitled to recover the price of the slurry.

Marathon Petroleum Co. v. Noil Petroleum Corp.    Case No. 3:16-cv-2694 (N.D. Ohio Jan. 28, 2020)

## 2. Noil's Counterclaim

Noil's breach of contract claim rests on whether Marathon was required to secure a storage tank for the slurry at its destination - the Magellan Terminal. Relying on Ohio statutory law, Marathon contends that because the Marathon Contract states "FOB Buyer Facility," it was Noil's obligation to ensure storage was available at the Terminal.

The Ohio Revised Code provides that, "[u]nless otherwise agreed the term F.O.B. (which means 'free on board') at a named place ... is a delivery term under which...when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in section 1302.47 of the Revised Code." O.R.C. § 1302.32(A)(2). In turn, section 1302.47 states,

> (A) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable the buyer to take delivery. The manner, time, and place for tender are determined by

5    *5

> the agreement and sections 1302.01 to 1302.98, inclusive, of the Revised Code, and in particular:
> ...
> (2) unless otherwise agreed the buyer must furnish facilities reasonably suited to the receipt of the goods.

O.R.C. § 1302.47(A).

Noil alleges these general principles should not apply because the parties "otherwise agreed" twice. First, Noil contends there was an alternate agreement as to the FOB because the Marathon Contract states "FOB Buyer Facility" even though Noil's "facility" is in Chicago and the shipment's contractual "Destination" is "Marrero, LA." And second, Noil claims the two "otherwise agreed" as to who was supposed to secure storage for the slurry once it arrived at the destination - or furnish facilities reasonably suited for the receipt of goods. Both arguments must fail.

In its first argument, Noil essentially urges me to find that the Marathon Contract is ambiguous since "the parties clearly intended that Marathon deliver the slurry to Magellan in Marrero" rather than Chicago, and yet, the Marathon Contract stated: "FOB Buyer Facility." (Doc. No. 53 at 8-9). Noil contends that because of this alleged ambiguity, the Marathon Contract should be construed against its drafter, Marathon. While Noil is correct that ambiguities should be resolved in favor of the non-drafting party, "'it is equally well settled that a court cannot create ambiguity in a contract where there is none. Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation.'" *Smith v. Erie Ins. Co.*, 69 N.E.3d 711, 717 (Ohio 2016) (quoting *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008)) (further citation omitted). Endorsing Noil's argument would require me to read ambiguity into the Marathon Contract that does not exist. From a plain reading of the Marathon Contract, and in light of the parties' "clear intent" to deliver the slurry to the Magellan Terminal, reasonable minds can come to only one conclusion - Marathon was to deliver the

6    shipment to a specified Noil facility -- Marrero, Louisiana. *6

Noil next argues the parties "otherwise agreed" that Marathon rather than Noil would secure a storage tank at the Magellan Terminal. This argument is based upon conversations that allegedly occurred prior to execution of the Marathon Contract. Specifically, Noil CEO Morrell Steve Neely contends he "fully expected that Althea could pick up the slurry directly from Marathon—either a Marathon barge or Marathon-controlled storage tank

Marathon Petroleum Co. v. Noil Petroleum Corp.    Case No. 3:16-cv-2694 (N.D. Ohio Jan. 28, 2020)

—without the expense of renting storage facilities" based upon representations from Adam Lauth that "Marathon would deliver the slurry from a storage tank at the Magellan Midstream Partners' facility in Marrero, Louisiana." (Doc. No. 54 at 3-4, ¶¶ 8 & 9).

> 2 Noil briefly contends that "Neely informed Lauth that Noil Petroleum or its customer would have a barge to accept the oil slurry from Marathon, satisfying § 1302.47(A)(2)." (Doc. No. 53 at 10). But even if using this statement in this way was not barred by the parol evidence rule, there is no evidence that Noil or Althea had a barge awaiting the shipment or that Marathon rejected a barge-to-barge transfer proposal. Therefore, this statement is irrelevant since there is no evidence that satisfied the requirements of O.R.C. § 1302.47(A)(2). Further, it may be considered detrimental to Noil's case in that Noil was aware of the need to procure barges to, at the very least, timely ship the slurry from the Magellan Terminal to Althea in Houston and failed to do so.

But, as noted by Marathon, these alleged representations are excluded by the parol evidence rule. The Ohio statutory parol evidence rule provides that,

> [t]erms...set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

O.R.C. § 1302.05(B). Noil objects to the application of the parol evidence rule, arguing that the Marathon Contract was not intended as a "final expression of their agreement." (Doc. No. 53 at 11-12). But the Marathon Contract explicitly states, "This Agreement contains the entire agreement of the parties with respect to its subject matter." (Doc. No. 4-1 at 4). Because there is no evidence to the contrary, I conclude the Marathon Contract is the complete and exclusive statement of the terms of the single transaction and may not be supplemented or contradicted by parol evidence. *7

Had Noil wished to incorporate the additional obligation that Marathon secure a storage facility at the Magellan Terminal, it should have done so prior to executing the Marathon Contract. Because it did not, and because the Marathon Contract is the complete and exclusive statement of the parties' agreement, Noil is barred from supplementing the terms of the Marathon Contract with parol evidence. As such, Marathon is granted summary judgment on Noil's breach of contract claim.

## B. MISREPRESENTATION COUNTERCLAIMS

Noil's claims of fraudulent and negligent misrepresentation are similar to its breach of contract claim. Noil again alleges that, prior to executing the Marathon Contract, MPC trader Adam Lauth represented that Marathon would deliver and discharge the barrels of slurry to a tank in the Magellan Terminal by August 25, 2016, where it could be immediately resold.³ (Doc. No. 4 at 19-21). Noil claims that these representations were fraudulent and negligent because Marathon and MPC knew or should have known the slurry could not be timely discharged because there was no available storage at the terminal. (Id.). *8

> 3 In its memorandum in opposition, Noil briefly argues Marathon also made a fraudulent misrepresentation regarding the intent to enter into a long-term supply relationship with Noil. (Doc. No. 53 at 12-13). But this was not alleged in the original complaint, (Doc. No. 4), and Noil "may not expand [its] claims to assert new theories for the first time in response to a summary judgment motion." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 689, 666 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). Even so, this claim would fail as a matter of law since Noil could not have justifiably relied on a long-term supply deal with Marathon that did not comply with the statute of frauds since such a deal would be unenforceable. *See Olympic*

Holding Co., L.L.C. v. ACE Ltd., 909 N.E.2d 93, 94 (Ohio 2009) ("Agreements that do not comply with the statute of frauds are unenforceable."); see also Doe v. SexSearch.com, 551 F.3d 412, 417-18 (6th Cir. 2008) (Justifiable reliance is an element of negligent and fraudulent misrepresentation).

Marathon argues that like the breach of contract claim, the parol evidence rule bars these claims because they derive from alleged representations made prior to the execution of the Marathon Contract.[4] I agree.

[4] Marathon also introduces an alternative argument with respect to the claim of negligent misrepresentation. (Doc. No. 48-1 at 11- 12; Doc. No. 55 at 13-14). Specifically, Marathon contends a "special relationship" is required to prove the duty element of negligent misrepresentation and, because this was a typical business relationship rather than a "special relationship," no duty exists here. (Id.). But contrary to Marathon's argument, the Supreme Court of Ohio has not imposed this requirement and it is far from settled law. See Hodell-Natco Indus., Inc. v. SAP Am., Inc., 13 F. Supp. 3d 786, 797 (N.D. Ohio 2014) (citing Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Products, Inc., No. 2:02-cv-1288, 2007 WL 894833, at * 9-*12 (S.D. Ohio Mar. 22, 2007) (fully reviewing the state of the law on this issue to explain how a "special relationship" contemplated by Picker Int'l, Inc. v. Mayo Found., 6 F. Supp.2d 685, 689 (N.D. Ohio 1998) is not an element of negligent misrepresentation)). Because summary judgment on the negligent misrepresentation claim is granted on other grounds, I need not and decline to consider this unsettled point of law at this time.

Found in both statutory and common law, "[t]he parol evidence rule is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of alleged or actual agreements." Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank, 662 N.E.2d 1074, 1080 (Ohio 1996) (citation omitted); see also Williams v. Spitzer Autoworld Canton, LLC, 913 N.E.2d 410, 415-16 (Ohio 2009). "Because the parol evidence rule is substantive in nature[, it is] not limited in application to contract claims[.]" Williams, 913 N.E.2d at 416 (applying the parol evidence rule to statutory claim); see, e.g. Ed Schory, 662 N.E.3d at 1080-81 (applying the parol evidence rule to negligent misrepresentation claim).

Parol evidence may be considered in some circumstances to prove fraudulent inducement. See Galmish v. Cicchini, 734 N.E.2d 782, 790 (Ohio 2000). "But, a fraudulent inducement case is not made out simply by alleging that a statement or agreement made prior to the contract is different from that which now appears in the written contract." Id. (quotation omitted). Instead, "the proffered evidence of fraud must show more than a mere variation between the terms of the written and parol agreement." Id. [9]

Here, Noil's claim is based on representations which would merely supplement the Marathon Contract with an additional delivery term for this slurry shipment. Because these representations show nothing more than a variation from the written terms of the Marathon Contract, this parol evidence may not be proffered to show fraud. Like the breach of contract claim, had Noil sought to incorporate these alleged representations into the Marathon Contract prior to execution, it should have done so. Because it did not, Noil may not now use this parol evidence to show negligent or fraudulent misrepresentation. Therefore, Marathon and MPC are granted summary judgment on these claims as a matter of law.

## C. TORTIOUS INTERFERENCE

Finally, Noil contends Marathon tortuously interfered with a business expectancy because Althea terminated the Althea Contract after becoming "[f]rustrated by the failed delivery" of the first shipment of slurry. (Doc. No. 54 at 4). Essentially, Noil contends that because Marathon did not secure a storage tank at the facility (or did not ship it to Althea directly), the shipment was delayed. And because the shipment was delayed, Althea terminated the Althea Contract.

*Marathon Petroleum Co. v. Noil Petroleum Corp.*    Case No. 3:16-cv-2694 (N.D. Ohio Jan. 28, 2020)

As an initial matter, because this claim ultimately derives from the same alleged representations regarding Marathon's provision of the storage tank discussed above, it must fail as a matter of law under the parol evidence rule. But even if the statements offered by Noil could be used to show Marathon breached the Marathon Contract, Noil's claim here would fail because Noil cannot establish two other necessary elements.

"The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995). "The main distinction between tortious interference with a contractual \*10 relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, 780-81 (Ohio Ct. App. 2002).

Although Noil characterizes its claim as one of tortious interference with a prospective business relationship, it identifies only its relationship with Althea. (Doc. No. 53 at 15-16). Because the only identified relationship was reduced to a contract, this claim is actually one of tortious interference with contract rather than tortious interference with a prospective business relationship.[5] Therefore, to survive summary judgment on this claim, Noil must set forth sufficient evidence of the following elements:

[5] "A claim for a tortious interference with a business relationship requires proof of (1) the existence of a business relationship; (2) the wrongdoer's knowledge of the relationship; (3) an intentional interference causing a breach or termination of the relationship; and (4) resulting damages." *WLB Radiology, LLC v. Mercy Health N., LLC*, 69 N.E.3d 1032, 1042-43 (Ohio Ct. App. 2016) (citations omitted). Noil provides no evidence that any other business relationship existed let alone that Marathon knew of such a relationship and intentionally interfered with it. In any case, Noil is unable to prove the common elements of these two claims.

(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.

*Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999) (citing *Kenty v. Transam. Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995)).

In support of this claim, Noil again relies on Neely's statement that "Lauth was aware that Noil was negotiating an extended supply contract with at least one of its customers to supply that customer with oil slurry." (Doc. No. 54 at 1). Lauth disputes this allegation, stating he did not learn of Noil's intent to resell the slurry until much later. (Doc. No. 48-2 at 4). This is corroborated by an email Lauth sent at the time he learned of this intent. (*Id.* at 11). \*11

But even taking Neely's statement as true, the statement fails to show that Lauth knew of Noil's relationship and contract with Althea. In turn, since there is no evidence that Lauth knew of the Althea Contract, there is no evidence that he knew of contents of that contract - including the delivery date of the slurry from Noil to Althea. Because Marathon and MPC, through Lauth, had no knowledge that Noil was contractually required to deliver the resold slurry to Althea immediately after the scheduled receipt, there is no basis for a finding that Marathon and MPC intentionally procured a breach of the Althea Contract, effectively terminating the relationship between Noil and Althea.

Because there is no evidence by which a reasonable jury could find Marathon knew of the Althea Contract or intentionally interfered with it, Marathon and MPC are granted summary judgment on this claim.

Marathon Petroleum Co. v. Noil Petroleum Corp.    Case No. 3:16-cv-2694 (N.D. Ohio Jan. 28, 2020)

## D. DAMAGES

Marathon also moves for summary judgment on Noil's final counterclaim seeking a declaratory judgment as to the price term of the Marathon Contract. The Marathon Contract states the price of the slurry was to be the "[a]verage of Platt's U.S. Gulf Coast 3% Sulfur No. 6 Fuel Oil mean posting effective of August 23, 24 and 25, 2016, plus $0.42 per barrel." (Doc. No. 4-1 at 2). When invoicing Noil, Marathon used the average of "Platt's US Gulf Coast Waterborne 3% Sulfur No. 6 Fuel Oil." Noil contends that, based upon conversations with Lauth prior to execution of the Marathon Contract, it believed the price would be calculated using the "CME Gulf Coast No. 6 Fuel Oil 3.0% Platts Futures." Further, Noil argues the Marathon Contract is ambiguous because it does use the word "Waterborne."

For the reasons discussed above, parol evidence, like the conversations with Lauth that Noil relies upon here, is barred. Therefore, the only remaining question is whether the Marathon Contract's price term was ambiguous. I conclude it is not. The omission of the term "Waterborne" *12 alone does not result in ambiguity. The price index Noil seeks to apply is not only dissimilar in name, but calculation of the price on this index would also be at odds with the remaining terms of the Marathon Contract, requiring the average mean posting of the three days at issue. Therefore, I once again reject Noil's request to create an ambiguity in the Marathon Contract where none exists and grant Marathon summary judgment on Noil's declaratory judgment of price calculation claim.

Based on my analysis above, I find Noil owes Marathon $1,482,346.54, as invoiced, in contract damages for the breach of contract claim. (Doc. No. 48-2 at 22). Further, since the Marathon Contract is governed by Ohio law, Noil owes prejudgment interest in the amount of $212,469.67.[6] *See, e.g.*, *Quest Workforce Solutions, LLC v. Job1USA, Inc.*, 119 N.E.3d 817, 825-26 (Ohio Ct. App. 2018) ("In contract cases, the prevailing plaintiff is entitled to prejudgment interest as a matter of law.").

> [6] "Prejudgment interest accrues on a contract claim from the time that the money due to the plaintiff should have been paid." *Quest Workforce Solutions*, LLC, 119 N.E.3d at 825. In this case, the invoice indicates $1,478,194.78 was due by September 4, 2016 (net 3 days of the invoice date - September 1, 2016). (Doc. No. 48-2 at 22). But the invoice ultimately states $1,482,346.54, including the slurry price and contractually-owed reimbursement for environmental fees, (*id.* at 8), was the "amount due by" September 6, 2016. (*Id.* at 22). Because the plain language of the invoice states the total of $1,482,346.54 was due by September 6, 2016, prejudgment interest must be calculated from September 7, 2016, through the date of this opinion.
>
> The annual interest rate used to calculate prejudgment interest is the "federal shortterm rate" rounded to the nearest whole percent plus three percent. See O.R.C. §§ 1343.03(A), 5703.47. Here, the applicable interest rates are as follows: 3% in 2016, 4% in 2017, 4% in 2018, and 5% in 2019. As such, Noil owes the sum of the following: (3%*$1,482,346.54)*(116/366) in 2016, (4%*$1,482,346.54) in 2017, (4%*$1,482,346.54) in 2018, (5%*$1,482,346.54) in 2019, and (5%*$1,482,346.54)*(28/366) in 2020. 2016 and 2020 are both leap years.

Finally, the Marathon Contract provides that "[i]f Seller does not receive payment when due, ...and...suit is filed thereon, Seller will be entitled to attorney fees and court costs." (Doc. No. 4-1 at 3). In accordance with this provision, I hereby award Marathon $350 in court costs. (Doc. No. 48-4 at 3). But, while I recognize Marathon's contractual right to recover attorney fees, I find the level of detail provided insufficient to award Marathon the fees as requested at this time. *13 Additionally, in light of the judgment in favor of Marathon, I find Marathon's requested *in camera* review of the detailed accounting unwarranted. Should Marathon wish to collect these attorney fees, it shall supplement the request by February 10, 2020. Noil may then file an objection to such a request by February 17, 2020.

Marathon Petroleum Co. v. Noil Petroleum Corp.    Case No. 3:16-cv-2694 (N.D. Ohio Jan. 28, 2020)

## V. CONCLUSION

For the foregoing reasons, the motions for summary judgment filed by Marathon and MPC are granted. (Doc. Nos. 48 & 49). Because Marathon and MPC are granted summary judgment on all of Noil's counterclaims, the pending motions to dismiss these same counterclaims are denied, as moot. (Doc. Nos. 14 & 20). Noil shall pay Marathon $1,694,816.21 in damages.

After granting MPC and Marathon summary judgment on Noil's counterclaims and granting Marathon summary judgment on its breach of contract claim, all that remains are Marathon's account stated and unjust enrichment claims. In its motion for summary judgment, Marathon seeks voluntary dismissal of these claims. (Doc. No. 48-1 at 7). Noil alleged it would file a cross-motion for summary judgment dismissing these same claims but has not done so. (Doc. No. 53). Given the fact that Noil has no apparent objection to voluntary dismissal of these claims and intended to pursue dismissal itself, I hereby dismiss these remaining claims.

Should Marathon wish to pursue its request for attorney fees, it shall file a detailed accounting by February 10, 2020. Noil may then object to the requested fees by February 17, 2020.

So Ordered.

s/ Jeffrey J. Helmick

United States District Judge

casetext