IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MAXIM CRUDE OIL, LLC <br>     Plaintiff | § § § § | |
| vs. | § § | Civil Cause No. 2:21-cv-00090 |
| NOIL CORP., INC. and <br> MORRELL STEVE NEELY | § § § | |
|     Defendants | § § | |

**DEFENDANTS' BRIEF IN RESPONSE
TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION**

Defendants Noil Corp., Inc. ("Noil") and Morrell Steve Neely ("Neely") file their Response to Plaintiff Maxim Crude Oil, LLC's ("Maxim") Request for a Preliminary Injunction, and respectfully state the following:

**I.    EXECUTIVE SUMMARY**

1. This is a breach of contract case. As Maxim admits, Maxim and Noil entered into a Crude Products Agreement. To date, it is undisputed that Maxim has failed to comply with its contractual obligations by failing to pay the required amount. Pursuant to the contract and the executed invoice, Maxim agreed to pay Noil $2,795,877 by March 16, 2021. Maxim failed to do so. Maxim's own pleadings and the Jensen affidavit show that Maxim only paid $2,000,000, not the contractually agreed and obligated sum of $2,795,877. Maxim continually made excuses as to why it failed to pay the required amount, including delays caused by purportedly needing to "move money around."

2. Even though Maxim failed to abide by the contract and remains in breach of the contract, Noil made extensive efforts to source product for Maxim. On multiple occasions, Noil was told by Valero that it could allocate the product for Noil. Noil informed Maxim of this fact.

However, Valero subsequently told Noil that Valero would not be able to supply the product. It is undisputed that problems at the Valero terminal made it impossible to source product from Valero. The parties had contemplated such a situation and included both a "Force Majeure" and "Shortage of Supplies" provision in the contract.

3. Even after Maxim made threats against Noil and its employees, Noil successfully attempted to source product for Maxim. On one occasion, a company refused to do business with Maxim because of the results of its due diligence on Maxim.[1] On other occasions, Noil obtained sources to provide product to Maxim. However, Maxim refused the offers. This important fact is missing from all of Maxim's briefing.

4. Maxim filed its lawsuit in state court even though Maxim's own pleadings show that diversity jurisdiction existed in this Court. Maxim then obtained an *ex parte* temporary restraining order **without prior notice** to Noil. Maxim's current counsel did **not** inform Noil's Illinois counsel even though they had extensive prior communications about this dispute.

5. As set forth below, Maxim cannot meet the requirements for the "extraordinary remedy" of a preliminary injunction. Furthermore, Maxim cannot obtain injunctive relief based on a contract that it breached.

## II.    FACTS

**A.    Maxim Breached The Crude Products Agreement By Failing To Pay The Agreed And Required Amount.**

6. On March 15, 2021, Maxim and Noil entered into the Crude Products Agreement.[2] Maxim and Noil also executed an invoice pursuant to the Crude Products Agreement.[3] The Crude

---

[1] Noil has discovered that James L. Jensen, listed as the member, manager, and director of Maxim, has opened and closed companies and been sued for buying and reselling condensate stolen by cartels in Mexico.

[2] Ex. 1, Crude Products Agreement.

[3] Ex. 2, Maxim Invoice.

2

Products Agreement is a prepaid account agreement. The provision entitled "Payment Terms." expressly requires that "Jobber shall, except at Noil Corp. Inc's option, pay Noil Corp. Inc. cash **before delivery or pickup** for crude products purchased hereunder."[4] Pursuant to the Crude Products Agreement and the executed invoice, Maxim was required to pay $2,795,877 by March 16, 2021.[5] The invoice shows the "PAYMENT DUE BY" date as March 16, 2021.[6] Both the Crude Products Agreement and the invoice were executed by James L. Jensen ("Jensen") on behalf of Maxim.[7]

7. Maxim failed to make the required $2,795,877 payment by March 16, 2021.[8] On March 18, 2021, two days after the payment was due, Jensen tried to explain Maxim's failure by claiming that "[t]he pre-payment cash amount is more than Maxim typically keeps in its normal operating account and hence I've had to move some additional funds out of money market type account which is taking a few days longer than I anticipated to transfer over."[9] After apologizing for Maxim's failure, Jensen claimed "I'm think we should have everything straightened around by tomorrow."[10]

8. To date, Maxim has never paid the agreed and required $2,795,877.[11] In its Original Petition, Maxim pled that it only paid $2,000,000, not the required $2,795,877.[12] Maxim also submitted a document from Chase Connect showing that Maxim only paid $2,000,000 with

---

[4] Ex. 1, Crude Products Agreement at 6(a) (emphasis added).

[5] Ex. 2, Maxim Invoice.

[6] *Id.*

[7] Ex. 1, Crude Products Agreement; Ex. 2, Maxim Invoice.

[8] Ex. 3, Declaration of Jennifer Watson.

[9] Ex. 4, Jensen email dated March 18, 2018.

[10] *Id.*

[11] Ex. 3, Declaration of Jennifer Watson.

[12] Petition at ¶ 13 [Dkt. 1 at 6].

**both payments occurring after** the March 16, 2021 due date.[13] It is undisputed that Maxim breached the Crude Products Agreement and never paid the agreed and required amount. It is also undisputed that Noil previously returned $1,400,000 to Maxim and kept the remaining amount pursuant to the contract as damages.

9. The Crude Products Agreement contains a provision that expressly provides that it "terminates and supersedes any prior agreements" between Maxim and Noil:[14]

> Subject to the foregoing, effective as of the commencement of the term hereof, **this agreement terminates and supersedes any prior agreements** between Jobber [Maxim] and Noil Corp. Inc. and its affiliates relating to the subject matter hereof, provided that any outstanding breach by Jobber of any such prior agreement shall be deemed to be a breach of this agreement.

The Crude Products Agreement also contains a provision that any modification of the contract must be "in writing and signed by Noil Corp. Inc.:[15]

> **No modification of this agreement**, and no waiver of any provision hereof, shall be binding on Noil Corp. Inc. **unless in writing and signed by Noil Corp. Inc.**

The Crude Products Agreement and associated invoice are the only contracts between Maxim and Noil. There is no escrow agreement.

**B.   After Being Told By Valero That Product Was Available, Noil Was Unable To Source Product From Valero Because It Shut Down Its Terminal.**

10. Noil sources millions of dollars of product a year for its customers.[16] Noil has worked with Shell, Phillips 66, Valero and other large refiners. Noil contracts with the Department of Defense and multiple resellers. In this instance, Noil's goal was to find and provide product to Maxim.

---

[13] Chase Connect showing wire transfers on March 22, 2021 and March 26, 2021 [Dkt. 7-1 at 54-57].

[14] Ex. 1, Crude Products Agreement at 21 (emphasis added).

[15] *Id.*

[16] Ex. 3, Declaration of Jennifer Watson. The factual statements in this section are supported by this declaration.

4

11. Maxim wanted the product to come from the Valero Three Rivers terminal near Corpus Christi. Jennifer Watson, a senior vice president at Noil, worked primarily with David Hillman of Maxim. They regularly spoke to try and get the deal done while Noil was working with Valero to get set to start lifting the product. Maxim knew that Noil was working on obtaining the product because Maxim also called the refinery verifying what Noil was telling Maxim.

12. Noil was told by Valero that it could provide the requested product. Noil received a commitment from Valero for the product and informed Maxim of Valero's commitment. However, Noil was unable to obtain product from Valero. As Maxim was told by both Noil and Valero, Valero shut down the terminal and Valero may never bring this terminal back up. David Hillman of Maxim told Noil that Valero had told Maxim that Valero may never provide product out of its terminal again.

C. **Noil Was Able To Obtain Offers For Product For Maxim, But Maxim Refused These Offers.**

13. Even after Maxim threatened Noil and terminated the contract, Noil continued to try and source product for Maxim.[17] Noil's efforts, before and after Maxim breached the contract, resulted in Noil identifying product that could be sourced for Maxim. However, Maxim has turned down those sources due to pricing or logistics. Another company with product decided not to do business with Maxim because its due diligence showed Maxim to be too high of a risk.

C. **Allegations Against Noil And The Checkered Past Of Maxim And Jensen.**

14. Although it is undisputed that the parties entered into a contract that governed their relationship, Maxim all but ignores the contract while trying to disparage Noil and Steve Neely. While Maxim identified personal bankruptcies of Steve Neely, Maxim failed to inform the Court

---

[17] Ex. 3, Declaration of Jennifer Watson. The factual statements in this section are supported by this declaration.

5

that those bankruptcies were closed, dismissed, or discharged. Furthermore, there is no jurisdiction as to Steve Neely and Maxim has failed to make any specifics factual allegations against him. Next, Maxim attached an article about a lawsuit filed by L Energy filed against Noil Petroleum Corporation.[18] As the article reports, Steve Neely clarified that it was L Energy who breached the contract and sold the product to the client who then refused to pay. Finally, Noil Petroleum Corporation was in a lawsuit with Marathon that concerned the delivery point for the slurry which was decided against Noil Petroleum Corporation.

15. On the other hand, a quick search shows that Maxim and Jensen have a checkered past. For example, Jensen and two of his prior companies were accused of reselling condensate that had been stolen by cartels in Mexico.[19] Pursuant to an agreed stipulation, the claims against Jensen and his two companies were dismissed with all parties bearing their own costs.[20] Interestingly, the two companies who were co-defendants with Jensen appear to be no longer operating. Big Star Gathering, LTD. L.L.P.'s status expired on March 31, 2010.[21] St. James Energy Operating, Inc.'s last public information report was filed on December 31, 2010.[22] Maxim

---

[18] In conversations with counsel, Maxim also claimed that Noil was part of a fraudulent scheme. That is false. Several individuals used the name "Noil" in a fraudulent scheme as a quick Lexis search revealed. *See United States v. Dermen,* 2021 U.S. Dist. LEXIS 27430 (D. Utah February 10, 2021). Noil Corp., Inc. and Steve Neely were not involved in that fraud in any way. *Id.*

[19] Ex. 9, First Amended Complaint dated April 20, 2012 in Civil Action No. 4:10-CV-01997; styled *PEMEX Exploración y Producción v. BASF Corp., et al.,* in the U.S. Southern District of Texas.

[20] Ex. 10, Agreed Stipulation and Order of Dismissal against James Jensen, Big Star, and St. James Energy, dated May 30, 2013.

[21] Ex. 7, Utah Secretary of State Business Organization Information Inquiry for Big Star Gathering Ltd., L.L.P., entity 6130359-0170 and 7663057-0171.

[22] Ex. 8, Texas Secretary of State Business Organization Information Inquiry listing management, assumed names, and filing history for St. James Energy Operating, Inc.

6

and both of these two entities also share the same address of 1058 FM 3024 George West, Texas 78022.  Maxim also previously forfeited its carter that was subsequently reinstated.[23]

### III.   ARGUMENT AND AUTHORITIES

**A.   A Preliminary Injunction Is An Extraordinary Remedy That Can Only Issue If Maxim Can Establish, By A Clear Showing, All Of The Requirements.**

16.   "A preliminary injunction is an 'extraordinary remedy' that should only issue if the movant establishes: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Turner v. Epps*, 460 F. App'x. 322, 327 (5th Cir. 2012) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).  "Plaintiffs must satisfy all four requirements." *Jones v. Bush*, 122 F. Supp. 2d 713, 718 (N.D. Tex.), aff'd 244 F.3d 134 (5th Cir. 2000) (citations omitted).

17.   A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  Here, Maxim cannot meet the four requirements necessary for this extraordinary remedy.  Furthermore, Maxim cannot obtain injunctive relief because Maxim breached the contract.

**A.   The Court should deny Maxim's request because Maxim cannot show a substantial likelihood of success.**

**1.   Maxim cannot show a substantial likelihood of success as to its claims against Neely.**

---

[23] Ex. 6, Texas Secretary of State Corporations Section Forfeiture pursuant to Section 171.309 of the Texas Tax Code of Maxim Crude Oil, L.L.C., dated August 1, 2014.

18.     Maxim cannot show a substantial likelihood of success as to its claims against Neely. In fact, as set forth in Steve Neely's Motion to Dismiss, Maxim cannot show that the Court has jurisdiction over him.[24] Maxim admits that Neely is not a Texas resident and Neely's affidavit shows that he does not have sufficient contacts to establish jurisdiction in Texas.

19.     Furthermore, Maxim failed to plead any specific factual allegations against Neely. Neely is only mentioned six times in the entirety of Plaintiff's Petition:[25]

> Defendant, **Morrell Steve Neely ("Neely")** is an individual and domiciled in the State of Illinois and conducting business within the State of Texas, and in Nueces County, Texas. **Neely** may be served at 9011 S. Paxton Avenue, Chicago, Illinois 60617. **Neely** has more than minimum contacts with the State of Texas.
>
> At all times relevant hereto, Defendant **Neely** was the control person of Defendant Noil and exercised his position to cause Noil to breach its fiduciary duty, and is liable and responsible for all damages for the aiding and abetting of this breach of fiduciary duty by Noil, and is jointly and severally liable for the breach of fiduciary duty damages.
>
> Therefore, Plaintiff seeks actual damages in the amount of the deposited funds converted, and exemplary damages for this defalcation while acting in as a fiduciary, both jointly and severally against both Defendant Noil and Defendant **Neely**.

Missing are any specific factual allegations to support any of the claims against Neely. Therefore, Maxim cannot show a substantial likelihood of success as to Neely.

### 2. Maxim cannot show a substantial likelihood of success as to its claims against Noil.

20.     Maxim cannot show a substantial likelihood of success as to its claims against Noil. First, it is undisputed that Maxim breached the contract by failing to pay the agreed and required amount of $2,795,877 by March 16, 2021. The Crude Products Agreement expressly requires that Maxim "shall, except at Noil Corp. Inc's option, pay Noil Corp. Inc. cash **before delivery or**

---

[24] *See* Defendant Morrell Steve Neely's Motion To Dismiss [Dkt. 8]. For brevity, Defendants will not repeat the facts and arguments in the Motion to Dismiss which is incorporated herein for all purposes.

[25] Petition at ¶¶ 5; 56; 58 [Dkt. 1 at 2, 14, and 15] (emphasis added).

8

**pickup** for crude products purchased hereunder."[26] The invoice, executed by Jensen on behalf of Maxim, required Maxim to pay $2,795,877 by March 16, 2021.[27] However, Maxim failed to make the required payment by March 16, 2021.[28]

21.     Instead, on March 18, 2021, Jensen tried to explain Maxim's failure by claiming that he had to move "funds out of [a] money market type account" and claimed that he would have "everything straightened around by tomorrow."[29] That did not happen, Maxim's own documents show that it took an additional four days for the $1,500,000 payment and an additional eight days for the $500,000 payment.[30] Importantly, Maxim never paid the additional $795,877 that it was required to do so under the parties' written agreement.

22.     Second, when a plaintiff breaches terms of an agreement, it is axiomatic that they cannot attempt to enforce select terms of that agreement. *See Parker v. United-Bilt Homes, LLC*, 2017 Tex. App. LEXIS 11564 (Tex. App.—Tyler Dec. 13, 2017, pet. denied); *Joseph v. PPG Indus., Inc.*, 674 S.W.2d 862, 867 (Tex. App.—Austin 1984, writ ref'd n.r.e.) ("[O]ne who has himself broken a contract cannot recover on it."). In P*arker*, a dispute arose between homeowners and a homebuilder. *Id.* at *1. When the homeowners defaulted on their payments, the homebuilder initiated a foreclosure proceeding and the homeowners sued to enjoin the foreclosure. *Id.* The homebuilder removed the case to federal court, which ordered the parties to mediation and arbitration. *Id.* at *2. The arbitrator ruled in favor of the homebuilder, but the homeowners failed to comply with the award, appealing to the Fifth Circuit. *Id.* The parties agreed to a settlement

---

[26] Ex. 1, Crude Products Agreement at 6(a) (emphasis added).

[27] Ex. 2, Maxim Invoice.

[28] Ex. 3, Declaration of Jennifer Watson.

[29] Ex. 4, Jensen email dated March 18, 2018.

[30] Chase Connect showing wire transfers on March 22, 2021 and March 26, 2021 [Dkt. 7-1 at 54-57].

agreement wherein the homeowners would pay the homebuilder and the homebuilder would dismiss its foreclosure. *Id.* at *2-3. After the homeowners failed to pay and dismiss the appeal pursuant to the settlement agreement, the homebuilder scheduled the foreclosure. *Id.* at *3. The homeowners then sued in county court seeking a temporary restraining order, temporary injunction, permanent injunction, and declaratory judgment. *Id.* The trial court confirmed the arbitration award and authorized the homebuilder to proceed with the foreclosure. *Id.*

23.     On appeal, the court held that "a defaulting party under a contract cannot subsequently enforce that contract." (citing *Shellnut v. Wells Fargo Bank*, N.A., No. 02-15-00204-CV, 2017 Tex. App. LEXIS 3844, 2017 WL 1538166, at *7 (Tex. App.—Fort Worth Apr. 27, 2017, pet. filed) (mem. op.); *Ramex Constr. Co. v. Tamcon Servs. Inc.*, 29 S.W.3d 135, 137 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Joseph v. PPG Indus., Inc.*, 674 S.W.2d 862, 867 (Tex. App.—Austin 1984, writ ref'd n.r.e.) ("one who has himself broken a contract cannot recover on it[]"); *see also Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.")). The appellate court further concluded that "because [the homeowners] breached the terms of the settlement and release agreement, it is axiomatic that [they] cannot attempt to enforce select terms of that agreement." *Id.* at *8. Similarly, it is axiomatic that Maxim cannot enforce select terms of the parties' agreement after materially breaching the agreement.

24.     Third, Maxim is wrongfully seeking specific performance of a term that does not exist. Neither the Crude Products Agreement nor the invoice contains or consists of an escrow agreement.[31] An escrow agreement contains the basis for the escrow, the identity of the third-

---

[31] Ex. 1, Crude Products Agreement; Ex. 2, Maxim Invoice.

party escrow agent, the conditions for holding and releasing the escrow, and provisions for what occurs when the escrow period ends. None of that is present in either Crude Products Agreement or the invoice.[32] Importantly, the parties agreed that the Crude Products Agreement "terminates and supersedes any prior agreements" between Maxim and Noil.[33] The parties also agreed that any modification of the contract must be "in writing and signed by Noil Corp. Inc.[34] There was no escrow agreement and Maxim's request to rewrite the parties' contract and require specific performance of a non-existent provision should be denied.

25. Furthermore, to obtain specific performance, Maxim "must plead and prove that [it] was ready, willing, and able to timely perform [its] obligations under the contract." *DiGiuseppe v. Lawler,* 269 S.W.3d 588, 593 (Tex. 2008). Here, Maxim cannot do that because it breached the contract by failing to make the required payment.

26. Fourth, although Maxim does not make it a significant issue, Maxim does complain that Noil was not able to source the product from Valero's terminal. Noil worked to source the product from Valero's terminal and was told by Valero that it could provide the requested product.[35] However, it is undisputed that neither Noil nor Maxim could obtain product from Valero because Valero shut down the terminal. The parties had contemplated such a situation and included both a "Force Majeure" and "Shortage of Supplies" provision in the contract that excused Noil's inability to source the product from Valero.[36] Even so, Noil has continued to try and source product for Maxim, but Maxim has turned down those sources due to pricing or logistics.

---

[32] *Id.*

[33] Ex. 1, Crude Products Agreement at 21 (emphasis added).

[34] *Id.*

[35] Ex. 3, Declaration of Jennifer Watson. The factual statements in this paragraph are supported by this declaration.

[36] Ex. 1, Crude Products Agreement at 13(a); 13(b).

**B.      The Court should deny Maxim's request because (1) Maxim cannot show a substantial likelihood of irreparable harm and (2) there is an adequate remedy at law, monetary damages.**

27.     Second, there is no substantial likelihood of irreparable harm. "[A] harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "Loss of income, compensable after trial on the merits, or financial distress, does not constitute irreparable injury." *Digital Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 781 (N.D. Tex. 2012) (citing *Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974)). That is the same case here.

28.     Maxim seeks monetary damages. In fact, Maxim's injunction request is for the specific monetary amount of $600,000, the same amount that it claims Noil has kept from Maxim. Because Maxim cannot dispute that monetary damages constitute an adequate remedy at law for its alleged claims, Maxim is forced to take a different tact. *Janvey*, 647 F.3d at 600.

29.     Without any support, Maxim claims that it would not be able to collect on a supposed judgment. Because Maxim has no evidence to support this claim, the best Maxim can do is to claim – without support – that Noil is a shell company with no operations. That claim is false. The undisputed evidence is that (1) Noil does business with some of the largest oil and gas companies in the world; (2) Noil has contracted with the Department of Defense and multiple resellers; (3) Noil sources millions of dollars of product a year for its customers; and (4) Noil was able to source product for Maxim but Maxim refused the offers.[37] There is no evidence that Noil could not satisfy a judgment in the unlikely event that Maxim prevails.

30.     Similarly, Maxim claims that the injury would be irreparable because Maxim claims – without support – that Noil is a shell company. Maxim also claims – again without

---

[37] Ex. 3, Declaration of Jennifer Watson.

support – that the injury would be irreparable because it needs the $600,00 for operating capital. However, there is no evidence to support this claim.

**C.  The Court should deny Maxim's request because Maxim cannot show that some threatened injury outweighs the harm that will result if the injunction is granted.**

31.  Third, Maxim cannot show that some threatened injury in the absence of an injunction outweighs the harm that will result if the injunction is granted. Maxim did not even claim that any harm would result. Instead, Maxim simply restates its claim that it owns the $600,000.[38] However, that is the actual dispute. Nor has Maxim explained how the granting of the injunction will not harm Noil.

**D.  The Court should deny Maxim's request because Maxim cannot show that the grant of the injunction will not disserve the public interest.**

32.  Fourth, Maxim cannot show that the granting of the injunction will not disserve the public interest. Maxim did not attempt to make this required showing in its initial Motion. Now, Maxim claims that a preliminary injunction would promote the public welfare because it would maintain the status quo and place the funds as the parties originally agreed, in escrow.[39] Maxim is wrong.

33.  First, the status quo is that the funds are not subject to an escrow agreement. Maxim's requested injunction would disturb the status quo. Second, as discussed above, there was no and is no escrow agreement.

34.  Furthermore, it would be a disservice to the public interest to allow Maxim to breach the Crude Products Agreement and obtain injunctive relief. Similarly, it would be contrary to Texas' public policy to honor parties' agreements.

---

[38] Plaintiff's Brief at ¶ 31.

[39] Plaintiff's Brief at ¶ 32.

**WHEREFORE,** Defendants respectfully request the Court deny Plaintiff's Motion and for such other and further relief to which they may be justly entitled.

OF COUNSEL:                                    Respectfully submitted,

                                               */s/ Matthew R. Beatty*
Marty J. Schwartz                              Matthew R. Beatty
IL State Bar                                   State Bar No. 24001169
mschwartz@schainbanks.com                      mbeatty@bnsfirm.com
Schain Banks                                   Michael L. Navarre
Three First National Plaza                     State Bar No. 00792711
70 W. Madison Street, Suite 5300               mnavarre@bnsfirm.com
Chicago, IL 60602                              Beatty Navarre Strama, PC
(312) 345-5700 Telephone                       901 S. MoPac Expy.
(312) 345-5701 Facsimile                       Building 1, Suite 200
                                               Austin, Texas 78746
                                               (512) 879-5050 Telephone
                                               (512) 879-5040 Facsimile

                                               **ATTORNEYS FOR DEFENDANTS
                                               NOIL CORP., INC. AND
                                               MORRELL STEVE NEELY**

**CERTIFICATE OF SERVICE**

I certify that on this the 18th day of May, 2021, I served a true and correct copy of the foregoing instrument on the counsel of record below by CM/ECF and by email as follows:

Antonio Ortiz – via aortiz@jhwclaw.com
Shelby A. Jordan – via sjordan@jhwclaw.com
**JORDAN, HOLZER & ORTIZ, P.C.**
500 N. Shoreline, Suite 900
Corpus Christi, Texas, 78401

                                               */s/ Michael L. Navarre*
                                               Michael L. Navarre