IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MAXIM CRUDE OIL, LLC<br>    Plaintiff<br><br>vs.<br><br>NOIL CORP., INC. and<br>MORRELL STEVE NEELY<br><br>    Defendants | § § § § § § § § § § | Civil Cause No. No. 2:21-cv-90 |

**DEFENDANT/COUNTER PLAINTIFF**
**NOIL CORP, INC.'S ORIGINAL COUNTERCLAIM**

TO THE HONORABLE DAVID S. MORALES, UNITED STATES DISTRICT JUDGE:

Defendant/Counter Plaintiff Noil Corp. Inc. files its Original Counterclaim against Maxim Crude Oil, LLC and, in support, respectfully shows the Court as follows:

## I. PARTIES

1. Defendant/Counter Plaintiff Noil Corp. Inc. ("Noil") is a foreign corporation organized and existing under the laws of the State of Illinois with its principal office in the State of Illinois.

2. Plaintiff/Counter Defendant Maxim Crude Oil, LLC ("Maxim") is a Texas limited liability company with its principal place of business in Texas. Maxim has appeared in this lawsuit.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction over this counterclaim because complete diversity exists and the amount in controversy is within the jurisdictional limits of the Court. 28 U.S.C. §§ 1332. This Court has jurisdiction over Maxim because Maxim has minimum contacts with the State of Texas and has purposefully availed itself to the laws of the State of Texas.

4. Venue is proper over this action pursuant to 28 U.S.C. §§ 1391, 1441(a) which permits the removal of action to the federal court for the district and division where the state court action was pending. The state court action was pending in the District Court for Nueces County which is located within the Southern District of Texas, Corpus Christi Division. 28 U.S.C. § 124(d)(1). Venue was proper in the state court for this counterclaim pursuant to 15.062(a) of the Texas Civil Practice and Remedies Code. Venue is also proper because Maxim has appeared and not contested venue.

## II. FACTUAL BACKGROUND

5. In 2021, Jennifer Watson was contacted by brokers and told by Maxim that Maxim needed to buy Naptha. Maxim, through David Hillman, told Jennifer Watson that it had experience in the oil fuel buying business, experience in the jobber/rack end of fuel buying, and had been buying product from Valero. During the discussions that led to the Crude Services Agreement, Maxim, through David Hillman, assured Jennifer Watson that it had the funds necessary to pay cash for the requested Naptha before any delivery of Naptha.

6. On March 15, 2021, Maxim and Noil entered into the Crude Products Agreement.[1] Maxim and Noil also executed an invoice pursuant to the Crude Products Agreement ("Invoice").[2] Pursuant to the Crude Products Agreement, Maxim is obligated to purchase "during each contract year not less than 50,000,000 gallons of Naptha, crude or motor fuels."[3] Maxim is also obligated to "diligently promote the sale in [Maxim's] area of primary responsibility of the crude products

---

[1] Ex. 1, Crude Products Agreement.
[2] Ex. 2, Maxim Invoice.
[3] Ex. 1, Crude Products Agreement at § 3(a).

purchased under this agreement, and shall conduct the operation of [Maxim's] business in such a manner as to promote goodwill toward Noil Corp. Inc. and its products."[4]

7. The Crude Products Agreement is a prepaid account agreement. The provision entitled "Payment Terms" expressly requires that "[Maxim] shall, except at Noil Corp. Inc's option, pay Noil Corp. Inc. cash **before delivery or pickup** for crude products purchased hereunder."[5] Pursuant to the Crude Products Agreement and the Invoice, Maxim was required to pay $2,795,877 for the first quantity of Naptha.[6] Both the Crude Products Agreement and the invoice were executed by James L. Jensen ("Jensen") on behalf of Maxim.[7] Pursuant to the Crude Products Agreement, the pricing provision was to be $0.03 cents per gallon less than the cited benchmark pricing.[8]

8. Maxim failed to make the required $2,795,877 payment by the required deadline. In fact, *Maxim never paid the required $2,795,877*. On March 18, 2021, Jensen tried to explain Maxim's failure by claiming that "[t]he pre-payment cash amount is more than Maxim typically keeps in its normal operating account and hence I've had to move some additional funds out of money market type account which is taking a few days longer than I anticipated to transfer over." After apologizing for Maxim's failure, Jensen claimed "I'm think we should have everything straightened around by tomorrow." The money never came. *Maxim never paid the contractually agreed amount.*

---

[4] *Id.* at § 10(c).

[5] Ex. 1, Crude Products Agreement at 6(a) (emphasis added).

[6] Ex. 2, Maxim Invoice.

[7] Ex. 1, Crude Products Agreement; Ex. 2, Maxim Invoice.

[8] Ex. 1, Crude Products Agreement at Exhibit D.

9. Noil sources millions of dollars of product a year for its customers. Noil has worked with Shell, Phillips 66, Valero and other large refiners. Noil contracts with the Department of Defense and multiple resellers. In this instance, Noil's goal was to find and provide product to Maxim. Maxim wanted the product to come from the Valero Three Rivers terminal near Corpus Christi. Noil was working with Valero to get set to start lifting the product. Maxim knew that Noil was working on obtaining the product because Maxim also called the Valero refinery verifying what Noil was telling Maxim.

10. Noil was told by Valero that it could provide the requested product. In fact, Noil received a commitment from Valero for the product and informed Maxim of Valero's commitment. However, Noil was unable to obtain product from Valero. As Maxim was told by both Noil and Valero, Valero shut down the terminal and may never bring this terminal back up. David Hillman of Maxim told Noil that Valero had told Maxim that Valero may never provide product out of its terminal again.

11. Even after Maxim threatened Noil and terminated the contract, Noil continued to try and source product for Maxim. Noil's efforts, before and after Maxim breached the contract, resulted in Noil identifying product that could be sourced for Maxim. However, Maxim turned down those sources due to pricing or logistics. Additionally, another company with product decided not to do business with Maxim because its due diligence on Maxim showed Maxim to be too high of a risk.

12. Maxim and James Jensen have a checkered past. For example, Jensen and two of his prior companies were accused of reselling condensate that had been stolen by cartels in

Mexico.[9] Interestingly, the two companies who were co-defendants with Jensen appear to be no longer operating. Big Star Gathering, LTD. L.L.P.'s status expired on March 31, 2010.[10] St. James Energy Operating, Inc.'s last public information report was filed on December 31, 2010.[11] Interestingly, Maxim and both of these two entities share the same address of 1058 FM 3024 George West, Texas 78022. Maxim also previously forfeited its company charter that was subsequently reinstated.[12]

13. Although Maxim never paid the contractually agreed amount of $2,795,877 for the first quantity of Naptha, Maxim did pay $2,000,000 in two separate wires. After Maxim threatened Noil, Noil sent $1,4000,00 back to Maxim. Even then, Noil continued to try and obtain Naptha for Maxim.

### III.  CAUSES OF ACTION

**Count 1:  Fraudulent Misrepresentation And Inducement By Maxim.**

14. Noil incorporates by reference the foregoing allegations.

15. Maxim made fraudulent representations to Noil in the course of its business and concerning a transaction in which it had a monetary interest. Maxim supplied false information to Noil for the guidance of Noil in its business. Maxim made fraudulent representations to induce Noil into entering into the Crude Product Services Agreement with Maxim. Maxim falsely stated to Noil, through David Hillman, that Maxim had the necessary funds to pay for the requested

---

[9] First Amended Complaint dated April 20, 2012 in Civil Action No. 4:10-CV-01997; styled *PEMEX Exploración y Producción v. BASF Corp., et al.,* in the U.S. Southern District of Texas.

[10] Utah Secretary of State Business Organization Information Inquiry for Big Star Gathering Ltd., L.L.P., entity 6130359-0170 and 7663057-0171.

[11] Texas Secretary of State Business Organization Information Inquiry listing management, assumed names, and filing history for St. James Energy Operating, Inc.

[12] Texas Secretary of State Corporations Section Forfeiture pursuant to Section 171.309 of the Texas Tax Code of Maxim Crude Oil, L.L.C., dated August 1, 2014.

5

Naptha, would be able to pay for the requested Naptha pursuant to the contractual terms, and that it had experience in the oil fuel buying business, experience in the jobber/rack end of fuel buying, and had been buying product from Valero.

16. Maxim did not exercise reasonable care or competence in providing the information and representation or intentionally made these false statements. Maxim made the representations with the intent that Noil act on them. Noil entered into the Crude Products Agreement and the Invoice based on these false representations by Maxim.

17. Noil justifiably relied on the information and representations provided by Maxim and, as a result, was damaged in an amount within the jurisdiction of this Court, including lost profits.

18. Maxim's fraud injured Noil in an amount that is within the jurisdictional limits of this Court. Noil also requests exemplary damages based on Maxim's fraud.

### Count 2: Breach Of Contract By Maxim.

19. Noil incorporates by reference the foregoing allegations.

20. Noil and Maxim executed the Crude Products Agreement and Invoice. The Crude Products Agreement and Invoice are valid and enforceable written contract(s).

21. Pursuant to the Crude Products Agreement and Invoice, Maxim was contractually obligated to do the following:

- Purchase "during each contract year not less than 50,000,000 gallons of Naptha, crude or motor fuels."[13]
- "[P]ay Noil Corp. Inc. cash before delivery or pickup for crude products purchased hereunder.[14]
- "[D]iligently promote the sale in [Maxim's] area of primary responsibility of the crude products purchased under this agreement, and shall conduct the operation of

---

[13] Ex. 1, Crude Products Agreement at § 3(a).

[14] *Id.* at § 6(a).

> [Maxim's] business in such a manner as to promote goodwill toward Noil Corp. Inc. and its products."[15]

- Pay $2,795,877.00 for the first quantity of Naptha.[16]

Maxim breached the Crude Products Agreement and Invoice by breaching these provisions and failing to perform its obligations.

22.	Maxim's breach of the Crude Products Agreement and Invoice injured Noil in an amount that is within the jurisdictional limits of this Court.

23.	All conditions precedent have been satisfied.

### COUNT 3: Declaratory Judgment.

24.	Noil incorporates by reference the foregoing allegations.

25.	There is a real and substantial controversy between the parties as to their respective obligations and rights under the Crude Services Agreement.

26.	The purpose of the Uniform Declaratory Judgments Act is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. A person interested under a contract or whose rights, status, or other legal relations are affected by a contract may have determined any question of construction or validity arising under the contract and obtain a declaration of rights, status or other legal relations thereunder.

27.	The Crude Products Agreement contains a provision entitled "Prevention of Performance; Shortage of Supply."[17] Noil seeks to have determined questions of construction, status, and validity arising under the Crude Products Agreement and to obtain the following judicial declarations:

---

[15] *Id.* at § 10(c).
[16] Ex. 2, Maxim Invoice dated March 15, 2021.
[17] Ex. 1, Crude Products Agreement at § 13.

- Noil has no obligation to perform its obligations if the condition(s) specified in Section 13 of the Crude Products Agreement are met.
- Noil is excused from performing its obligations if the condition(s) specified in Section 13 of the Crude Products Agreement are met.
- Valero's closing of its Three Rivers terminal near Corpus Christi and the facts set forth herein satisfied the condition(s) specified in Section 13 of the Crude Products Agreement.

28. Noil seeks a declaratory judgment concerning these provisions of the Crude Products Agreement.

## IV. REQUEST FOR ATTORNEYS' FEES, INTEREST, AND COSTS

29. Noil incorporates by reference the foregoing allegations.

30. Pursuant to Texas law, including Section 37.009 and Chapter 38 of the Texas Civil Practice and Remedies Code, Noil seeks to recover its reasonable attorneys' fees and costs, including reasonable fees for the cost of successfully making or responding to an appeal.

31. Noil is also entitled to recover its costs incurred in this action. Furthermore, Noil requests that it be awarded prejudgment and post-judgment interest to which it is entitled under the law.

32. All conditions precedent for the recovery of attorneys' fees, costs, and interest have been met.

## V. JURY REQUEST

33. Noil requests a jury trial.

## VI. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Noil requests that Maxim be cited to appear and answer herein and for the following relief;

(1) that this matter be set down for trial;

(2) that, upon trial/hearing, the Court award Noil all of its actual damages sustained as a result of Maxim's conduct, as well as exemplary damages;

(3) that, upon trial/hearing, the Court award a declaratory judgment that (1) Noil has no obligation to perform its obligations if the condition(s) specified in Section 13 of the Crude Products Agreement are met; (2) Noil is excused from performing its obligations if the condition(s) specified in Section 13 of the Crude Products Agreement are met; and (3) Valero's closing of its Three Rivers terminal near Corpus Christi and the facts set forth herein satisfied the condition(s) specified in Section 13 of the Crude Products Agreement.

(4) that, upon trial/hearing, the Court award Noil its reasonable attorneys' fees as permitted by law, including reasonable attorneys' fees for the cost of successfully making or responding to any appeal

(5) that, upon trial/hearing, the Court award Noil its costs, including costs of court; and

(6) for all such other relief, at equity or otherwise, to which Noil may show itself entitled.

OF COUNSEL:

Respectfully submitted,

/s/ Michael L. Navarre
Michael L. Navarre
State Bar No. 00792711
mnavarre@bnsfirm.com
Beatty, Navarre, Strama, PC
901 S. MoPac Expy.
Building 1, Suite 200
Austin, Texas 78746
(512) 879-5050 Telephone
(512) 879-5040 Facsimile

Marty J. Schwartz
IL State Bar No. 50839
mschwartz@schainbanks.com
Schain Banks
Three First National Plaza
70 W. Madison Street, Suite 5300
Chicago, IL 60602
(312) 345-5700 Telephone
(312) 345-5701 Facsimile

ATTORNEYS FOR DEFENDANT
NOIL CORP., INC.

## CERTIFICATE OF CONFERENCE

Pursuant to Rule 15(a)(2), I certify that I conferred with opposing counsel concerning the filing of this counterclaim and opposing counsel consented to its filing.

                                     */s/ Michael L. Navarre*
                                     Michael L. Navarre

## CERTIFICATE OF SERVICE

I certify that on this the 16th day of August, 2021, I served a true and correct copy of the foregoing instrument on the counsel of record below by EM/EC and by email as follows:

Antonio Ortiz – via aortiz@jhwclaw.com
Shelby A. Jordan – via sjordan@jhwclaw.com
JORDAN, HOLZER & ORTIZ, P.C.
500 N. Shoreline, Suite 900
Corpus Christi, Texas, 78401

                                     */s/ Michael L. Navarre*
                                     Michael L. Navarre