```
 1                 IN THE UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                        HOUSTON DIVISION

 4   MAXIM CRUDE OIL, LLC           §     CASE NO. 21-cv-00090
                                    §     CORPUS CHRISTI, TX
 5   VERSUS                         §     THURSDAY,
                                    §     MAY 20, 2021
 6   NOIL CORP., INC., et al.       §     1:07 PM TO 2:14 PM

 7                             HEARING

 8           BEFORE THE HONORABLE DAVID S. MORALES
                 UNITED STATES MAGISTRATE JUDGE
 9
                            APPEARANCES:
10

11      FOR THE PARTIES:            SEE NEXT PAGE

12      COURT REPORTER:             SHARON RUSSELL

13      COURT CLERK:                ARLENE RODRIGUEZ

14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21              Veritext Legal Solutions
                330 Old Country Road, Suite 300
22                   Mineola, NY 11501
                Tel: 800-727-6396 ▼ www.veritext.com
23
        Proceedings recorded by electronic sound recording; transcript
24                produced by transcription service.

25
```

```
 1                            TELEPHONIC APPEARANCES:

 2

 3   FOR THE PLAINTIFF:              JODRAN & ORTIZ, P.C.
                                     Jose A. Ortiz
 4                                   500 N. Shoreline Blvd.
                                     Suite 900
 5                                   Corpus Christi, TX 78401
                                     361-884-5678
 6

 7   FOR THE DEFENDANTS:             BEATTY NAVARRE STRAMA, PC
                                     Michael L. Navarre
 8                                   901 S. Mopac Expressway
                                     Building 1, Suite 200
 9                                   Austin, TX 78746
                                     512-854-5050
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      CORPUS CHRISTI, TEXAS; THURSDAY, MAY 20, 2021; 1:07 PM

2           CLERK:  Court will call Civil Action C21-90, Maxim

3  Crude Oil, LLC v. Noil Corp., Inc., et al.  May I have

4  appearances by counsel.

5           THE COURT:  For plaintiff.

6           MR. ORTIZ:  Yes, Your Honor.  Antonio Ortiz here for

7  the plaintiff, Maxim Crude Oil, LLC.  As the Court is very

8  aware, we are here on our motion seeking injunctive relief from

9  the Court.

10           THE COURT:  Yes.  Let's go ahead and get the

11  announcements first, and then you can proceed.

12           MR. ORTIZ:  Sure.

13           THE COURT:  And for the defense.

14           MR. NAVARRE:  Thank you, Your Honor.  Michael

15  Navarre, Your Honor, for the defendants, Noil Corp., and Steve

16  Neely.

17           THE COURT:  And Mr. Jensen, who are you representing?

18           MR. ORTIZ:  That's my client, Your Honor.

19           THE COURT:  Okay.  And what is your position there?

20           MR. ORTIZ:  My position is attendance in the hearing.

21           THE COURT:  No, no.  Mr. Jensen.

22           MR. ORTIZ:  Mr. Jensen is my client.

23           THE COURT:  Oh, very good.

24           MR. JENSEN:  I'm sorry, Your Honor.  I missed that

25  mute button.  I'm sorry.  I'm president of Maxim Crude Oil and

1    manager/owner.

2           THE COURT:  Very good.  Thank you.

3           Okay, Mr. Ortiz, you may proceed.

4           MR. ORTIZ:  Thank you, Your Honor.

5           As I know that Your Honor has read through all the

6    briefing that has been submitted by the plaintiff and the

7    defendants, you know, we're here seeking an injunction that

8    deals directly with $600,000 in funds that my client sent over

9    to the defendants; that much is undisputed.  They don't dispute

10   that they received those funds.

11          There is a dispute, I understand, as to whether or

12   not these funds were escrow funds and whether or not there was

13   an agreement that they would be treated as escrow funds

14   segregated in an escrow account with all of the related legal

15   obligations that come with that.  But the fact that the funds

16   were sent is absolutely not in dispute.

17          And so, what we're trying to accomplish here is

18   safeguard those funds, is seeking an injunction that deals

19   directly with those funds.

20          And on that note, I would like as just a preliminary

21   issue, perhaps ask the Court that we establish, you know,

22   whether -- and I'm sorry, let me back up.

23          The defendants' response and the defendants'

24   briefings filed with this Court were my client's biggest fear,

25   and that's the fact that no escrow -- now they're taking the

1    position that no escrow agreement existed, no escrow account

2    exists, and I don't know exactly what that means.  I don't know

3    if that means their position is there's just no legal

4    contractual obligations to maintain the escrow account or if

5    they're saying that there's no account that has these funds at

6    all.

7            And, you know, when there is a legal obligation to

8    have an escrow agreement in place, you know, I think that's, I

9    think, an issue that is for trial on the merits, but that has

10   nothing to do with my injunction pleadings.  No matter what

11   they call the account, you know, I think we'd like to know

12   whether there's an account out there that has my client's money

13   or that can be traced back to the $600,000 my client sent that

14   is in the defendants' position or control, and I think that

15   they need to tell this Court whether there's a bank account out

16   there that they control that holds that money.

17           And if they say no, that means they've spent the

18   money and that the relief that the plaintiff is seeking here,

19   it might just be moot and a waste of this Court's, you know,

20   resources and the attorneys' time and clients' money, and I

21   think that's a threshold issue is to what we're trying to

22   accomplish here.

23           Of course, I'm ready to proceed with my arguments on

24   the merits of the injunction and the elements and why it's

25   necessary here.  But I'd like to know, I guess, that, you know,

1    we're here -- we're trying to accomplish something that can be

2    accomplished.

3              THE COURT:  Mr. Ortiz, prior to filing this suit or

4    since the filing of the suit, have you attempted to reach an

5    agreement concerning the $600,000 being put in the registry of

6    the court or being put in a fund pending the outcome of the

7    litigation?

8              MR. ORTIZ:  I have, Your Honor.  I have asked that

9    the funds be deposited in the registry of the court.  I'm not

10   sure if I had that conversation with current defense counsel,

11   but I had that conversation with prior counsel.

12             I did ask current defense counsel whether he has

13   confirmed that the funds do exist, you know, whether they are

14   in an account.  He was not willing to disclose because he

15   believed that to be attorney-client privilege communications

16   and I sort of stopped there.

17             But I have tried to discover the answer to that

18   question, and I have been unsuccessful.

19             THE COURT:  So before we get started, Mr. Navarre --

20   and is it Navarre or Navarre?

21             MR. NAVARRE:  It can go both ways, Your Honor.  It's

22   generally speaking the "e" is silent though.

23             THE COURT:  Okay.

24             MR. ORTIZ:  That's why I didn't say it.

25             THE COURT:  So there was an injunction from the state

1   court, which I'm sure --

2           MR. NAVARRE:  That's correct.

3           THE COURT:  -- your client complied with, and then it

4   was extended by this Court pending this hearing.  What has your

5   client done to comply with that order?

6           MR. NAVARRE:  Yes, Your Honor.  My understanding,

7   Your Honor, is that prior to the TRO being entered into by the

8   state court, some of those funds, my understanding is more than

9   half of those funds, were already disbursed I guess or what

10  have you.  When the TRO was entered by the state court,

11  Illinois counsel, who I think Mr. Ortiz was referencing as

12  prior counsel, instructed the client not to move any additional

13  funds that were remaining of that $600,000.

14          When I became involved in the case even before the

15  hearing, I made the same thing.  The client has confirmed to me

16  the understanding that there has been no movement, any

17  additional movement of any of those $600,000 in funds.

18          But to answer the Court's question, some of those

19  funds were previously moved before the TRO.

20          THE COURT:  So concerning the funds that are

21  remaining, let's say roughly $300,000.

22          MR. NAVARRE:  I think it's -- just so I don't mislead

23  the Court, I believe it's about $160,000, Your Honor, that

24  remains.

25          THE COURT:  So with the remaining funds that are

1    there, is there any -- is there a problem with agreeing to that

2    amount remaining in status quo pending the litigation?

3              MR. NAVARRE:  I have not discussed that with my

4    client, Your Honor.  My only discussions with opposing counsel

5    had nothing to do with putting money in the registry of the

6    court; they had to do with a settlement to pay the $600,000.

7    So that's about all I can say, I think, Your Honor.

8              I do think if we go to the argument, Your Honor, I

9    think will go to show that an injunction should not occur in

10   this case.

11             THE COURT:  Okay.  Well --

12             MR. NAVARRE:  As a matter of fact, appreciate the

13   Court -- I understand the Court's question.

14             THE COURT:  Yes.  And so, that by agreement is wholly

15   separate and apart from the injunction.

16             MR. NAVARRE:  Yes, sir.

17             THE COURT:  And I was just wondering if that had been

18   approached.  But there's your answer, Mr. Ortiz.  There is

19   still some funds that are pending that would be subject to the

20   injunction if all of the elements are met for a preliminary

21   injunction; it's just not the entire amount.

22             So with that, let me let you know, Mr. Ortiz, the

23   issue that's causing the Court the most concern is the

24   likelihood of irreparable harm and why damages would not be a

25   suitable legal remedy for your client.  Obviously, we've got

1  breach of contact claims going both ways.

2        My understanding is that the amount at issue in the

3  first contract or in the contract was something north of 2

4  million, something like $2.4 million, of which 2 million was

5  paid, 1.6 returned -- or 1.4 returned with 600,000 being what

6  we're discussing today.  So I'm not sure if the additional

7  $400,000 is still something the defendants would seek to

8  recover as far as damages, or if the damages are just the sole

9  amount here.

10        But we've got these breach claims that are going both

11  ways.  And at the end of the day, even if the $600,000 was

12  there, it seems to the Court that there would be an adequate

13  remedy at law and whatever is owed to Maxim would be able to be

14  recovered pursuant to monetary damages.

15        So if you could put the Court's mind at ease about

16  that, that is what's causing me the most concern with entering

17  a preliminary injunction.

18        MR. ORTIZ:  Your Honor, well, with respect to what

19  they claim to be a breach, I'll establish here -- and I've got

20  a PowerPoint that I'd want to walk you through -- the agreement

21  for the escrow and, you know, the evidence, all of which is in

22  writing.

23        I've never had a case that has so much in writing

24  that deals with fraud because usually that's a lot harder to

25  prove.  I like to say fraud is rarely committed in the light of

1    day, but I believe here, you'll find the opposite to be true.

2         THE COURT:  Well, Mr. Ortiz, just concerning breach

3    just so you know, the Court is likely to find that you have a

4    likelihood of success.  I'm just going to assume that.  It's

5    this last part that's causing me concern.

6         MR. ORTIZ:  Sure.  Well, I guess to get into that

7    issue, I'd have to get into the history of the defendants, and

8    that's Mr. Neely himself and this Noil Corp., Inc.  And that,

9    for me to do that, I'd have to tell you first about Noil

10   Petroleum, Inc, and that was a previous entity owned by Mr.

11   Neely that -- there's a series of litigation that's been filed

12   against Noil Petroleum Corp. that involves a lot of the same

13   sort of allegations that we have here where people have paid

14   for fuel for it to be delivered and no fuel shows up.

15        Noil -- and that has resulted in lawsuits by Marathon

16   Petroleum, Potent Petroleum, L. Energy International, and

17   Genesis Marine, all against Noil Petroleum.  Marathon was

18   awarded a judgment in excess of a million dollars, and I think

19   at least a couple of others were awarded judgments in excess of

20   $7 million.  It's my understanding that none of them have ever

21   collected a dollar on those judgments.

22        Now, Noil Petroleum Corp. was involuntarily dissolved

23   in September 2020, where Mr. Neely just started doing business

24   under Noil Corp.  It's the identical website.  It's all the

25   identical business activities.  It's just a new shell entity

1   conducting the same short of shame operations.  Mr. Neely

2   himself has filed bankruptcy five times in two different

3   states, with the most recent bankruptcy being in Illinois.  I

4   believe the case was closed in November of 2019.  So we have

5   defendants here who have a history of misappropriating funds,

6   of converting funds.

7          L. Energy International in their lawsuit alleged that

8   Mr. Neely was running a Ponzi scheme through Noil Petroleum

9   Corp.  And so what has he done?  He's just shut down Noil

10  Petroleum Corp. and started doing business under Noil Corp.

11  with the identical website that it's obvious in certain

12  portions he just deletes the actual word Petroleum in the name

13  of the entity.

14         The video that he uses on his website, it's the same

15  video he used for Noil Petroleum Corp. where he advertises, you

16  know, he markets himself to, well, the entire country, claims

17  to be one of the nation's leading fuel provider.  Actually

18  claims to be fueling the nation -- that is their tag line --

19  and claims to have defense contracts, all of which there's no

20  evidence to be true.

21         There's just substantial evidence there that he's

22  mishandled/misappropriated funds, and the funds at issue here,

23  you just heard Mr. Navarre say that he's already spent some of

24  the money.  So the only reason that there's -- whether there's

25  160 or 120, the only reason there's $160,000 left is because he

1  was told by his lawyers not to spend it when we have an

2  agreement in place that will show that there was -- it could

3  not have been more crystal clear that the agreement was that he

4  was not -- that the funds were not to be removed from the

5  account until plaintiff had received its product.  Plaintiff

6  never received its product.

7          THE COURT:  Was that in the -- Mr. Ortiz, was that

8  memorialized in the written contract?

9          MR. ORTIZ:  It was -- yes, it's memorialized in the

10  invoice sent with the contract, and the invoice says, "To be

11  held in the trade account, not to be disbursed until product

12  has been confirmed as lifted."  And then there's a message, an

13  email, where they say that their trade account, which is

14  referenced on the invoice, actually means their escrow account.

15  And I could show you that right now if you'd like me to

16  screenshot it.

17          THE COURT:  I've reviewed that, so please proceed.

18          MR. ORTIZ:  Okay.  So there, I mean, that's as

19  explicit as you could possibly be.  But also, the agreement

20  itself, you know, the actual, you know, approved products

21  agreement says that the payment terms -- well, it says, "Jobber

22  shall, except at Noil's option, pay Noil cash before delivery

23  or pickup."  However, there's a section that says, "Change of

24  payment terms," and it says, "Terms of payment are subject to

25  change based on agreement written with jobber."

```
 1              Well, I will show you at least 12 different written
 2    correspondence where they acknowledge the agreement that there
 3    would be an escrow structure.  They refer to the funds as
 4    escrow funds.  They refer to the account as an escrow account.
 5    They ask about the status of the remaining escrow funds.  I
 6    mean, you know -- I have it in one slide up -- and these
 7    representations were made before the contract was entered into,
 8    the day the contract was entered into, after the contract was
 9    entered into.
10              And even after I got involved, Mr. Neely was telling
11    my client that his lawyer would send a screenshot of the escrow
12    account that shows all of the funds are there in place and have
13    not been touched.
14              So there was an agreement to have those funds be
15    treated as escrow funds, be placed in an escrow account, and to
16    not be touched until the product has been confirmed by
17    plaintiff as being lifted.  No product was ever delivered.
18              Also, the price that they used for the product is
19    dated March 15th.  Well, as of April 15th, their lawyer
20    confirmed that they still hadn't secured any product, but the
21    price is supposed to be that price and, in fact, at the time of
22    delivery.  So there's no way they could even come up with the
23    price on March 15th for a product that they still hadn't had
24    access to a month later.
25              THE COURT:  And when did they have access to the
```

```
 1   product that supposedly you declined, or your client declined?
 2            MR. ORTIZ:  They claim my client declined the
 3   product, but it was after they were unable to supply it for two
 4   or three weeks.  And my client had told them that he had
 5   purchasers that -- timely preparing this product was very
 6   necessary and they said that the product was there so that my
 7   client would wire the funds.
 8            And then it became excuse after excuse as to why they
 9   couldn't get codes necessary to lift the product at the
10   terminal and then my client would demand to be paid back.  My
11   client even offered to provide a letter of credit from JPMorgan
12   Chase Bank if they would return the $2 million; that way, he
13   knew at least his money was being safeguarded during this time
14   they were trying to secure the product.
15            All the excuses that they came up for over a month is
16   what led my client -- my client eventually found an alternate
17   source for this because he had -- you know, they had $2 million
18   of his operating capital tied up for a month, which is huge,
19   you know, for my client and he's not a huge company.  Two
20   million dollars is a massive amount of money for him; of
21   course, it's even more than enough money when I consider it.
22            But that left him without operating capital.  He was
23   having to actually get -- factor some of his invoices at
24   extremely high interest rates and he had no choice.  They never
25   received confirmation that they actually have the product ever.
```

1          THE COURT:  Okay.  So the Circuit tells me that I can

2     only find irreparable harm where there's no adequate remedy at

3     law, such as monetary damages.  So explain to me why monetary

4     damages wouldn't solve all of those issues if you were to

5     prevail on the merits.

6          MR. ORTIZ:  Well, Your Honor, there's case law that

7     says there's title to the property of the funds are in dispute,

8     the proper remedy is to place those funds in the registry of

9     the court.  Also, there is other case law that says that the

10    likelihood that -- I'm sorry -- the unlikelihood or the

11    speculative nature in which you'd be able to collect monetary

12    damages from a defendant is also a factor that we can consider

13    in granting injunctive relief.

14          And here, we have a defendant that -- if no

15    injunctive relief is granted and they are no longer under the

16    TRO that's currently in place, those funds will be gone.  Mr.

17    Neely will file bankruptcy again.  There's simply -- I have no

18    confidence at all, and I think the evidence proves, his history

19    proves that there'd (indiscernible) ever be recovered.

20          THE COURT:  So the evidence that the Court's going to

21    find on if the Court were to find in your favor is the Law 360

22    article that you introduced, the memorandum and order from

23    Northern District of Ohio, as well as the bankruptcies,

24    correct?

25          MR. ORTIZ:  Yes.  I would like to offer, you know,

1    the lawsuits or I guess the order of judgment for Marathon

2    Petroleum and also, the dissolution of Noil Petroleum Corp. and

3    the fact that Noil Corp. was then created a year after the

4    Marathon litigation was instituted.

5              THE COURT:  Okay.  Mr. Navarre.

6              MR. NAVARRE:  Thank you, Your Honor.  Let's start

7    with that if you don't mind.  Yes, there's a Law 360 article

8    about a recently filed L. Energy case in Harris County.

9    There's no judgment in that case, Your Honor.  There's been no

10   discovery in that case; nothing has occurred in that case.

11             Counsel previously talked about civil judgments

12   against Noil Petroleum Corp.  No judgment in that case.  And in

13   that case, as Mr. Neely is quoted in the article, he explains

14   that what happened was the person went behind his back to get

15   the customer, then that customer didn't pay, so that doesn't

16   prove anything.  It doesn't prove failure to pay, et cetera.

17             The Marathon case, Your Honor, went up on appeal.  I

18   believe it just came back on appeal, and it's now in the

19   proceedings as far as judgment.  That case is not like this

20   case at all.  In that case, the disputes, and the Court will

21   see from looking at the opinion, the dispute was who -- was

22   where the destination was going to be as far as the slurry in

23   the case.  It has nothing to do with the allegations that are

24   being made in this case whatsoever.

25             Counsel mentioned two other cases that he says

1    there's judgments on.  It's not in the record, Your Honor.  I'm

2    not aware of those.  Had those been brought up in the briefing,

3    I would have been more than happy to respond to it, but that's

4    obviously no evidence.

5          Now, as far as Noil Corp. versus Noil Petroleum

6    Corp., we cited in our response, Your Honor, the case of the --

7    I guess it turned out to be Russian fraudsters who were using

8    the name Noil for a tax evasion scheme.  And what we submitted

9    to the Court, Your Honor, was from Lexis, the recent opinion

10   convicting those people of fraud.

11         The Court will notice that Mr. Neely and Noil Corp.

12   and Miss Jennifer Watson, who is the person dealing mostly with

13   Maxim, none of them were there.  That's why the name -- that's

14   why we now are Noil Corp. is because of that fraud and the

15   repercussions of that.  Had nothing to do with Mr. Neely, Mr.

16   Neely was not a defendant, et cetera.

17         As far as Mr. Neely's personal bankruptcies, those

18   were discharged, et cetera, and they don't show anything.  And

19   frankly, Your Honor, to show that there's no adequate remedy at

20   law with respect to Mr. Neely, they have to get past the -- you

21   know, being successful on the case, the likelihood of success.

22   And with respect to Mr. Neely, there's just nothing there;

23   there's not even factual allegations in the petition.

24         And as the Court is aware, we did file the motion to

25   dismiss, as we had promised to do so, on the basis of

```
 1     jurisdiction, so before we can even get to the --

 2              THE COURT:  When was that filed, Mr. Navarre?

 3              MR. NAVARRE:  I'm sorry, Your Honor.

 4              THE COURT:  When was that filed?

 5              MR. NAVARRE:  Oh, shoot.  I believe that was filed

 6     maybe --

 7              MR. ORTIZ:  A week ago.

 8              MR. NAVARRE:  Yeah, a week ago.  It was filed a day

 9     early actually, Your Honor, which meant I got to sleep that

10     night, along with our -- then we also filed an Answer in the

11     case obviously.  So that puts Mr. Neely aside.

12              With respect to Noil Corp., if the claim is because

13     the corporation is closed down, that means that there's no

14     adequate remedy of law because the prior corporation was closed

15     down.  Well, Your Honor, that's frankly why we cited the case

16     where Mr. Jensen was personally sued, along with two of the

17     companies that look like they're no longer doing business with

18     Mr. Jensen, and the claims about stolen gas by Mexican cartels

19     being resold by Mr. Jensen and many other companies.  And those

20     two companies, Big Star Gathering and St. James, I think, at

21     least based upon searching through the records, those companies

22     have been closed down.

23              So that kind of swings both ways, if you will, Your

24     Honor, where frankly, no evidence as far as no adequate remedy

25     of law.  We cited in our briefing the court cases that
```

1    establish that monetary damages is adequate as a matter of law.

2    The exception that counsel is trying to argue is not supported

3    by the evidence here.

4          But, Your Honor, I would like to address the question

5    of the success on the merits, the likelihood of success, which

6    they bear the burden of with this extraordinary remedy.  And in

7    this case, Your Honor, it is undisputed, undisputed that Maxim

8    breached the contract.

9          The invoice that counsel referred to had a payment

10   due date of March 16th in the amount of $2.8 million.  Even the

11   evidence offered by Maxim shows that they didn't pay anything

12   before that due date; they paid $2 million on March 22nd and

13   March 26th combined.  They've never paid the full amount, Your

14   Honor.

15         We have an email that we attach as Exhibit 4 of Mr.

16   Jensen on March 18th, so this is two days after the deadline

17   for payment that was required by the contract and by the

18   invoice, both of which Mr. Jensen signed on behalf of his

19   company, Maxim.

20         In that email, he said that, "I've had to move some

21   additional funds out of money market type of account, which has

22   taken a few days longer than I anticipated transfer over."

23   That was his excuse for not having to pay the full amount yet.

24   He then stated, "I think we should have everything straightened

25   out by tomorrow."  Tomorrow would have been March 19th.  Money

1   market funds, Your Honor, can be moved rather quickly.  But

2   more importantly, contrary to his promise to have everything

3   straightened by tomorrow, the $2.8 million was never paid.

4          And we cited black letter case law, a longstanding

5   Texas case law, that you cannot enforce a provision of a

6   contract when you have breached that same contract.  You can't

7   pick one provision and enforce it while breaching the other

8   provisions.

9          And really, Your Honor, what they're seeking here is

10  specific performance of a contract that they breached of a term

11  that does not exist.  I will assure the Court I have looked

12  through the crude services agreement several times, both with

13  my eyes and also using (indiscernible) pdf, the find function,

14  to see if the word escrow was in there.  The word escrow is

15  nowhere in there.

16         Yes, there are communications between Miss Watson,

17  who -- and they submitted an affidavit from her.  She's not a

18  lawyer, she didn't go to law school.  She did use the word

19  escrow before the contract, Your Honor, and even after the

20  contract, Your Honor, but there's no escrow agreement.

21         In an escrow agreement, you have a third party that

22  holds the escrow, you have a purpose for the escrow that's set

23  forth, you have conditions as far as how the money is going to

24  be held and by who.  You also have conditions as far as how the

25  money is going to be disbursed when the escrow agreement

1  terminates or on other conditions.  That does not exist, Your

2  Honor.

3          And importantly, in this case, the contract itself,

4  Your Honor, states, and this is in Section 21 in its inter-

5  briefing.  Contract states that the crude products agreement,

6  "Terminates and supersedes any prior agreements between Maxim

7  and Noil."  This is the agreement, that's it, no more.

8          And, Your Honor, counsel tried to say, well, we've

9  got emails showing an agreement that could be an escrow

10  agreement.  That doesn't do the trick, Your Honor, because in

11  the contract itself, as you'll see in most contracts between

12  sophisticated parties like these parties, the contract again in

13  Section 20 states that any modification or waiver to contract

14  must be, "in writing and signed by Noil Corp., Inc."

15          There is no modification of the contract, there is no

16  waiver of any of the terms of the contract that was signed by

17  and agreed to by Noil.  The only other contract or agreement is

18  the invoice, Your Honor, and that just takes away the whole

19  breach of contract claim that they have because there's no

20  escrow.

21          But even more importantly, Your Honor, because I

22  heard counsel referencing more the fraud, Your Honor, they did

23  not even set forth in their briefing the elements of fraud and

24  trying to prove that they can prove the elements of fraud.  One

25  of the elements of fraud, as the Court is aware, is reliance.

1    But it's not just reliance, Your Honor, it is justifiable

2    reliance, justifiable reliance.  And the Texas Supreme Court

3    consistently, especially in the last couple of years, has

4    stated that as a matter of law, justifiable reliance is negated

5    by the terms of a written contract.

6              And, Your Honor, I'd like to cite a couple of cases

7    for the Court on that proposition.  Number one is the Barrow-

8    Shaver case, it is at 590 S.W. 3d 471; it's a Texas Supreme

9    Court case in 2019.  In that case, Your Honor, the contractual

10   provision stated -- and I apologize if I was talking too

11   quickly for the court reporter -- "The rights provided to

12   Barrow-Shaver under this letter agreement may not be assigned,

13   subleased, or otherwise transferred in whole or in part without

14   the express written consent of Carrizo."  That was the

15   contractual provision, Your Honor.

16             Well, there was evidence, undisputed evidence that in

17   the negotiations, representations were made that the assignment

18   wouldn't be a problem, "It won't be a problem," "Don't worry

19   about it.  We will work with you.  We will promise you the

20   consent and it won't be a problem."  So all of those statements

21   remain, okay, before the contract as representations, and those

22   were deemed to be alleged misrepresentations.

23             But the Court said written agreements, as well as

24   oral agreements, serve a purpose under the law; they provide

25   binding terms for the parties.  "In this case, we recognize

1    that Laufer's oral representations and the consent to sign

2    provision also do not involve precisely the same language."  In

3    other words, it doesn't have to be in the contract, you know,

4    the light is red, and then the representation is the light is

5    green.

6            If it's on the same subject matter and it conflicts,

7    the written contract governs, and you cannot justifiably rely

8    on representations that are contrary to what you agreed to in

9    writing and that were signed and executed by Maxim by Mr.

10   Jensen.  The Court held that Barrow-Shaver could not

11   justifiably rely on statements that purported to change the

12   parties' written agreement.

13           And, in fact, Your Honor, that is in line with the

14   other Texas Supreme Court authority, I would cite, to JPMorgan

15   Chase Bank case versus Orca, and that's at 546 S.W. 3d 648,

16   another Texas Supreme Court case in 2018.

17           And in that case, the Court states, relying -- I

18   think quoting to another case, "As Texas Courts have repeatedly

19   held, a party to a written contract cannot justifiably rely on

20   oral misrepresentations regarding the contract's unambiguous

21   terms."  The Court went on to express the public policy in

22   Texas with respect to freedom of contract and to have value put

23   into written contracts.  "It is to provide greater certainty

24   regarding what the terms of the transactions are and that those

25   terms would be binding, thereby lessening the potential for

1    error, misfortune, and dispute."

2          So, Your Honor, with respect to the substantial

3    likelihood of success, they don't have a substantial likelihood

4    of success.  They cannot enforce a contract: number one, that

5    doesn't have the escrow agreement provision that they would

6    like it to have; number two, they cannot enforce it because

7    they breached the contract and, frankly, Your Honor, they

8    breached the contract first.  The contract was breached on

9    March 16th where they didn't pay the full amount.  The contract

10   continues to be in breach because they never did pay the $2.8

11   million.

12         And, Your Honor, if they go to the fraud

13   misrepresentation, they have not provided evidence that they

14   justifiably relied on it, and they can't because under clear

15   and consistent Texas Supreme Court authority, they cannot

16   justifiably rely on alleged oral, or in this case email or

17   text, representations that are contrary to what they

18   subsequently executed, so there's no substantial likelihood of

19   success.

20         And, Your Honor, I can go into the other two

21   requirements for injunctive relief, but frankly, Your Honor, I

22   think those are two barriers that they cannot pass, and I

23   appreciate the Court letting me go back.  And, frankly, Your

24   Honor, I appreciate the Court referencing the Court's initial

25   thoughts on a substantial likelihood of success so that I could

1    address that; that is why we have, you know, hearings.

2              THE COURT:  Exactly, and I wasn't saying that the

3    issue was foreclosed.  I was saying that I wanted to

4    concentrate on one particular one, assuming the other.

5              Let me ask you before I go back to Mr. Ortiz, one of

6    the elements is balance is hardships.

7              MR. NAVARRE:  Yes, Your Honor.

8              THE COURT:  What hardship would it create for your

9    client to have the remaining $160,000 remain as status quo

10   pending the litigation?

11             MR. NAVARRE:  Yeah.  I think it's the same hardship

12   on both companies frankly, Your Honor, and that is just having

13   working capital, which I don't see that as a factor that goes -

14   - or is a requirement that goes either way.

15             THE COURT:  Okay.

16             MR. NAVARRE:  And that is being as candid as I can

17   be.

18             THE COURT:  I understand.  I appreciate that.

19             Mr. Ortiz, response.

20             MR. ORTIZ:  Yes, Your Honor.  Great arguments there,

21   except nothing here contradicts the terms of the agreement.

22             If I may screenshare?

23             THE COURT:  Yes, please.

24             MR. ORTIZ:  It says it's disabled.

25             THE COURT:  Let's see if there's something I can do.

```
1            MR. ORTIZ:  I think if you click on participants,

2   there'll be an option for you to allow me to screenshare.

3            CLERK:  Okay.  He should be able to share.

4            THE COURT:  Okay.  Mr. Ortiz, you want to give it a

5   try?

6            MR. ORTIZ:  Thank you, Your Honor.  Well, as you can

7   see here, the payment terms on the contract say that they're

8   subject to change based on agreement with (sound glitch).  It

9   doesn't mean that it has to be a written, signed agreement.

10  But no matter the case, you will see that before the agreement

11  is even entered into -- I'm sorry, got the wrong slide here.

12  Oh, there we are.  I'm sorry.

13           You'll see that before the agreement is even entered

14  into, Noil, through its representative Jennifer Watson,

15  expressly states, "I can guarantee to have the contract today.

16  It includes the escrow structure."  And above, you'll see that

17  it's crucial to Maxim that it has that escrow arrangement

18  because it wants to save for those funds.

19           So then the agreement itself.  Well, payment terms

20  says shall pay Noil in cash before delivery or pickup.  We did

21  send the funds before delivery or pickup.  Then there's Section

22  6(c), which says, "The terms of payment are subject to change

23  based on agreement written with (indiscernible)."

24           Well, we got no less than a dozen different

25  representations where they acknowledged the agreement is having
```

1    an escrow account.  Not only that, but we have the invoice

2    which is sent with the contract, and it says, "Payment is to be

3    held by Noil Corp., Inc. trade account until the first lift has

4    been confirmed as completed."  Now, no lift was ever made and

5    there was never -- no lift was ever confirmed as completed.  We

6    know that they had $2 million in their possession, and they

7    were never able to produce the product we were trying to

8    purchase.

9         So the money was supposed to be held in that trade

10   account which, you know, normally if you have an escrow

11   agreement when it says something about a trade account and not

12   an escrow account, you know, red flags go off.  But here's how

13   they diffused that with these fraudulent representations where

14   Miss Watson says the escrow listed on the invoice -- oh sorry -

15   - the escrow is listed on the invoice as trade account escrow,

16   not to be released until completed lift, date of first lift."

17        Now, there was no date of first lift because the

18   product was never delivered.  She's clearly -- she's

19   supplementing the contract terms.  She's actually defining what

20   a trade account is by saying trade account actually means an

21   escrow account.

22        And I think it's very important, it might be a subtle

23   point, but it's crucial that the Court is aware that this

24   contract is the defendants' contract that was provided to the

25   plaintiff.  Plaintiff did not have counsel draft their contract

1    or make redline changes or anything.  This is 100 percent a

2    version of defendants' contract that they prepared.

3            Now, even after, you know, this trade account issue,

4    the invoice is sent.  Again, Miss Watson refers to the funds as

5    funds for the escrow trade account, just to keep the ruse

6    going, to continue this fraud where they let the plaintiff

7    believe that his funds are being sent to an escrow account

8    where they will be safeguarded and will not be touched until he

9    received the product.

10            And as to Mr. Navarre's claim that, well, we breached

11    the contract because when we paid 2 million and the invoice

12    had, I think, it was 2.3 something million.  Well, here's the

13    conversations between Miss Watson and the plaintiff where she

14    says we are -- because the wires had to be sent in two separate

15    wires, 1.5 million and then 500,000.  And she says, "We're good

16    to go.  When will the other 500,000 be available?  That is all

17    we need."  And then again, she says, "Once the other 500 comes

18    in over the day or two, then we will be good to lift the full

19    load."

20            So it's clear there she's representing, hey, just

21    give us another 500,000, once you get to 2 million and you're

22    good to go.  Of course, the justifiable reliance on those

23    representations is shown right here in Maxim's wire

24    confirmations of $2 million.

25            Even afterwards, here, April 2nd, well after the

 1    contract was entered into, we have Miss Watson saying: "Your

 2    agreed escrow amount was not received until late last Friday.

 3    That was when the schedule was to be released.  The refinery is

 4    the one who had not performed and caused issues.  But as of

 5    today, Steve -- referring to Neely -- will send you what you

 6    need to lift.  He's waiting on a final call from the scheduling

 7    desk now."

 8            And these excuses just kept on and on and on until my

 9    client said, please give me my money back; I'm very concerned

10    about these funds and said I'll provide a $2 million letter of

11    credit once you give me those $2 million in funds back, because

12    he's very concerned about their whereabouts and what they're

13    doing with those funds.  And the excuses as the time goes on,

14    they just get more and more ludicrous.

15            And they say, oh, we have the product, and he says,

16    okay, great, I'll send trucks over to pick it up.  And they

17    say, well, we kind of have it, we just need some codes, and

18    once we get those codes, we'll have it for real.  And he's

19    saying, well, what do you mean; do you have it, or do you not

20    have it?  And then they say, we should have it by tomorrow.

21            And this continues for two weeks.  Ultimately, he

22    sends his termination letter on, I believe, it's April 6th, and

23    the contract allows that -- says that the jobber can terminate

24    with seven days' notice, which he provided.  We did not hear

25    from their attorney until April 15.  And in that letter, the

```
1   attorney said would you like my client to cease seeking to
2   procure that product, meaning as of April 15, they still had
3   not secured that product.
4           It's my belief that -- it's my client's belief that
5   they never intended to secure that product at all.  This was
6   just -- it was all about getting the funds.  I don't know what
7   they did with them.  I don't know how they spent, you know,
8   $440,000 of it already, but they did.  And they claim to be
9   entitled to lost profits on the sale of product it never had to
10  purchase.  I just can't wrap my head around that and, you know,
11  I hope it's not just me.
12          THE COURT:  When was the contract without the escrow
13  language signed?
14          MR. ORTIZ:  March 16th.  What do you mean without the
15  escrow language?
16          THE COURT:  Well, the contract.  When was the
17  contract signed?
18          MR. ORTIZ:  The crude products agreement was signed
19  March 16th, which is the same date that the invoice was sent
20  that has the trade account language.
21          THE COURT:  Sure.
22          MR. ORTIZ:  It was actually sent in the same email.
23          THE COURT:  So in those texts, the vice president was
24  saying we're going to send you a contract with the escrow
25  language in it; that was never done?
```

1        MR. ORTIZ:  They sent the contract with the invoice

2    that has the trade account language in it, and then she

3    explained that trade account means escrow account.

4        THE COURT:  Okay.  So the contract itself didn't, but

5    the language that you're referencing is in an attachment.  Was

6    it an exhibit to the contract, the invoice?

7        MR. ORTIZ:  Well, so the crude products agreement is

8    sort of a master services agreement that sort of covers the

9    relationship with the parties.  But then the individual

10   purchases of crude that would have the amount, you know, the

11   volume being purchased, the price for that particular volume,

12   and then that's where the trade -- you know, the trade account

13   language is contained.  And you know, an invoice is, under

14   Texas law, considered a contract.

15       THE COURT:  Okay.  Mr. Ortiz, other than what you've

16   submitted to the Court, do you have any other testimony

17   evidence or anything that you wish to present to the Court?

18       MR. ORTIZ:  I have a whole bunch of text messages

19   referencing the escrow funds and referencing their agreement

20   for there to be escrowed, and I'd be happy to take you through

21   that.

22       THE COURT:  But these are all text messages that are

23   included in your briefing, correct?

24       MR. ORTIZ:  The only text messages that were not

25   included in my briefing are the ones that I just showed you

1   where they acknowledge the $2 million is enough, you know,

2   we're not saying you breached any contract by not providing the

3   2.3.  And that's because the issue was raised for the very

4   first time in their briefing I think that we received yesterday

5   or maybe the day before yesterday because it's (sound glitch)

6   that we breached the contract because only 2 million was there

7   (sound glitch).  So that's why I secured those text messages

8   and that was not in my brief.  I had not anticipated that

9   argument.

10          THE COURT:  Okay.  Those will be in the record and

11   the Court will consider those as part of the record as well.

12          Any reply, Mr. Navarre?

13          MR. NAVARRE:  Yes, Your Honor.

14          Let's start with those messages and getting the

15   product (sound glitch) that he doesn't think we ever tried to

16   get the product or ever intended to.  There's no evidence of

17   that, Your Honor.  On the contrary, Miss Watson's affidavit

18   shows the opposite.  The text messages show they were trying to

19   arrange pricing terms, et cetera.

20          They also show that we thought we were going to get

21   the product from the Valero, which is where Maxim had wanted us

22   to get the product from.  And they also show, Your Honor -- Mr.

23   Jensen's shaking his head there -- but we also have an email or

24   a text message in the record -- this is part of what Maxim

25   submitted -- on April 7th and it's at Page 39 of this

1    submission.  It's a text message, and I believe it's from Mr.

2    Jensen where he says, "David has convinced me that we should

3    wait another day based on his conversation with Valero."

4         So remember the agreement was signed about March

5    15th/March 16th.  By April 7th, both parties were trying their

6    best to get product from Valero.

7         The problem, Your Honor, that we experienced and the

8    problem that everybody experienced is that Valero had told us

9    that they had the product for us.  They had made a commitment

10   to us, which we passed on to Maxim.  However, we then found out

11   subsequently that Valero was shutting down that Three Rivers

12   terminal.  And there's a text message frankly from Maxim that's

13   also that there would never be product from that Three Rivers

14   terminal and, therefore, we couldn't get it.

15        But at least on April 7th -- so this is, what, about

16   three weeks after the contract was signed -- David, who I

17   believe is David Hillman is his name, who works at Maxim was

18   having phone calls with Valero where Valero was telling them,

19   hey, we can get product, we can still do it.  So as of April

20   7th, everybody still thought we were going to get product from

21   Valero.  We always intended to do that.

22        And, Your Honor, even after we were starting to be

23   threatened by Maxim, our people have continued to try to get

24   product, and this goes back to the Court's prior question, and

25   was able to obtain offers from other companies for product, but

1    those companies were turned down.  But we also submitted

2    evidence, Your Honor, in the record that at least one company

3    decided not to do business with Maxim based upon their due

4    diligence of Maxim and its history.

5         So we have tried to get product.  We continue to try

6    to get product even after things broke down, even after we were

7    threatened.  This is not a shell company; there's no proof of

8    that.  In fact, Miss Watson's affidavit disproves that.

9         However, Your Honor, I also want to go back to the

10   claim about the $2 million being sufficient.  There was never

11   any amendment to this contract that they'd only have to pay 2

12   million.  It was $2.8 million in the beginning, Your Honor.

13   The text messages that counsel showed don't change that.

14        In fact, we were being pressured by Maxim to start

15   our work prior to getting any of the money, and we did, Your

16   Honor.  We started trying to get product even before the

17   contract was signed.  That's all that were good to go.  We were

18   trying to get the product before we got a dollar in.  We

19   continued to try to get the product when we only had 1.5 in,

20   when we had 2 million in, and even after that point in time,

21   Your Honor.

22        And by the way, when that text message was sent, I

23   believe that was before the text message where Mr. Jensen had

24   promised to us, "I think we should have everything straightened

25   out by tomorrow," as far as the payment of the $2.8 million.

1    So we would also rely on Mr. Jensen and Maxim to comply with

2    their obligations of the contract, which they never did.

3            Well, let me go back to the contract, and I'm going

4    to try to show the Court my screen.  Does that work?

5            THE COURT:  It does.

6            MR. NAVARRE:  Okay, great.  My 13-year-old son will

7    be proud of me for showing me how to do that.

8            This is the contract, Your Honor.  This is Section 21

9    of the contract.  And I've hopefully highlighted two of the

10   sentences in this prior agreement provision, "Subject to the

11   foregoing, effective as of the commencement of the term hereof,

12   this agreement terminates and supersedes any prior agreements

13   between jobber, which is Maxim, and Noil Corp., Inc. and its

14   affiliates relating to the subject matter hereof."

15           And then, Your Honor, the last sentence, "No

16   modification of this agreement and no waiver of any provision

17   hereof shall be binding on Noil Corp., Inc. unless in writing

18   and signed by Noil Corp., Inc."

19           So when counsel said that there was no requirement

20   that things be in writing or be signed by Noil, that's directly

21   contrary to the contract, Your Honor.  The text messages back

22   and forth with Miss Watson talks about an escrow, which she

23   mistakenly thinks escrow is the same as what's in the invoice

24   as far as trade account.  That's not an escrow agreement, Your

25   Honor.

1       There was no escrow agreement in the contract.  The

2   word escrow, as I went through with the Court before, is not in

3   the contract.  It's not in the invoice, Your Honor.  And

4   there's no proof that any of the money was removed from the

5   trade account prior to the breaches and the subsequent downfall

6   in the parties' relationship.  So there's no evidence of a

7   breach as far as the trade account, Your Honor, prior to the

8   breaches made by Maxim.

9       So that goes back to the substantial likelihood.

10  There is no contractual term for escrow agreement; therefore,

11  there can be no breach of contract, Your Honor.  There was no –

12  – there is, in fact, a written contract for what's going to

13  happen to the money and it's not to go into escrow, it's

14  something different; therefore, there could be no justifiable

15  reliance on that, so there can be no justifiable reliance, Your

16  Honor.

17      THE COURT:  What does the contract say is going to

18  happen to the funds?

19      MR. NAVARRE:  It'll be in the trade account, Your

20  Honor.

21      THE COURT:  And the trade account, according to the

22  invoice, says they're going to be held until the product is

23  lifted.

24      MR. NAVARRE:  That's correct, Your Honor, that's

25  correct.  And by the time we got to that point in time, the

1    contract had already been breached.  And there is black letter

2    law in Texas that says that you cannot enforce a contract that

3    you have breached, and there's no doubt that the first breach

4    here was by Maxim.  It's undisputed, Your Honor, that the first

5    breach was by them.

6            And of course, by that point in time, we were far

7    down the line as far as our efforts to try to procure the

8    product with brokers and having to pay and having resources.

9            And on the other part of the likelihood of success on

10   the fraud, Your Honor, the Texas Supreme Court cases are

11   straight on point.  They can't win on that claim.  They

12   certainly can't show the likelihood of success that's required

13   for this extraordinary remedy.  And that's separate and apart,

14   Your Honor, from the issue that the Court first raised as far

15   as adequate remedy of law.

16           So unless the Court has any questions, we would ask

17   that the Court deny the motion for preliminary injunction.

18           MR. ORTIZ:  If I may make a couple of quick points,

19   Your Honor.

20           THE COURT:  Of course.  And, Mr. Ortiz, if you could

21   address which breach was first, as the defendant is saying that

22   it's undisputed that Maxim breached first.

23           MR. ORTIZ:  I have no idea what he's talking about

24   that was a breach.  No one had ever mentioned to my client that

25   there was a breach at all.  My client wired $2 million.

1          If he is saying that there was a breach because only

2     $2 million was wired, I would like to point Mr. Navarre to

3     this.

4          MR. NAVARRE:  Your Honor, I can clarify if the Court

5     would like.

6          MR. ORTIZ:  To this provision.

7          THE COURT:  I'll let Mr. Ortiz --

8          MR. ORTIZ:  Am I screen sharing?

9          THE COURT:  Yes, you are.

10         MR. ORTIZ:  So the prices -- the price terms on the

11    contract say that they were the prices to jobber in effect at

12    the time and place of each delivery for the particular product.

13    So I don't know how the invoice for, you know, 2.8 million or

14    whatever it was, could even dictate the price for a product

15    that they took -- that at least a month went by, and they still

16    hadn't been able to procure it.

17         Also, the money was only wired because they had

18    represented that they have the product.  They represented they

19    had the product.  They said we're ready, we've got it for you

20    at the terminal, send us the money.  That's when my client

21    started working to get those funds wired.  And then once they

22    got wired, he realized that they don't have the product, so

23    it's really misconstruing the facts as they played out.

24         But they said they had the product.  We then, because

25    they had the product, they took the price in effect at the

1    time, I guess, and then they created an invoice and that's how

2    they calculated the dollar figure on that invoice.  Sent us the

3    invoice, which required payment I think on the day that it was

4    sent, which would have been impossible, you know, to send the

5    wire that quick basically at the time it was sent, and we got

6    our funds together as quickly as we could.  We sent them $2

7    million.  They were unable to provide the product for at least

8    a month and we don't know that they'd ever been able to source

9    the product.

10           And again, as to his arguments that we can't -- that

11   the contract requires that in order for it to be -- the terms

12   to be altered, it needs to be in writing and signed by both

13   parties.  Well, nothing about the escrow structure that is

14   discussed at length and agreed to clearly by the parties is

15   contradictory to any of the terms of the contract.  It simply

16   supplements and clarifies certain terms of the contract.

17           I mean, the payment terms on the contract are

18   extremely vague.  For example, it says, "Jobber shall, except

19   at Noil's option, pay Noil cash before delivery or pickup for

20   crude products purchased hereunder."  Well, the jobber, which

21   is my client Maxim, did pay them $2 million in cash before

22   delivery or pickup of the crude.

23           Also, it says, "Change of payment terms.  The terms

24   of payment are subject to change based on agreement written

25   with jobber," where we clearly have extensive agreement written

```
 1    where we talk about the escrow structure.  But the point is
 2    that the escrow structure, the escrow agreement, none of that
 3    contradicts the terms of this contract as it's written.
 4         Also, the invoice, the trade account; that's all
 5    consistent with our escrow agreement and the escrow structure.
 6    So I don't know how he can say that the provision on the
 7    invoice regarding the trade account and the funds not to be
 8    disbursed from there until product is confirmed as delivered,
 9    how that is not contradictory to the crude products agreement.
10         But an escrow agreement or structure would be
11    contradictory to the terms of the agreement because they're
12    essentially the same thing if you respect the provisions as
13    they're worded.
14              THE COURT:  Mr. Ortiz, could I see the invoice again?
15              MR. ORTIZ:  Absolutely.
16              THE COURT:  So it looks like the invoice was for how
17    much, 2.3?
18              MR. ORTIZ:  $2,329,897.50.
19              THE COURT:  And so, the amendment that you -- you're
20    saying the working amendment is the text back and forth that 2
21    million will suffice, as opposed to the 2.3.
22              MR. ORTIZ:  Yes.  The $2 million would allow them to
23    get the product.  In that same text message, they say that,
24    well, you know, I could talk to Steve about just reducing the
25    amount of volume that we give you based upon the $1.5 million
```

1    figure that they had already received.  But if we wait and get

2    the other 500,000, we'll give you all of the volume that this

3    represented in this invoice.

4         THE COURT:  So it's not 2.3 because the price allowed

5    the entire amount for 2 million even, correct, or no?

6         MR. ORTIZ:  I think the agreement was that we will

7    allow you to start lifting the product at the terminal so long

8    as we have the $2 million, because they knew that, at that

9    point, just getting the balance of $329,000 would be quick as

10   soon as he had received that product or had gotten access to to

11   lift the initial volume there that's listed on the invoice.

12        THE COURT:  So there was still additional volume

13   beyond the 2 million that was left under the contract, correct,

14   that was still --

15        MR. ORTIZ:  Well, the contract provides for I think

16   it was 6.5 million gallons a month for up to a year; that's why

17   it was sort of like an MSA or a master services agreement.  The

18   crude products agreement called for -- it may have been 50

19   million gallons in the entire year unless it's terminated by

20   one of the parties prior.

21        THE COURT:  And what amount of volume did the $2

22   million account for?

23        MR. ORTIZ:  Oh, that accounts for 1.5 million

24   gallons.

25        THE COURT:  Okay.  So on that point about first in

 1   time breach, Mr. Navarre, you wanted to respond.

 2           MR. NAVARRE:  Yes, Your Honor, if I can show my

 3   screen if you don't mind.

 4           THE COURT:  Yes, please.  And Mr. Ortiz, you'll have

 5   the last word since it's your motion.

 6           MR. NAVARRE:  So here's the invoice, Your Honor, that

 7   the Court was asking about.  This shows the payment due date, I

 8   highlighted here, is March 16 of 2021.

 9           Contrary to counsel's suggestion or going through

10   that it had to be wired that day because down here, it says

11   double asterisk, "All payments are due by Friday at 11:00 a.m.

12   Central time for the following week," so that would have made

13   it March 19th.

14           On March 19th, they were required to pay -- and it's

15   not $2.3 million, Your Honor -- it's 2.795, so that's why I

16   said $2.8 million.  That's the 20 percent overage that you'll

17   see in the text messages that Mr. Jensen was not aware of, but

18   he agreed is existing in the industry norm, so it's 2.8

19   million.  There it is signed by Mr. Jensen on behalf of Maxim.

20           So that is the amount of the payment that was due on

21   March 19th which, I was checking, is the Friday of the

22   following week.  And even if it's for the Friday of next week

23   of March 26th, they still didn't make the payment, so the

24   breach is either on March 19th or March 26th.  Either way,

25   there's no evidence that any money was moved out of the trade

1    account before that date.  In fact, the evidence is that this

2    amount of money was not in the trade account because it was

3    never paid.

4                Now what counsel is trying to suggest is that a text

5    message where Miss Watson said we are good to go is a complete

6    amendment to the contract and the pricing terms and the value

7    terms.  This is all, as counsel knows, there was never a

8    reduction in the volume, no agreement to reduce the volume

9    because to do so would have been sending the bad message to

10   Valero that this party would not be able to continue to draw

11   the same amount, so the parties agreed not to change the

12   volume.

13               There's no term -- there's no written document

14   changing the volume.  Saying, Your Honor, saying that we are

15   good to go is not a modification of a requirement to pay $2.8

16   million.  You just can't get there in a text message, we are

17   good to go.

18               And as I showed the Court before, the contract in

19   Section 21, which is a subsequent provision to what counsel

20   showed you, says it must be in writing and signed by Noil Corp.

21   There's no amendment to this contract.  If counsel's trying to

22   claim that the invoice is an amendment, well, the invoice shows

23   that it's got to be 2.8 million due March 16th, Friday

24   following.  Never happened, never happened.  That is the first

25   breach, Your Honor, and there is no evidence whatsoever before

 1    the Court that there was any movement of monies out of the

 2    trade account by Maxim on that date.

 3              So in answer to the Court's question, first breach,

 4    no doubt about it, it was done by Maxim.  And Maxim cannot

 5    enforce a contract that they previously breached, especially

 6    when the contract does not even have the provision that they're

 7    trying to enforce.  There is no escrow agreement.  Escrow is

 8    not in the invoice, it's not in the contract, there's no

 9    structure for an escrow agreement, there's no third party like

10    you would have a bank or a trustee or somebody holding the

11    money, there's no conditions.  It's a trade account, Your

12    Honor, that's what it is.  It's not an escrow agreement.

13              And Miss Watson did call it an escrow in several

14    places; that was a mistake by her to call it that.  I can

15    guarantee you she'll never call it that again, but there's no

16    escrow agreement.  And that is contrary to the terms, the

17    express terms of the contract itself and the invoice because it

18    shows what's going to happen to the monies.

19              So counsel's attempt to say that saying it's, you

20    know, creating an escrow agreement out of thin air is simply

21    supplementing or clarifying the contract terms, what counsel is

22    trying to do is get around the parol evidence rule that I'm

23    sure the Court is rather familiar with.  It doesn't supplement

24    or clarify; it changes.

25              If you want an escrow agreement, you know how to do

1    an escrow agreement.  People know how to do escrow agreements.

2    You do them all the time for the sale of houses, for the sale

3    of businesses, for holding funds like this.  That's not the way

4    it was, Your Honor.  And for them to seek a specific

5    performance injunction to create something that didn't exist,

6    it's contrary to Texas law.

7            It's also contrary to Texas law, Your Honor, for the

8    misrepresentation and we had no response to the consistent

9    Texas Supreme Court authority.  There could be no justifiable

10   reliance on an alleged misrepresentation concerning subject

11   matter that's in a written contract, especially a written

12   contract here, Your Honor, where it says this is the only

13   agreement, any prior agreements are terminated and any changes

14   to this agreement must be in writing and signed, and there's

15   nothing else that's been in writing or signed.

16           That's why we have contracts, Your Honor.  We're not

17   talking about, you know, two uneducated non-sophisticated

18   people on a street corner shaking hands and then, you know,

19   signing a post-it note.  We're talking about sophisticated

20   parties.

21           THE COURT:  Mr. Navarre, the breach of contract that

22   you're talking about is represented in the invoice for 2.8

23   million --

24           MR. NAVARRE:  Correct.

25           THE COURT:  -- where only 2 million was paid,

1    correct?

2            MR. NAVARRE:  Correct.  And it wasn't even timely

3    paid, Your Honor.

4            THE COURT:  So that in essence makes it part of the

5    contract, doesn't it, the invoice?

6            MR. NAVARRE:  I agree, Your Honor.  I think the

7    invoice is part of the contract.  And frankly, it's the only

8    place where they can point to where there's agreement as to the

9    trade account.  And as counsel said, this is a master services

10   agreement.  We then have invoices on a continuing basis.

11           THE COURT:  Okay.  Mr. Ortiz.

12           MR. NAVARRE:  I'm sorry, Your Honor.  I just wanted

13   to make sure I responded to the Court's question.

14           THE COURT:  You did and that's very helpful.

15           MR. NAVARRE:  Okay.

16           THE COURT:  Mr. Ortiz.

17           MR. ORTIZ:  Yes, a couple of things.

18           Mr. Navarre, if you would stop sharing your screen,

19   I'd appreciate it.  Thank you.

20           His claim that I have not responded to his arguments

21   about the merger clause or, you know, no subsequent agreements

22   because it wasn't reduced to writing.  Again, the trade

23   account, the terms of the trade account are clear.  He says

24   there's no conditions placed upon the trade account.  Well,

25   there are.  I mean, if you just look at the trade account, the

1   provisions there, it says payment will be held by Noil in the

2   trade account until the first lift has been confirmed as

3   completed.  That is a condition and that's a condition that was

4   violated by the defendants.

5          Not only that, he mentioned the parol evidence rule.

6   Well, there's an exception to the parol evidence rule, and

7   that's when abused by fraud and that's exactly what we have in

8   this case.

9          As to his argument that we waived -- I'm sorry --

10  that we breached the contract first.  Clearly, they waived any

11  possible breach when you have them constantly afterwards say,

12  you know, March 17th, please let me know when the funds for the

13  escrow trade account should be issued.  So they're still trying

14  to get the funds on March 17.  Here, we have the text message

15  where they said they'll be good to go once they have the entire

16  2 million; this is after March 17.

17         The wire was sent -- so the wire was sent on March

18  22nd; that's the $1.5 million wire.  After they have the $1.5

19  million wire, they were saying, hey, send us that other

20  500,000; that way, we can, you know, get you the volume and get

21  you access at the terminal.

22         So clearly as of March 22nd, which is after the date

23  he said that we breached, they are -- they have waived that

24  breach and are still trying to get that other $500,000 from us.

25  But they did not, you know, cry foul and say you breached the

 1    agreement, you know, we want to terminate it, or complained at

 2    all.  No.

 3              To the contrary, they were doing anything they could

 4    to continue to try and get these funds and continue to

 5    reference these funds as escrow funds or your agreed escrow

 6    amount was not received until late last Friday; that was when

 7    the schedule was to be released.  You know, Steve will send you

 8    what you need to lift.  So clearly, to the extent that there

 9    was ever a claim that we breached some agreement, it was waived

10    by them.

11              And contrary to Mr. Navarre's arguments, the

12    provisions on the invoice regarding the trade account do have

13    conditions and those conditions were violated.

14              MR. NAVARRE:  Your Honor, no waiver is required to be

15    in writing and signed also in Section 21.  There's no waiver.

16    We just were trying to -- we were trying to work things out,

17    Your Honor.

18              THE COURT:  All right.  If there's nothing further,

19    the Court has what it needs to rule on the preliminary

20    injunction and will do so by noon on Monday.  The expiration

21    would be close of business Monday, but the Court should have a

22    ruling out by noon Monday.

23              If there's anything that you referenced or you want

24    the Court to make sure we have in the record, Mr. Ortiz, like

25    those texts that you put up on the screen, if you would just

1  supplement and just make sure those are in the record, then the

2  Court will make sure that they are.

3         MR. ORTIZ:  Absolutely.  Thank you, Your Honor.

4         THE COURT:  Okay.  Is there anything further, Mr.

5  Navarre?

6         MR. NAVARRE:  No, Your Honor, just thank you again to

7  you and your staff.

8         THE COURT:  Thank you.  Mr. Ortiz.

9         MR. ORTIZ:  Yes.  Thank you very much for your time

10  and for hearing this on such an emergency basis.

11         THE COURT:  Very good.

12         MR. ORTIZ:  We appreciate it.

13         THE COURT:  Thank you all.  We are in recess.

14         MR. NAVARRE:  Thank you, Your Honor.

15         THE COURT:  Thank you.

16     (Hearing adjourned at 2:14 PM)

17                              *  *  *  *  *

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  October 12, 2021