1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                              HOUSTON DIVISION

4     MAXIM CRUDE OIL, LLC            §    CASE NO. 21-CV-00090
                                      §    CORPUS CHRISTI, TX
5     VERSUS                          §    THURSDAY,
                                      §    SEPTEMBER 23, 2021
6     NOIL CORP., INC. ET AL          §    10:00 AM TO 10:42 AM

7                          PRE-MOTION CONFERENCE

8                  BEFORE THE HONORABLE DAVID S. MORALES
                     UNITED STATES MAGISTRATE JUDGE

9
                               APPEARANCES:
10

11        FOR THE PARTIES:             SEE NEXT PAGE

12        COURT REPORTER:              GENAY ROGAN

13        COURT CLERK:                 ARLENE RODRIGUEZ

14

15

16

17

18

19

20                   TRANSCRIPTION SERVICE BY:

21                   Veritext Legal Solutions
                     330 Old Country Road, Suite 300
22                        Mineola, NY 11501
                  Tel: 800-727-6396 ▼ www.veritext.com
23
            Proceedings recorded by electronic sound recording; transcript
24                  produced by transcription service.

25

```
 1                              APPEARANCES:

 2

 3   FOR THE PLAINTIFF:         JORDAN & ORTIZ, PC
                                Antonio Ortiz
 4                              500 N Shoreline Blvd.
                                Suite 900
 5                              Corpus Christi, TX 78401
                                361-884-5678
 6

 7   FOR THE DEFENDANTS:        BEATTY NAVARRE STRAMA, PC
                                Michael L. Navarre
 8                              901 S. Mopac Expy.
                                Bldg. 1, Ste. 200
 9                              Austin, TX 78746
                                512-879-5050
10

11                                    -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    CORPUS CHRISTI, TEXAS; THURSDAY, SEPTEMBER 23, 2021; 10:00 AM

 2              CLERK:  Good morning, counsel.  The Court call civil

 3    action C21-90, Maxim Crude Oil, LLC, versus Noil Corp., Inc.,

 4    et al.  May I have appearances by counsel?

 5              MR. ORTIZ:  Antonio Ortiz here for the Plaintiff,

 6    Maxim Crude Oil, LLC.

 7              MR. NAVARRE:  Michael Navarre and good morning.

 8              THE COURT:  Good morning, Mr. Navarre.  And who are

 9    you representing?  We had a momentary glitch there.

10              MR. NAVARRE:  I'm sorry.  I'm representing the

11    Defendants, Noil Corp and Steve Neely.

12              THE COURT:  Thank you.

13              MR. NAVARRE:  I apologize, Your Honor.

14              THE COURT:  No worries.  Good morning, counsel.  I

15    know we've got disagreements on both sides.  We'll start with

16    Defendant Noil's motion to compel or -- which was stricken.

17    Have we reached any resolution on any parts of production or

18    interrogatories before this --

19              MR. NAVARRE:  No, Your Honor.

20              THE COURT:  All right.  So what is the status of the

21    production?  I've read through the discovery but my

22    understanding is Maxim is not producing internal communications

23    with third parties concerning agreements and invoices.  Is that

24    correct?

25              MR. NAVARRE:  That is correct, Your Honor.  We
```

1    haven't received any either internal communications at Maxim or

2    third-party communication with anybody on any subject

3    whatsoever, and I can answer the Court's first question as far

4    as the status.

5          The documents we received initially were 82 pages of

6    documents which were various copies of the invoice -- copies of

7    version of the invoice and the contract and some communications

8    between Maxim and Noil that had already been produced.  We

9    subsequently received 68 more pages which were again versions

10   or copies of the contract and additional communications that we

11   already had.  So there hasn't been anything else received since

12   then, Your Honor.

13         THE COURT:  And Mr. Ortiz, is there anything that is

14   being held back?

15         MR. ORTIZ:  No, Your Honor.  There's nothing that's

16   being held back.  The only thing that we are really objecting

17   on is this request for documents that just far exceed the scope

18   of what could possibly be relevant.  We're not holding back any

19   internal communications.  The only internal communications

20   could be between James Jensen and David Hillman, both, you

21   know, the owner of Maxim and sort of his right-hand man, they

22   really communicate over the phone.  He (indiscernible)

23   communications with anybody that we procured naphtha from

24   eventually.  And I guess I retract my earlier statement, Your

25   Honor.  We are objecting based on -- you know, producing any

1    customer lists because that would be proprietary information

2    and trade secrets.  We also don't see why that's relevant at

3    all to the claims.  So we --

4            THE COURT:  You don't see where it's relevant to

5    their claims?

6            MR. ORTIZ:  Correct.

7            THE COURT:  Okay.

8            MR. ORTIZ:  They want our customer lists of the --

9    our customer who we are going to supply naphtha fuel product

10   from that we intended under the original agreement to purchase

11   from the Defendants.

12           THE COURT:  Right.  So my understanding is, they're

13   looking to see whether or not there was actually capacity and

14   whether you're actually working with others to see whether or

15   not you could procure and whether it was or was not available.

16   Is that correct, Mr. Navarre?

17           MR. NAVARRE:  That is, Your Honor.  We're not asking

18   for their customer list.  The only customer we're really asking

19   about is the person who they supposedly were purchasing this

20   product for who is identified -- not specifically -- but

21   identified in their petition.

22           THE COURT:  And who is --

23           MR. NAVARRE:  That's --

24           THE COURT:  And who is that?

25           MR. NAVARRE:  We don't know, Your Honor.  It's just

1    identified as the purchaser.

2            MR. ORTIZ:  Well, it's various purchasers not just

3    one.  But that's why I believe it to be customer lists which,

4    you know, ordinarily are, I guess, produced under, you know,

5    confidentiality agreements or protective order, but I could

6    talk to my client about that.  There's no -- I don't think it's

7    ever been disputed that my client had customers he was

8    attempting to procure naphtha product for.  And so I'm just

9    confused as to how that relates to the claims because we were

10   attempting to procure the naphtha product.  We couldn't procure

11   it from the Defendants.  We eventually did find another

12   supplier for the naphtha product and we have since purchased

13   substantial amounts of naphtha product for those customers.

14           THE COURT:  So on this matter concerning those, it

15   seems to me that if it is proprietary or if there are

16   (indiscernible) you concerned about, it seems that a protective

17   order could resolve that, but the Court does -- based on what

18   I've seen, it does look there is some relevance to it under the

19   claims that Noil is bring.  So the Court would be inclined, if

20   a motion were to compel, would -- I'm not ruling on it, but I'm

21   saying that it does seem that -- it does seem to favor Noil in

22   that regard.

23           So as you're discussing with your client whether or

24   not you want to see if there's some accommodation that can be

25   made to respond to the request for production regarding those

1    documents or information if it's in interrogatories, then I

2    would mention that.  And if you can't come to an agreement,

3    then I would ask Mr. Navarre to file that motion to compel and

4    the Court will rule on it.

5              MR. NAVARRE:  Thank you, Your Honor.

6              MR. ORTIZ:  Thank you, Your Honor.  Understood.

7              THE COURT:  Are those the -- Mr. Navarre, go ahead.

8              MR. NAVARRE:  I'm sorry, Your Honor.  I think it was

9    maybe answering the question you're about to ask so I'd rather

10   just listen to your question and then answer it.

11             THE COURT:  My question is, what remains from the

12   requests that are -- other than what we just discussed -- that

13   are outstanding?

14             MR. NAVARRE:  Yes, Your Honor.  There's a few others.

15   Number one is communications concerning the status of the

16   Valero terminal 10:07, whether the Valero terminal could supply

17   product.  I think we've talked about the efforts to procure the

18   product.  Another one, Your Honor, is, as the Court is aware,

19   Maxim represented to us that they had the funds sufficient to

20   pay the required amount.  As the Court knows, they never did

21   pay the required amount under the invoice, and therefore, we

22   have a misrepresentation claim because we don't think they ever

23   did have the money.  And so we've also asked for financial

24   documents as to their ability to pay as they had promised to do

25   so.

1    We've also asked for any escrow agreements they have

2 because, as the Court is aware, that's an issue in the case.

3 There was no escrow agreement in this case.  What I mean by

4 that, there was no third party.  There was no draft of

5 anything, et cetera, and I think it's going to be important

6 down the line to show that the references that were made by one

7 of our people as to an escrow agreement -- everybody knew what

8 an escrow agreement is and there was nothing ever even close to

9 that or even draft of anything where you would have a third-

10 party escrow agent, et cetera.  So we want to be able to show

11 any escrow agreements they've had.

12    We've also asked for documents respecting to the

13 attorney's fees and costs.  And then there are some

14 interrogatories and a request for production as to their claim

15 damages.  So those are the other topics, Your Honor, in a broad

16 outline.

17    And I'm a little bit hesitant.  I believe Mr. Ortiz

18 said they don't have any internal communications which include

19 text messages, but based upon the production that we made and

20 the documents that they produced to us as far as communication

21 with us, they texted with us -- both people texted with us --

22 on a frequent basis.  So I just want to make sure that we're

23 clear on the record that Mr. Ortiz is representing that there

24 are no internal communications that are a response to any of

25 these requests that are being withheld.

1          THE COURT:  Mr. Ortiz.

2          MR. ORTIZ:  I'd like to make clear on the record but

3    I've requested those that my clients -- searches through all of

4    their text messages and produce anything that's relevant in

5    terms of internal communication regarding this matter to me,

6    and they have said that they have diligently searched and that

7    they have given me everything they have.  And in my possession,

8    I am not withholding any text messages at all, and so I -- if

9    they exist, my client has given to me or my client was not able

10   to find them for some reason.

11         I will press upon my client our need for those once

12   again, but I assure you that I am not (indiscernible) anything

13   at all.

14         THE COURT:  Well, I believe that.

15         MR. NAVARRE:  I didn't --

16         THE COURT:  I do believe that and I know you didn't

17   assert that Mr. Navarre.

18         MR. NAVARRE:  No.  That's far from it.  No way.

19         THE COURT:  And so -- and I do believe that, Mr.

20   Ortiz.  Here's the concern, that certainly with external

21   communications, there were quite a few text messages concerning

22   this matter, and so I think it's reasonable for Mr. Navarre to

23   think, well, possibly there could be internal ones as well.

24   When you're speaking with your clients, I would have you

25   admonish and remind them that it's not necessarily what they

1   believe is relevant.  You can make that call, Mr. Ortiz.  But

2   have them give you what they have, take a look through those,

3   and see if there's anything that's responsive and anything that

4   you want to put together a privilege log if you believe that

5   that's necessary or disclose pursuant to the rules.

6           MR. ORTIZ:  Yes, Your Honor.  As to these requests

7   for the escrow agreement, I have nowhere contended that there

8   is some separate written document that comprises the escrow

9   agreement.  That's not my position in this case.  My position

10  is that the representations and the agreement between the

11  Defendant and my client were -- altered the terms and said that

12  the funds would be treated as escrow funds and they refer to

13  their account as a (indiscernible) escrow account.  So that's

14  where that arises from so I have nothing to produce in that

15  respect, and I'm not withholding any escrow agreement.  I wish

16  I was.  I wish there was an escrow agreement that was put

17  together that I had in this case.

18          THE COURT:  So perhaps supplemental responses to that

19  effect might be helpful, Mr. Navarre, that the assertion is not

20  that there are?  Or are you seeking something beyond this

21  agreement?

22          MR. NAVARRE:  Sure.  I agree with counsel.  There

23  never was an escrow agreement -- a draft or anything else.  But

24  one of the elements for misrepresentation or fraud claim is

25  reliance -- reasonable reliance -- and in this case, these are

1    -- they've been presented to the Court and to us as experienced

2    businessmen and therefore, their prior experience with escrow

3    agreements -- seeing what an escrow agreement actually looks

4    like, having it draft up before the money is sent -- all of

5    that would show that they did not have any reasonable reliance

6    on our person's statement that this money would be in an escrow

7    account.

8            So that's what I'm looking for, Your Honor.  I agree

9    that there is no escrow agreement in this case.  Never was,

10   never will be.  But it goes to the reasonable reliance element

11   of the misrepresentation or fraud claim.

12           THE COURT:  So are you seeking escrow accounts or

13   information regarding escrow accounts other than this -- like

14   prior escrow accounts?  Is that my understanding?

15           MR. NAVARRE:  Close, Your Honor.  I'm not -- I don't

16   what their escrow accounts.  I'm looking for drafts or actually

17   executed escrow agreements entered into by Maxim previously and

18   they can be redacted as far as who they entered in with and the

19   amount of money.  I don't want any of that information.  I just

20   want to be able to show the jury, these guys are sophisticated

21   businessmen.  They know what an escrow agreement looked like.

22   They know that it's executed before the money gets sent so that

23   there's a third party that's holding the money.  They know

24   this, and now they're trying to tell you that (indiscernible)

25   statements prior to the contract being signed that it was going

1    to be held in escrow meant to them that it was an escrow

2    agreement.  So that's what I'm talking about, Your Honor.

3              I don't care about any of the confidential privileged

4    information as far as who they're with or the amount of money

5    or bank.  Just to be able to show that they had them, they knew

6    what they were, and they were a lot different than what was

7    discussed here.

8              THE COURT:  So admissibility at trial is one issue,

9    but relevance and whether they're discoverable is another.  Mr.

10   Ortiz, what is the issue with producing documents such as

11   these?

12             MR. ORTIZ:  I actually don't even know which request

13   for production you're referring to -- regarding a particular

14   escrow agreement or other escrow agreements other than any that

15   were at issue in this dispute.  Also, I think he got -- really

16   kind of went down a rabbit trail and got into questions of law

17   as to what -- how you know -- what constitutes an escrow

18   agreement and how an escrow agreement is formed.

19             I think that everybody knows that an escrow agent

20   does not have to be a third party.  They can be one of the

21   parties in the transaction.  They owe a higher duty as part of

22   that transaction and I think everybody knows that.  Agreements

23   can be made by terms of representations and -- in writing and

24   somebody responding and saying, I agree.  We'll do this.  And

25   they really have an agreement.  It does not have to be a formal

1   written document by a third party -- appoint a third-party

2   agent.

3            Also the invoice at issue said that those funds would

4   be held in the trade account on which then they refer to as an

5   escrow trade account and set until the first (indiscernible)

6   has been confirmed.  So I'm alleging the fact that, you know,

7   there's an agreement (indiscernible) escrow.

8            THE COURT:  And I think we all understand that that

9   is your client's position and that's what the suit is about.  I

10  think they're looking for, okay, when has that been done before

11  where you've relied on such communications to enter into an

12  escrow agreement or whether there are actual escrow agreements

13  in the past that you've relied on that were drafted, revised,

14  executed, proposed, or sent to Maxim and were proposed by Maxim

15  so that they can show, okay, this is the way that Maxim always

16  did business, which I think inures to your favor or if in the

17  past, there were escrow agreements that were properly drafted,

18  revised, executed, and you relied on, and in this case, you did

19  not do that.

20           I think that's his point and he wants to show that to

21  the jury.  Do you -- I presume -- how long has Maxim been in

22  business, Mr. Ortiz?

23           MR. ORTIZ:  I don't know the exact dates -- four or

24  five years at the very least.

25           THE COURT:  So escrow agreements are pretty common

1    and are done all the time, and I think he's essentially asking

2    for prior escrow agreements so he can either show the jury that

3    there were -- that this was an aberration or that this is the

4    actual way that you -- that Maxim did business.

5         I didn't want to put words in your mouth, Mr.

6    Navarre.  That's the -- that's my understanding.

7         MR. NAVARRE:  No.  You said it better than I did,

8    Your Honor.  And in response to Mr. Ortiz's question, it's a

9    request for production number 32 which I think the Court may

10   have been looking at actually when (indiscernible).

11        THE COURT:  So with that one, Mr. Ortiz, as you're

12   visiting with your client, the Court is inclined to believe

13   that is discoverable under the misrepresentation claim that the

14   -- that Noil has alleged.

15        What else, Mr. Navarre?

16        MR. NAVARRE:  It's just a -- as far as the status of

17   the Valero terminal after it's procured the product and whether

18   the supply would exist.  And that all goes under the -- as the

19   Court is aware, under the contract there's a fairly extensive

20   force majeure clause that is at issue.  They're claiming that

21   we never intended to try to get product for them.  We'll show

22   that this was somehow or another a sham deal.  We'll show that

23   we tried our best to do it, and we want to know -- we want to

24   be able to show the communication that they were also receiving

25   from Valero about the status of the Valero terminal and whether

 1   supply could occur.  And that goes into not just the breach

 2   claim but also in (indiscernible) of (indiscernible) judgment

 3   action as to that force majeure claim.

 4           THE COURT:  And what request is that?

 5           MR. NAVARRE:  That is request 7 to 9, 19, 22 to 24

 6   and parts of 6, I believe.

 7           THE COURT:  Mr. Ortiz.

 8           MR. ORTIZ:  I believe we amended our responses to

 9   those interrogatories and we -- my client when he approached

10   Noil told them that they were receiving some naphtha product

11   from Valero on -- sort of sparsely and then Valero informed

12   them that they would not be providing that product at that

13   terminal anymore ever in the future again.

14           That's what our client's (indiscernible) to Noil is

15   to try and obtain the naphtha product.  Naphtha then -- I'm

16   sorry -- Noil then has started contacting Valero attempting to

17   get the naphtha product from them, and we were trying to tell

18   Noil, Valero does not have that product.  They at least told us

19   that they will never providing it at that terminal again.  So I

20   guess I --

21           THE COURT:  How did they tell you that, Mr. Ortiz?

22   In writing?

23           MR. ORTIZ:  Did Valero tell us that in writing?

24           THE COURT:  Yes.

25           MR. ORTIZ:  No.  They told my client at the terminal.

1    There's communications between my client and Noil where my

2    client tells Noil Valero told them that they're not going to be

3    providing that product anymore at that terminal.  And so I

4    don't know what we're supposed --

5              THE COURT:  So it sounds like -- so, for example,

6    what you just communicated, if there are documents -- any

7    documents -- related to that, it seems like that would be

8    relevant to those requests.  But also, specifically, if there

9    are any communications -- status updates and the like -- that

10   came in from Valero either at the time or subsequent to the

11   time that are relevant to those, that are responsive, to those

12   requests, it seems like those would be relevant as well.  So

13   whether or not that's an objection -- were these objected to,

14   Mr. Navarre?

15             MR. NAVARRE:  Yes, Your Honor.

16             THE COURT:  And what was the basis for that?

17             MR. NAVARRE:  Plaintiff objects to the request

18   because it's not relevant to the claim or defense of any party

19   citing the rule.  Plaintiff further objects to this request on

20   the basis it does describe an item or category of items with

21   reasonable particularity.  Request for production must describe

22   with reasonable particularity of each item or category of items

23   to be produced.  A document request is not reasonably

24   particular if it merely asks for documents related to a claim

25   or defense in this litigation and then citing cases.

 1           And that was the response -- that was the objection

 2    to request number 7.  That's also part of the response to

 3    request number 8 with some additional objections.  And then

 4    request number is a little bit different.  The response is,

 5    Plaintiff objects to this request.  It is overly broad, not

 6    limited to time or scope and it will be onerous and burdensome.

 7    Plaintiff objects to this request because it's not relevant to

 8    the claim or defense of any party citing the rule.  And then

 9    again, with the not describing in detail enough.

10           And there was no statement after the response as far

11    as their production of any documents and that's 7, 8, 9.  I

12    could go through the others but I believe they're similar, Your

13    Honor.

14           THE COURT:  No, that's okay.  So it seems to me any

15    documents -- the documents -- the request asking for documents

16    showing that Maxim, like Noil, was informed that Valero could

17    supply the product; documents showing that Maxim also

18    unsuccessfully tried to procure the product from Valero;

19    documents showing that Valero informed Noil and Maxim that the

20    terminal had been shut down; and documents showing that Noil

21    tried to procure the product from Maxim -- for Maxim.  All of

22    those seem to be relevant to the claims of, I guess, fraud.

23           MR. ORTIZ:  But there was no -- sorry.

24           THE COURT:  Go ahead, Mr. Ortiz.

25           MR. ORTIZ:  So there was never an attempt by my

1   client to procure a naphtha product from Valero or continue to

2   communicate regarding naphtha after the date in which it

3   started -- which I will just call March 1st -- after March 1st

4   which is when they started engaging in communications with

5   Noil.  They gave up on Valero because they knew that that was

6   a lost cause and that they would be unsuccessful in procuring

7   the product from Valero.

8          And that's why I -- well, I objected on relevance and

9   asking them to narrow the scope for requests just because it

10  just says, produce all communications concerning the status of

11  the Valero terminal.  Well, that's extremely broad.  It's not

12  narrow in time or scope.  And so I want to know what timeframe

13  are we talking here --

14         THE COURT:  Agreed.

15         MR. ORTIZ:  -- and --

16         THE COURT:  I agree that is broad, but it seems to --

17  in just visiting here today, it seems like they are looking at

18  a narrow timeframe and that's in and around when Noil was

19  trying to procure the product from Valero.  So with that, that

20  narrowed scope does seem to be relevant.  I would ask the

21  parties to get together, talk about that, and see if there are

22  any such documents.

23         If it comes down to that Noil was able -- was told

24  that Valero could supply the product and Maxim was told

25  something else, well, then that's the fact pattern.  What Mr.

```
1   Navarre is trying to find out is whether or not you were told
2   the same thing they were according to what his clients are
3   alleging.  So with that, those -- that set of documents of
4   requests appears to be relevant as well, so I would invite the
5   parties to visit about those prior to any motion to compel
6   being filed.  If no resolution can be come to, please file that
7   motion, Mr. Navarre.
8           MR. NAVARRE:  Sure.  The next topic, Your Honor,
9   would be the topic about whether Noil actually -- whether
10  Maxim, I apologize -- actually had the funds to pay under the
11  invoice.  That goes directly to our misrepresentation claim.
12          THE COURT:  Mr. Ortiz.
13          MR. ORTIZ:  So we wired the Defendants $2 million on
14  -- the invoice that they sent us with the amount had a payment
15  date of March 16th.  They noted -- we did not -- they did not
16  have the funds by March 16th.  On March 17th, they asked us for
17  an update on when we -- they might receive the funds.  We let
18  them know that they were going to receive $1.5 million in the
19  next few days.  March 22nd, they received $1.5 million.  We say
20  that there's another $500,000 coming.  It's going to take a few
21  more days.
22          On March 24th, they are saying, hey, where are we on
23  the remaining $500,000.  They get paid on March 26th.  So I
24  guess I don't know where this -- how it's at all an issue that
25  we didn't have the funds to pay for the product when they got
```

1    all the funds that we had well after the date that the invoice

2    said to pay, and they were still requesting it.  So I just

3    don't see how it's relevant at all.

4              THE COURT:  I think their --

5              MR. ORTIZ:  This case is --

6              THE COURT:  Go ahead.

7              MR. ORTIZ:  -- is (indiscernible) the missing

8    $600,000 funds that they've stolen in converted from my client

9    and refuse to give back.

10             THE COURT:  That is your claim against them and their

11   claim coming back at you is that you had an agreement and

12   represented that you had the funds available to competently

13   fund the agreement had the product been produced.

14             I understand that the product was not produced for

15   any number of reasons, but as far as discovery, you either had

16   the funds that were represented or you didn't.  So it seems

17   that in this case, that would be relevant as well to the

18   misrepresentation case.  I understand the fact scenario.  I

19   understand the fact pattern concerning that the product was not

20   delivered as requested and so the fund -- that you did not pay

21   the entire amount which is -- you know, again, that's part of

22   the facts that we're going to dealing with.

23             But as far as discovery and as far as being able to

24   discover what funds were where, just like you're trying to

25   figure what -- you know, whether they were able to procure --

1  whether they actually were able to get this product, they're

2  entitled for their claims to determine whether or not you had

3  the funds that were represented to them.  So --

4           MR. ORTIZ:  Then I'll request something from my

5  client in that time period showing a bank account balances or

6  something to that effect.

7           THE COURT:  But Mr. Navarre, it is limited to this

8  time period.

9           MR. NAVARRE:  Yes, Your Honor.

10          THE COURT:  And so when you're discussing that, make

11 sure that it is limited because any motion to compel that comes

12 before me would be slashed and burned too so I think that it

13 would be as razor thin as possible.  So it's better for you to

14 discuss and come to an agreement on that timeframe with Mr.

15 Ortiz rather than Court doing it.

16          MR. NAVARRE:  Understood.  And, Your Honor, we

17 previously discussed limiting the timeframes on this topic area

18 and the prior topic area too.

19          THE COURT:  Okay.

20          MR. NAVARRE:  We were not able to come to an

21 agreement but I have a feeling we might be able to now.

22          THE COURT:  Okay.  Does that do it from Noil -- from

23 the Defendant's standpoint?

24          MR. NAVARRE:  Almost, Your Honor.  There's also -- we

25 asked for documents on attorney's fees that they're requesting

 1   and we also asked an interrogatory and a request for production

 2   on damages.  Their interrogatory answer on damages is not

 3   anywhere close to being specific as to what they're asking for.

 4   So those two are the only two topics left, I believe, Your

 5   Honor.

 6          THE COURT:  Mr. Ortiz, on damages, the request was

 7   that Maxim identify and describe all its damages, including

 8   methodology and calculation.  What is the concern about that?

 9          MR. ORTIZ:  So I have listed the categories of

10   damages that we were seeking.  We have not hired an expert.  We

11   have not put together a damage model yet at this point in the

12   case.  I have the categories.  They stem from having a shortage

13   of capital, having to get a high-interest loan, and the

14   increased -- you know, incredibly high interest on costs

15   associated with that, the damages from having to pay for long -

16   - semi-trucks to -- that were hauling petrol to go to the

17   refinery, wait for the product to be picked up only to find out

18   that the product was not going to be available.  And then, of

19   course, the damages stem from the $600,000 from my client's

20   funds that were converted -- we allege were converted by the

21   Defendants and then, just of course, breach of contract and

22   attorney's fees.

23          I  -- typically, in my cases whenever opposing

24   counsel, you know, has a request for attorney's fees, I always

25   offer to enter an agreement where we will each exchange sort of

1   our, you know, redacted invoices, you know, 30 days before

2   trial or something like that.  That way we're not -- have some

3   duties to, you know -- to supplement each additional month with

4   additional attorney's fees, invoice statements, and I am happy

5   to do that in this case.

6        I'm not saying that he's not entitled to it, of

7   course.  I mean, I'm seeking my attorney's fees as part of my

8   damages and he is entitled to that.  The only thing that I was

9   withholding that based upon is our agreement that we can do it

10  at once 30 days before trial and just have a mutual agreement

11  to do so.

12        THE COURT:  It sounds like you haven't come to a

13  mutual agreement.  I think that it would be incumbent on the

14  parties to do that.  He is entitled to both damages, discovery,

15  as well as attorney's fees so again, if you cannot come to an

16  agreement on that, Mr. Navarre, Mr. Ortiz, please file the

17  motion, Mr. Navarre.

18        MR. NAVARRE:  Okay.  And, Your Honor, on the loan

19  document, they didn't even produce the documents showing the

20  loan terms so I could least look at that.  So -- but understand

21  what the Court said.  I just want to make sure the Court's

22  aware.  I got -- I mean, I got that answer.  I got no documents

23  backing up the trucks or anything of that nature.  So --

24  anyhow.  I'll just leave it at that, Your Honor.

25        THE COURT:  I do understand.  Mr. Ortiz, you had

```
 1   objections or you had issues with objections that were made to
 2   requests for productions in interrogatories as boiler plate.
 3   Is that correct?
 4           MR. ORTIZ:  Yes.
 5           THE COURT:  And bad faith objections.
 6           MR. ORTIZ:  Yes, Your Honor.
 7           THE COURT:  Can you point -- you can proceed.
 8           MR. ORTIZ:  Well, nearly every response to every
 9   request with the exception of maybe four or five total -- they
10   all object on the basis that -- sorry -- they all object on the
11   basis that the request seeks the production of documents -- I'm
12   sorry --
13           THE COURT:  Well, while you're looking for that, Mr.
14   Navarre, we all agree that none of us likes boiler plate
15   objections.
16           MR. NAVARRE:  Yes, Your Honor, and we did not do
17   boiler plate objections across the way and I think the Court
18   has already seen that the other side also made similar
19   objections to similar requests.  With Mr. Ortiz's request -- a
20   lot of those requests were asking for the same thing in about
21   eight different ways, and frankly, therefore, I was consistent
22   with what I was saying.
23           A lot of those requests were requests for any
24   documents pertaining to any funds that were transferred from
25   the trade account to any other account, and it was just
```

1    different several iterations of that and -- where there no

2    parameters whatsoever and it would have us -- and the word

3    "you" was defined, Your Honor, not just to include the company

4    but also to include all of its employees and all of its

5    lawyers.

6              So that would have us under a burden of producing --

7    and they wanted the production from I believe it was March 1st

8    until three days before trial.  So we would basically be

9    producing to them every document, every contract, every bank

10   account statement, every check stub for any transfer either out

11   of the trade account or out of any account that money had been

12   sent from that trade account to another account.

13             And as the Court is aware and under fifth circuit

14   authority, money is fungible and once money gets into one

15   account, it gets comingled.  And so they -- so it was just --

16   it was impossible and that's why you see similar objections

17   because the requests were all really going after the same

18   thing.  And I think that's really what his motion to compel is

19   about, is about the redacted bank statements and those

20   requests, you know, for other documents concerning the

21   transfers.

22             THE COURT:  I think --

23             MR. NAVARRE:  But, yes, we did -- I'm sorry, Your

24   Honor.

25             THE COURT:  I think that's part of it, and I think

1   part of is correspondence between Neely and VP Watson.  It

2   seems to be specific --

3              MR. ORTIZ:  Yes.  There was also no internal

4   correspondence produced on his end.

5              THE COURT:  Right.  So what's good for the goose is

6   good for the gander, Mr. Navarre.

7              MR. NAVARRE:  Yes, Your Honor.

8              THE COURT:  And so all of the Court's leanings that

9   we talked about this morning concerning your client apply to

10  Mr. Ortiz's as well.

11             MR. NAVARRE:  Yes.

12             THE COURT:  I think what I'm hearing right now is

13  that significant limiting in time and scope is necessary and

14  that's what your clients -- each of your clients -- pay you a

15  lot of money to talk about and understand, and I think that you

16  can do that same that I asked Mr. Ortiz to do with you.  And if

17  you cannot come to that agreement or an agreement on these

18  matters, Mr. Ortiz, I would ask you to file the motion to

19  compel and the Court will rule on it.

20             MR. NAVARRE:  Your Honor, we did produce a

21  substantial amount of internal communications between Ms.

22  Watson and Mr. Neely.  We also did, Your Honor -- contrary to

23  Mr. Ortiz's motion, we did produce communications of the third

24  parties including Exxon, Valero, and a couple companies whose

25  names don't come to my head.  So we did produce those -- such

1   documents, Your Honor.

2          THE COURT:  I do appreciate that and if a motion to

3   compel were to be filed, certainly that would be in your

4   response.  My hope is to avoid that --

5          MR. NAVARRE:  Understood.

6          THE COURT:  -- and knowing that, we can move forward

7   and produce what, in limited fashion, within scopes that are

8   relevant, can be produced.

9          MR. ORTIZ:  And just to respond to one point about in

10  time.  Each of those requests for the bank statements or the

11  transfers specifically limit the request to the time period of

12  either March -- beginning March 1st up until just before, you

13  know, the trial of the case, just an ongoing duty to

14  supplement, or they asked for a time period to begin from the

15  date that they received -- first received funds from the

16  Plaintiff, from my client.

17         When we confer via telephone call, I agreed that we

18  could just have the timeframe stop from the very date that

19  these discovery responses were (indiscernible).  And I thought

20  we had an agreement.  I thought that I would be getting

21  supplemental discovery and bank statements that were

22  unredacted.  To my disappointment, that was not the case and

23  the motion to compel was filed by Defendants and, you know,

24  there was not supplemental discovery, no --

25         THE COURT:  That's true but today's a new day, Mr.

1  Ortiz and we're all understanding and seeing things a little

2  clearer here on the 23rd of September so I'm optimistic that

3  the two of you can --

4          MR. ORTIZ:  And, you know, to his point about, you

5  know, money is fungible and, you know, it just gets comingled,

6  well, we have an agreement at issue that says that the funds

7  will be held in the trade account until first lift is

8  confirmed.  Well, how do you do that if your position is, well,

9  all money is -- you know, (indiscernible) fungible and, you

10 know, who knows what happens to those funds once

11 (indiscernible).  Well, I mean, this case is about finding

12 those funds.

13         THE COURT:  Sounds like a jury argument.  Sounds

14 pretty good, Mr. Ortiz.

15         MR. NAVARRE:  Well, Your Honor, on that jury

16 argument, it's tough to enforce a contract that you already

17 breached by never the amount that was (indiscernible) and by

18 fraudulently inducing us into that contract.

19         THE COURT:  I think it would be an interesting trial.

20 I do think that the amount of money -- just from a 50,000-foot

21 standpoint, I know it's significant to both sides, but we are

22 eating up attorney fees as we sit here today and given the

23 amount of money, it is, as you are putting your heads together

24 on discovery and getting expert witnesses and working on

25 damages and the like -- it does seem to me that working towards

1  resolution of the matter at all stages of the litigation is

2  worthwhile for both the Defendant and the Plaintiff.

3          MR. NAVARRE:  Understood and agreed, Your Honor.

4          MR. ORTIZ:  I absolutely agree with that which is, I

5  suppose, sort of another reason why we want to see those bank

6  statements and see where our funds went and see if they still

7  exist or if they've just been gambled away in Reno.  That's not

8  to put (indiscernible) Defendant.

9          THE COURT:  Not necessary, Mr. Ortiz.

10          MR. ORTIZ:  Yeah.

11          THE COURT:  Not necessary.

12          MR. ORTIZ:  And I apologize.  That was nothing

13  personal towards the Defendant.  But we are -- we have asserted

14  fraudulent transfer claims and we do want them to state any

15  transfers that were made from Noil to Mr. Neely or any family

16  members or insiders of Mr. Neely.  So that's something that we

17  are specifically requesting other than the bank statements that

18  do deal with the transfer of funds after the date that they

19  received my client's (indiscernible).

20          THE COURT:  Understood.  If an agreement can't be

21  made on most if not all of this, I would expect, if there were

22  motions to compel, that these matters -- that those motions

23  would be significantly narrowed based on what I've heard today

24  so that we would just have specific issues that can't be agreed

25  on in the motions to compel.  And I'm thinking of that --

```
 1            MR. NAVARRE:  Your Honor, one last --

 2            THE COURT:  Yes, Mr. Navarre.

 3            MR. NAVARRE:  I'm sorry.  One last point on that.

 4   They say they want in these discovery requests any fraudulent

 5   transfers.  What's really interesting to me, Your Honor, is

 6   that we filed a motion to dismiss (indiscernible) Mr. Neely

 7   back in May.  They've amended their complaint twice.  Their

 8   amendment, including the fraudulent transfer, occurred on

 9   August 17th of 2021 which is approximately two months after

10   their discovery request (indiscernible).  So what they're

11   telling you is, we sent out discovery requests trying to get

12   fraudulent transfers even though we didn't have a claim alleged

13   in this lawsuit for more than two months.  And I just -- that

14   troubles me, Your Honor, that you would send out discovery

15   fishing for a claim in order to keep Mr. Neely in, which is the

16   stated reason for filing the fraudulent transfer three months

17   after the motion was filed.  That's just troubling to me, Your

18   Honor.

19            MR. ORTIZ:  From the very inception of this case, it

20   has been about finding those funds, and we've alleged

21   conversion of these -- those trust funds or escrow funds by Mr.

22   Neely.  We think that he was taking -- he took those funds and

23   paid himself or paid his insiders, transferred them out in

24   breach of the contract.  You know, this also directly relates

25   to the Plaintiff's breach of contract claim which they're
```

 1   saying the contract at issue -- the invoice they're trying to

 2   enforce -- they're saying we breached it.  Well, that contract

 3   says that they have to keep the funds in the trade account

 4   until it is confirmed that the -- until it is confirmed that

 5   the first product has been lifted.

 6          Well, if they transfer those funds out the day that

 7   they got them, I think that's very relevant to, one, my

 8   conversion claim, and also, two, the breach of contract claim.

 9   And they breached the very invoice that they're trying to

10   enforce.

11          THE COURT:  Understood.  Okay.  Gentlemen, I do need

12   to move on to the next case, but hopefully, this has been

13   helpful for you and your clients to understand the Court's

14   leanings on the potential motions to compel.  I look forward to

15   not hearing from you on these matters.  If I do, I look forward

16   to seeing a much significantly pared down motion from each of

17   you.  But again, I'm optimistic today.

18          MR. NAVARRE:  Your Honor, thank you for your time and

19   thank you for your good humor too.

20          THE COURT:  Very good.  Thank you, Mr. Navarre.

21   Thank you, Mr. Ortiz.  You're both excused.

22          MR. ORTIZ:  Thank you, Your Honor.

23          (Hearing adjourned at 10:42 AM)

24                              * * * * *

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 27, 2021